1  Howard N. Wisnia (SBN 184626)
   James P. Conley (SBN 216639)
2  April M. Wurster (SBN 228038)
   **BAKER & McKENZIE LLP**
3  12544 High Bluff Drive, Third Floor
   San Diego, CA  92130-3051
4  Telephone: +1 858 523 6200
   Facsimile:  +1 858 259 8290
5  howard.n.wisnia@bakernet.com
   james.p.conley@bakernet.com
6  april.m.wurster@bakernet.com

7  Attorneys for Plaintiff
   CONCEPTUS, INC.

8

9                  UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13 CONCEPTUS, INC., a Delaware           **Case No.  C 09-02280 WHA**
   corporation,
                                         **Honorable William H. Alsup**
14
                Plaintiff,               **CONCEPTUS, INC.'S NOTICE OF
15                                       MOTION, MOTION, AND
        v.                               MEMORANDUM OF POINTS AND
16                                       AUTHORITIES FOR A PRELIMINARY
   HOLOGIC, INC., a Delaware corporation, INJUNCTION**
17
                Defendant.               **Date:        August 13, 2009
18                                       Time:         8:00 a.m.**
                                         **Courtroom 9, 19th Floor**
19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

Case No 09-02280 WHA
NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES FOR A PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 3

    A.   Conceptus' Patented Technology ................................................................ 3

    B.   Hologic and the Accused Adiana System .................................................. 4

III.  THE COURT SHOULD ENJOIN HOLOGIC FROM MAKING, USING, SELLING, OFFERING FOR SALE OR IMPORTING THE ADIANA SYSTEM PENDING FINAL JUDGMENT ............................................................................................. 7

    A.   Conceptus is Likely to Succeed on the Merits ........................................... 7

        1.   The Asserted Patents Are Valid ..................................................... 7

        2.   Hologic Infringes the Asserted Patents ......................................... 7

            a.   Hologic Directly Infringes ................................................. 8

            b.   Hologic Indirectly Infringes .............................................. 8

            f.   The Adiana System Infringes Claim 41 of the '904 Patent ............... 14

            g.   The Adiana System Infringes Claim 9 of the '667 Patent ................. 14

            h.   The Adiana System Infringes Claim 10 of the '667 Patent ............... 16

            i.   The Adiana System Infringes Claim 14 of the '667 Patent ............... 16

            j.   The Adiana System Infringes Claim 1 of the '552 Patent ................. 19

    B.   Conceptus Will Suffer Irreparable Harm If An Injunction Is Not Granted ............... 20

        1.   Hologic Will Harm Conceptus' Goodwill and Reputation ........................... 20

        2.   Conceptus Will Lose Market Share ................................................. 21

        3.   Other Would-Be Infringers Will Be Encouraged ......................................... 23

    C.   The Balance of Hardships Clearly Tips in Conceptus' Favor ................................... 23

    D.   An Injunction Will Advance the Public Interest ........................................... 24

IV.   BOND ................................................................................................................... 24

V.    CONCLUSION .................................................................................................... 25

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

i

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*3M Unitek Corp. v. Ormco Co.*,
    96 F. Supp. 2d 1042 (C.D. Cal. 2000) ...................................................11

*Abbott Labs. v. Sandoz, Inc.*,
    544 F.3d 1341 (Fed. Cir. 2008).................................................10, 14

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008).......................................10, 11, 13, 14

*Bio-Technology General Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996)...............................................11, 13

*Boehringer Ingelheim Vetmedica v. Schering-Plough*,
    106 F.Supp.2d 696 (D.N.J. 2000) ...........................................10, 13

*Broadcom v. Qualcomm*,
    543 F.3d 683 (Fed. Cir. 2008)...............................................8

*DSU Medical Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006)..........................................8, 9, 10

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)...........................................................7

*Lab. Corp. of Am. Holdings v. Chiron Corp.*,
    384 F.3d 1326 (Fed. Cir. 2004) .............................................7

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ...............................................8

*MGM Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913, 936 (U.S. 2005) .............................................9

*Moleculon Research Corporation v. CBS*,
    793 F.2d 1261 (Fed. Cir.  1986).............................................8

*Novozymes A/S v. Genecor Intern., Inc.*,
    474 F.Supp.2d 592 (D. Del. 2007) .........................................11

*Oakley, Inc. v. Sunglass Hut Int'l*,
    316 F.3d 1331 (Fed. Cir. 2003).............................................7, 8

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005)............................................7, 8

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Philips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)........................................................................8

4

*Printers Servs. Co. v Bondurant*,
  20 USPQ2d 1626 (C.D. Cal. 1991).................................................................15

5

6

*Purdue Pharma L.P. v. Boeringer Ingelheim Gmbh*,
  237 F.3d 1359 (Fed. Cir. 2001).......................................................................7

7

*Ricoh v. Quanta Computer*,
  550 F.3d 1325 (Fed. Cir. 2008)...................................................................9, 10

8

9

*Sanofi-Synthelabo v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006)..................................................................10, 14

10

*Symantec Corp. v. Computer Assocs. Int'l*,
  522 F.3d 1279 (Fed. Cir. 2008).......................................................................1

11

12

*TiVo Inc. v. EchoStar Comm. Co.*,
  446 F.Supp.2d 664 (E.D. Tex. 2006)..............................................................12

13

*Titan Tire Corp. v. Case New Holland, Inc.*,
  566 F.3d 1372, 2009 U.S. App. LEXIS 11763 (Fed. Cir. June 3, 2009).................7

14

15

*Water Techs. v. Calco, Ltd.*,
  850 F.2d 660 (Fed. Cir. 1998).........................................................................9

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
San Diego

1    **TO DEFENDANT AND ITS ATTORNEY OF RECORD:**  Please take notice that on

2    August 13, 2009 at 8:00 a.m., or as soon thereafter as this matter may be heard in the above-entitled

3    Court, Plaintiff Conceptus, Inc.  ("Conceptus") will and hereby does move for a preliminary

4    injunction against Defendant Hologic, Inc.  ("Hologic").  This motion is based on this notice and the

5    accompanying:  points and authorities, declarations of James Conley, Todd Sloan and Dr. Mark

6    Glasser, exhibits, proposed order, the pleadings and records on file in this action, other matters of

7    which the Court may take judicial notice, and such matters as may be presented at or before the

8    hearing on the motion.

9         Conceptus requests that Hologic be enjoined from making, using, selling, offering for sale, or

10   importing into the Unites States, the Adiana Transcervical Sterilization System ("Adiana System")

11   pending final judgment in this matter based, *inter alia,* on its infringement of any of the following

12   patent claims:  Claims 20, 22, 39 or 41 of U.S. Patent No. 7,428,904; Claims 9, 10 or 14 of U.S.

13   Patent No. 6,709,667; Claim 1 of U.S. Patent No. 7,237,552.

14   **I.    INTRODUCTION**

15        This patent infringement action concerns permanent female birth control technology that

16   provides an alternative to tubal ligation.  Conceptus, a publicly traded Mountain View, California

17   company, was the first to bring to market an incisionless, transcervically-introduced permanent birth

18   control product -- the "*Essure*" system.  Treatment with Conceptus' *Essure* system can be done in a

19   doctor's office without general anesthesia.  In contrast, tubal ligation (colloquially referred to as a

20   woman having her "tubes tied"), involves abdominal incisions and the risks associated with general

21   anesthesia, post-operative pain, longer recovery periods and potential damage to organs.  Compare

22   the tubal ligation Figures 1(a) and 1(b) below with the Essure procedure Figure 2 below.



Fig 1 (a)          Fig  1 (b)

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

 

**FIGURE 2**

In the patented *Essure* system, fallopian tube occlusion results from tissue growth into and around a transcervically implanted device.  *Essure* received U.S. Food and Drug Administration (FDA) approval in 2002 and is Conceptus' only product.

As the only transcervical sterilization player in the market for the past 7 years, Conceptus faced the daunting task of building the market for this product, which required obtaining insurance reimbursement approvals and creating a paradigm shift in how doctors perform sterilizations – moving procedures from the operating room to the office.  Conceptus has spent over 300 million dollars researching, developing, and bringing its product to market.  As a result of these efforts, *Essure* is gaining market acceptance.  The product has been featured on The Today Show, The Doctors Show, MSNBC.com and in Time Magazine and has become an established method of treatment for many healthcare organizations and professionals.  Thousands of women worldwide have already benefited from *Essure*.

Recognizing the market that Conceptus is building, defendant Hologic is now attempting to ride Conceptus' coattails and sell its infringing Adiana Permanent Contraception System (the "Adiana System").  Hologic, a diversified medical products company with over $1.5 billion in sales, has tasked more than 100 of its sales professionals with marketing the Adiana System since its FDA

1   approval on or about July7, 2009.[1]

2          As demonstrated below, Conceptus is likely to succeed in demonstrating that the Adiana

3   System infringes Conceptus' valid patents.  If Hologic's infringement is not enjoined, Conceptus

4   will be irreparably harmed as it is a pioneering, one product company that had its first ever profitable

5   quarter last year after building up the market for the past 7 years.  Conceptus' reputation as an

6   innovator will be damaged and the inferiority of Hologic's product will damage the nascent market

7   (the Adiana System had 12 pregnancies in its clinical trials while Conceptus had none).  In addition,

8   the significant training of doctors and staff that is required to adopt a new procedure will make it

9   difficult to reconvert a lost customer, as they will be hesitant to go through training a second time.

10         The balance of hardships tips strongly in Conceptus' favor as Hologic is a large, diversified

11  company and sales of the Adiana System will account for a very small portion of its projected $1.6

12  billion in sales.  In fact, Hologic has publicly stated, with respect to a previous year long delay in

13  product release due to FDA approval problems, that it did "not believe this delay will have a material

14  adverse impact on our results or operations."  On the other hand, Conceptus is a one-product

15  company and a loss of market share or price erosion at this time could threaten the company's

16  financial welfare and operations.

17         Finally, patients and the public will not be negatively impacted by an injunction as

18  Conceptus has the capacity to meet the market's demand for its more-effective product and the

19  public interest is advanced by upholding Conceptus' patent rights.

20         Conceptus respectfully requests that the Court preliminarily enjoin Hologic from further

21  infringement of its duly issued U.S. Patent Nos. 7,428,904 ("'904 patent"), 6,709,667 ("'667

22  patent") and 7,237,552 ("'552 patent") (collectively the "Asserted Patents").

23  **II.      STATEMENT OF FACTS**

24  **A.      Conceptus' Patented Technology**

25         Conceptus has regularly sought patent protection for its technological advances and has been

26  issued at least 27 U.S. patents to date.  (Declaration of Todd Sloan ("Sloan Decl.") ¶ 6).  This motion

27  ───────────────

28  [1] Hologic's infringing use and sales within the U.S. have thus just likely begun (outside of prior use within clinical trials, which were likely protected by the safe harbor provisions of 35 U.S.C. § 271(e)(1)).

concerns three:  the '904, '667 and '552 patents.  (Declaration of James P. Conley ("Conley Decl.")

Ex. 1-3)[2].  The '904 patent relates generally to a transcervical sterilization system and method

involving the delivery of tissue damaging energy to the fallopian tube in conjunction with the

delivery of a tissue-ingrowth implant.  The following is an exemplary claim:

> '904 Claim 39: A method for sterilizing a female patient, said method comprising: delivering a body transcervically into the female patient; delivering energy to a surrounding tissue of a fallopian tube of said female patient; wherein a scar formation in a region of the surrounding tissue permanently attaches to the body.

The '667 and '552 patents relate generally to Conceptus' novel delivery systems.  These

systems conveniently allow device delivery through single-hand operation and without the danger of

perforating the fallopian tube through, for example, retracting the sheath instead of pushing out the

device and through a distal ball tip.  Exemplary claims are below:

> '667 Claim 9: A contraceptive method comprising: inserting a contraceptive device transcervically into an ostium of a fallopian tube by gripping a handle with a hand and moving the hand, the handle coupled to the contraceptive device by an elongate body; withdrawing a sheath surrounding the elongate body and at least a portion of the contraceptive device by moving the sheath proximally relative to the elongate body to expose the contraceptive device, such movement effected by moving an actuator on the handle with the hand while the hand grips the handle; expanding the contraceptive device by moving the actuator with the hand; and detaching the expanded contraceptive device from the elongate body so that the contraceptive device remains within the ostium to inhibit conception.

> '552 Claim 1: A contraceptive method comprising: guiding a contraceptive device distally into an ostium of a fallopian tube wherein a sheath covers the contraceptive device; avoiding perforation of the fallopian tube and facilitating tubal navigation of the fallopian tube with a distal ball tip of a distal portion of the contraceptive device, the ball tip having a diameter in a range from about 0.020 to about 0.050 inches; uncovering the contraceptive device by withdrawing the sheath from the contraceptive device; and releasing the uncovered contraceptive device so that the contraceptive device inhibits conception permanently.

The Adiana System infringes numerous claims of the five asserted patents. However, this motion

focuses on '904 claims 20, 22, 39 and 41; '667 claims 9, 10 and 14 and '552 claim 1.

**B.      Hologic and the Accused Adiana System**

Hologic acquired the Adiana product through a merger with Cytyc in October 2007, which

resulted in a $10 billion company.  (Ex. 4)  Cytyc had previously acquired Adiana in 2007.  (Ex. 5).

---

[2]  All exhibits mentioned herein are attached to the Conley declaration, unless otherwise noted.

Hologic and its predecessors were made aware of Conceptus' intellectual property.  On February 1 and March 16, 2007, Conceptus informed Adiana and Cytyc, in writing, of certain Conceptus' patent rights.  (Exs. 6 and 7).  Adiana, Cytyc and Hologic never responded to Conceptus' letters and continued with their plans to release the infringing Adiana System.

The Adiana System encountered substantial delays in the FDA approval process after having 12 pregnancies occur in its clinical trials (*Essure* did not have any pregnancies in its trials).  (Ex. 8 at 32, Ex. 12 at 7 and Ex. 9 at 17).  While members of the FDA panel questioned whether the Adiana System should be approved at all, approval did occur on or about July 7, 2009.  (Ex. 10).

The Adiana System is used to transcervically implant a device (a so-called "matrix") into the fallopian tubes.  A "delivery catheter is introduced into the patient … transcervically."  (Ex. 8 at 3). "The distal tip of the catheter delivers RF energy …" within the fallopian tube. (Ex. 8 at 3).  Then, "upon depressing the matrix delivery button on the delivery catheter handle, the electrode sheath retracts while the push rod assembly remains static leaving the matrix in the tubal lumen."  (Ex. 8 at 7).  After the sheath retracts, "the matrix expands to its approximate original shape and volume as permitted by patient anatomy."  (Ex. 11 at 99 (the page number indicated for Ex. 11 is the larger stamped number on the bottom right hand side of the page)).  "The non-absorbable matrix … is designed to provide a permanent scaffold which allows for 'space-filling' and occlusive tissue in-growth." (Ex. 8 at 4).  "The tissue in-growth response can be described as a fibroblast infiltration into the pores of the matrix."  (Ex. 12 at 3).



**FIGURE 3**
**(Adiana handle and catheter from Ex. 8 at 5)**



**FIGURE 4**
**(Illustration of Adiana matrix placement in fallopian tubes from Ex. 11 at 1016)**

5

Figure 5 shows the general catheter design, including the distal ball tip as claimed in the '552 patent claim 1.  (Ex 11, Hologic's FDA Panel Pack at 95).



**FIGURE 5**

Figure 6 shows the Adiana System with the matrix still inside (i.e., before deployment).  (Ex. 8, Hologic's FDA Executive Summary at 7).



**FIGURE 6**

Figure 7 shows the retraction of the outer sheath after matrix delivery.  (Ex. 8 at 8).

*P070022 – PMA for Adiana Transcervical Sterilization System*
*FDA Executive Summary*



The electrode sheath has been retracted over the push rod into the end of the
catheter shaft, exposing the matrix which exits the catheter tip.

**FIGURE 7**

Additional detail of the Adiana System is provided below and in the accompanying expert

declaration of Dr. Mark Glasser ( "Glasser Decl.").

### III. THE COURT SHOULD ENJOIN HOLOGIC FROM MAKING, USING, SELLING, OFFERING FOR SALE OR IMPORTING THE ADIANA SYSTEM PENDING FINAL JUDGMENT

In determining whether to grant preliminary injunctive relief, the Court considers four factors: (1) the likelihood of the plaintiff's success on the merits; (2) the threat of irreparable harm to the plaintiff if the requested relief is not granted; (3) the relative balance of harm to the plaintiff and the harm to the defendant if the relief is granted; and (4) public interest. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). Because an injunction involves substantive matters unique to patent law, it is governed by Federal Circuit precedent. *Lab. Corp. of Am. Holdings v. Chiron Corp.,* 384 F.3d 1326, 1331 (Fed. Cir. 2004).

### A. Conceptus is Likely to Succeed on the Merits

To demonstrate a likelihood of success on the merits, Conceptus must show that Hologic likely infringes at least one patent claim that will likely withstand challenges, if any, to its validity. *Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1372 (Fed. Cir. 2005).

### 1. The Asserted Patents Are Valid

The Court must "determine whether it is more likely than not that [Hologic] will be able to prove at trial, by clear and convincing evidence, that the patent is invalid." *Titan Tire Corp. v. Case New Holland, Inc.,* 566 F.3d 1372, __, 2009 U.S. App. LEXIS 11763, *17 (Fed. Cir. June 3, 2009)[3]. "If [the accused infringer] fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies [the patentee's] burden on validity." *Purdue Pharma L.P. v. Boeringer Ingelheim Gmbh*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). As Hologic has not yet raised an invalidity defense, Conceptus may properly rely on the presumption at this time.

### 2. Hologic Infringes the Asserted Patents

Conceptus will likely prevail on its infringement claims. Determining infringement is a two-step process: the Court must first construe the claims and then compare the construed claims to the accused product. *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1339 (Fed. Cir. 2003).

On a preliminary injunction motion, the Court may construe claims on a "tentative" or

---

[3] The *Titan* court clarified the proper analysis that a district court should conduct in considering a preliminary injunction motion in a patent case.

"rolling" basis and may revisit and alter "its interpretation of the claim terms as its understanding of the technology evolves." *Pfizer,* 429 F.3d at 1377; *Oakley*, 316 F.3d at 1345 n.3.[4]  Claim construction begins with the words of the claim.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  Words of the claims are generally given their ordinary and customary meaning as viewed by a person of ordinary skill in the art.  *Philips v. AWH Corp*., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  In some cases, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

### a.    Hologic Directly Infringes

Upon receiving FDA approval on or about July 7, 2009 (Ex. 10) Hologic began importing and marketing/offering for sale the Adiana product in the U.S.  It has launched a website for doctors and patients to learn about the procedure and request information for the procedure. www.adiana.com.  (See also Ex. 22 (Adiana patient information booklet available from website). Hologic directly infringes the asserted apparatus/system claims because it makes, uses, offers to sell, sells and/or imports the Adiana System—which system meets every limitation of the asserted claims as detailed below. 35 U.S.C. §271(a); *Pfizer*, 429 F.3d at 1376.

### b.    Hologic Indirectly Infringes

Hologic indirectly infringes the asserted method claims because it induces and contributes to the direct infringement of doctors that use the Adiana System. 35 U.S.C. § 271(b),(c).

### (1)    Hologic Induces Infringement

Hologic is liable for inducing infringement because it has "induced infringing acts and . . . knew or should have known [its] actions would induce actual infringements." *DSU Medical Corp. v. JMS Co*., 471 F.3d 1293, 1304 (Fed. Cir. 2006).  "A patentee may prove direct infringement or inducement of infringement by either direct or circumstantial evidence.  There is no requirement that direct evidence be introduced." *Broadcom v. Qualcomm*, 543 F.3d 683, 700 (Fed. Cir. 2008), *DSU Medical,* 471 F.3d at 1306; *Moleculon Research Corporation v. CBS*, 793 F.2d 1261, 1272 (Fed. Cir.

---

[4] The claim constructions provided herein are accordingly preliminary and Conceptus reserves its right to put forth modified constructions at the time required by the rules of this Court.

1986).  Moreover, "evidence of active steps . . . such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe." *DSU Medical,* 471 F.3d at 1305 (*citing MGM Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 936 (U.S. 2005)).

Hologic has engaged in precisely the active inducement steps described by the Supreme Court in *MGM Studios* through instructing doctors how to engage in the infringing uses.  For example, Hologic provides an "Instructions for Use" document with its devices (Ex. 12) and also requires specific training programs for physicians (Ex. 21 "Physicians must complete this program before using Adiana Permanent Contraception. The program includes didactic training, hands-on training, and proctored cases.").  (Glasser Decl. ¶ 11).  In addition, intent may be inferred from a defendant's knowledge of the patent and control over the design or manufacturing of the product used for direct infringement.  *See, e.g., Ricoh v. Quanta Computer*, 550 F.3d 1325, 1343 (Fed. Cir. 2008)(*citing Water Techs. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1998)).  Hologic controls the design and manufacturing of the Adiana System and Hologic knew of Conceptus' patents generally through the 2007 notice letters (Exs. 6 and 7) and specifically through being Conceptus' sole competitor and through the declaratory judgment complaint filed on May 22, 2009.

### (2)  Hologic Contributorily Infringes

Contributory infringement under § 271(c) does not require proof of active steps to induce infringement; rather, the sale of a product with no substantial use other than one that infringes the patent may constitute infringement.  35 U.S.C. § 271(c), *Ricoh Co. v. Quanta Computer*, 550 F.3d 1325, 1337 (Fed. Cir. 2008)("one who sells a component especially designed for use in a patented invention may be liable as a contributory infringer, provided that the component is not a staple article of commerce suitable for substantial noninfringing use").  The Adiana System is especially made to be used by physicians in a way that infringes Conceptus' method claims, as described in detail below. (Glasser Decl. ¶ 13).  Moreover, Hologic has stated "Adiana Permanent Contraception is indicated for women who desire permanent birth control (female sterilization) by occlusion of the fallopian tubes." (Ex. 12 at 4, Adiana Instructions For Use "Indications For Use").  Thus, in reality, the Adiana System is "good for nothing else but infringement of the patented process" and Hologic's

9

sales of the system create contributory liability.  *Ricoh*, 550 F.3d at 1337.  (Glasser Decl. ¶ 13).

Furthermore, Hologic had knowledge of the Asserted Patents (as discussed above) and as "one who makes and sells articles which are only adapted to be used in a patented combination," Hologic is "*presumed* to intend the natural consequences of [its] acts."  *DSU Medical*, 471 F.3d at 1303 (*citing MGM v. Grokster*, 545 U.S. 913, 125 S. Ct. 2764, 2777 (2005)(emphasis added)); *see also Ricoh*, 550 F.3d at 1338 ("the purpose of the 'substantial noninfringing use' exception of § 271(c) is to allow determination of instances where the intent to infringe may be *presumed* based on the distribution of a product that has an unlawful use")(emphasis added).

### c.    The Adiana System Infringes Claim 20 of the '904 Patent

Claim 20: An intrafallopian delivery system for transcervical introduction of a device, the delivery system comprising: a first portion having an elongate body and a shaft for delivering tissue damaging energy; a second portion detachably coupled to said elongate body, said second portion being sized to fit within a fallopian tube and being detachable from said elongate body to remain permanently within said fallopian tube and wherein said tissue damaging energy causes a scar formation, in said fallopian tube, which permanently attaches to said second portion.

A graphic aid is included below using Hologic's own diagrams to detail the infringement of Claim 20 by the Adiana System (Figures 3, 6 and 7 from above are used as well as two still images taken from an animated video of the Adiana procedure previously posted on www.adiana.com and used for Adiana patient education). (Glasser Decl. ¶ 22).  The complete element by element analysis follows below.

//
//
//
//
//
//
//
//
//
//

An intrafallopian delivery system for transcervical introduction of a device, the delivery system comprising:

a first portion having an elongate body

and a shaft for delivering tissue damaging energy

a second portion detachably coupled to said elongate body

said second portion being sized to fit within a fallopian tube and being detachable from said elongate body to remain permanently within said fallopian tube and wherein said tissue damaging energy causes a scar formation, in said fallopian tube, which permanently attaches to said second portion.



The claims' preambles are clearly met by the Adiana System as they merely refer to the basic

method or system for transcervical sterilization and do not add further limitations. *Symantec Corp.*

*v. Computer Assocs. Int'l*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008)("the preamble generally is not

limiting"). A detailed infringement analysis, coupled with claim charts, is also provided for each claim asserted in this motion in the Expert Declaration of Dr. Glasser submitted herewith.

       **(1)**     **A first portion having an elongate body and a shaft for delivering tissue damaging energy**

This first claim term should be construed in accordance with its plain meaning, which is consistent with the meaning ascribed by the specification of the '904 patent and its prosecution history. Specifically, the delivery system has a portion that is longer than it is wide, and a long member capable of delivering energy that will damage tissue. (Glasser Decl. ¶ 24).

The Adiana System includes this element. For example, Figure 3 above shows an elongate body distal to the handle of the Adiana delivery system and what is labeled as the "electrode sheath" in Figure 7 is a shaft for delivering tissue damaging energy. Hologic has described the shaft within its catheter in its FDA Executive Summary as follows: "The delivery catheter includes an electrode sheath configuration … the bipolar electrodes enable heating of the surrounding tissue." (Ex. 8 at 5). Figure 6 above shows additional detail of Hologic's energy delivering shaft. (Glasser Decl. ¶ 26).

       **(2)**     **A second portion detachably coupled to said elongate body, said second portion being sized to fit within a fallopian tube and being detachable from said elongate body to remain permanently within said fallopian tube and wherein said tissue damaging energy causes a scar formation, in said fallopian tube, which permanently attaches to said second portion**

Consistent with its plain meaning and the '904 patent's intrinsic evidence, this term refers to a second portion of the system that can be separated from the long body and remain in the fallopian tube permanently (as opposed to being expelled, removed or absorbed). This term also specifies that the application of energy causes scarring (e.g., fibroblasts) and that the scar tissue attaches to the portion of the device that is separated and left in the fallopian tube. (Glasser Decl. ¶ 25).

The Adiana System includes this element. The second portion is the "matrix" (see, e.g., Figures 4, 6 and 7 above). The delivery of tissue damaging energy causes scar tissue to attach to the matrix. For example, see the following excerpt from the Adiana System's Instructions for Use:

> "The epithelial layer in a discrete section of the fallopian tube is ablated by…electrical current…. Removal of the epithelium creates a superficial lesion which initiates an acute wound healing response … The tissue in-growth response can be described as a fibroblast infiltration into the pores of the matrix…." (Ex. 12 at 3). "Integration of this fibrous tissue into the matrix is the expected end result which in turn results in tubal

occlusion." (Ex. 12 at 4) (Glasser Decl. ¶ 26).

### d.    The Adiana System Infringes Claim 22 of the '904 Patent

Claim 22: A delivery system as in claim 20 wherein said second portion is resilient and imposes an anchoring force against said fallopian tube and wherein said second portion is radially restrained within a lumen of the elongate body before the transcervical introduction.

Consistent with its plain meaning, this claim provides that the portion that can be detachably coupled is radially restrained when inside the elongate body and its resilient nature causes an anchoring force against the fallopian tube when it is deployed.  This meaning is consistent with the '904 patent's specification and prosecution history.  (Glasser Decl. ¶ 28).  The Adiana System includes this element.  For example, "the Matrix is compressed within the electrode sheath. After release from the electrode sheath, the matrix expands to its approximate original shape and volume as permitted by patient anatomy."  (Ex. 11 at 99) (Glasser Decl. ¶ 29).

### e.    The Adiana System Infringes Claim 39 of the '904 Patent

Claim 39: A method for sterilizing a female patient, said method comprising: delivering a body transcervically into the female patient; delivering energy to a surrounding tissue of a fallopian tube of said female patient; wherein a scar formation in a region of the surrounding tissue permanently attaches to the body.

#### (1)    Delivering a body transcervically into the female patient

No additional construction is necessary for this term. (Glasser Decl. ¶ 31).  The Adiana method includes this step, for example, Adiana has stated, "The Adiana Transcervical Sterilization System is used to place a silicone implant, called a matrix, into each fallopian tube of the female patient." (Ex. 8 at 3) (Glasser Decl. ¶ 34).

#### (2)    Delivering energy to a surrounding tissue of a fallopian tube of said female patient

Consistent with its plain meaning and the patent's intrinsic evidence, this term refers to the delivery of energy to the fallopian tube tissue that surrounds the body.  (Glasser Decl. ¶ 32).

In the Adiana System, the "electrode array emits electrical energy that creates a thermal lesion [of the fallopian tube] adjacent to where the matrix is to be placed." (Ex. 8 at 8) (Glasser Decl. ¶ 34).

Baker & McKenzie LLP
San Diego

(3)     **Wherein a scar formation in a region of the surrounding tissue permanently attaches to the body**

Consistent with its ordinary meaning and the intrinsic evidence, this term provides that scar tissue (e.g., fibroblasts) forms in a region of the fallopian tube where the energy was delivered and that tissue permanently attaches to the delivered body.  (Glasser Decl. ¶ 33).  The Adiana System includes this element.  For example, see the following excerpts from the Adiana System's Instructions for Use and FDA Panel Pack:

> "The epithelial layer in a discrete section of the fallopian tube is ablated by…electrical current…. Removal of the epithelium creates a superficial lesion which initiates an acute wound healing response … The tissue in-growth response can be described as a fibroblast infiltration into the pores of the matrix…." (Ex. 12 at 3); "Integration of this fibrous tissue into the matrix is the expected end result which in turn results in tubal occlusion" (Ex. 12 at 4); "The implantable Matrix is specifically designed to provide a benign and permanent scaffold for tissue in-growth." (Ex. 11 at 880) (Glasser Decl. ¶ 34).

f.     **The Adiana System Infringes Claim 41 of the '904 Patent**

This claim is similar to claim 22 above and infringed for similar reasons.  *See, also,* Glasser Decl. ¶¶ 36-38.

g.     **The Adiana System Infringes Claim 9 of the '667 Patent**

Claim 9: A contraceptive method comprising: inserting a contraceptive device transcervically into an ostium of a fallopian tube by gripping a handle with a hand and moving the hand, the handle coupled to the contraceptive device by an elongate body; withdrawing a sheath surrounding the elongate body and at least a portion of the contraceptive device by moving the sheath proximally relative to the elongate body to expose the contraceptive device, such movement effected by moving an actuator on the handle with the hand while the hand grips the handle; expanding the contraceptive device by moving the actuator with the hand; and detaching the expanded contraceptive device from the elongate body so that the contraceptive device remains within the ostium to inhibit conception.

(1)     **Inserting a contraceptive device transcervically into an ostium of a fallopian tube by gripping a handle with a hand and moving the hand, the handle coupled to the contraceptive device by an elongate body**

Consistent with its plain meaning and the intrinsic evidence, this term refers to inserting a contraceptive device via the cervix into an ostium of a fallopian tube by gripping a handle with a hand and moving the hand, the handle coupled to the contraceptive device by body that is longer than it is wide.  (Glasser Decl. ¶ 39).  The Adiana System includes this element.  For example, Hologic has stated that:

"the physician places the Delivery Catheter into the ostium of the fallopian tube" (Ex. 11 at 878); "the Adiana Delivery Catheter contains the Adiana Matrix and includes … a handle at its proximal end" (Ex. 11 at 88); the handle "providing an ergonomic hand grip and release actuation control for the clinician" (Ex. 11 at 91); the catheter also including "a full catheter length push rod assembly … the distal end of the push rod is located … against the proximal end of the matrix" (Ex. 8 at 7); see also Figure 3 above.  (Glasser Decl. ¶ 43).

> **(2)** **withdrawing a sheath surrounding the elongate body and at least a portion of the contraceptive device by moving the sheath proximally relative to the elongate body to expose the contraceptive device, such movement effected by moving an actuator on the handle with the hand while the hand grips the handle**

This term requires no further construction. (Glasser Decl. ¶ 40).  The Adiana System includes this element.  For example, Hologic has stated that:

"A Matrix release actuator or button is incorporated into the device's handle. After delivery of the RF energy, the clinician deploys the Matrix within the region of the lesion by pressing the button." (Ex. 11 at 90); "Upon depressing the matrix delivery button … the electrode sheath retracts while the push rod assembly remains static leaving the matrix in the tubal lumen." (Ex. 8 at 7); "The electrode sheath has been retracted over the push rod into the end of the catheter shaft, exposing the matrix which exits the catheter tip" (Ex. 8 at 8); see also Figures 3, 6 and 7 above.  (Glasser Decl. ¶ 43).

> **(3)** **Expanding the contraceptive device by moving the actuator with the hand**

Consistent with its plain meaning and the intrinsic evidence, this term refers to expansion of the contraceptive device as the actuator is moved.  (Glasser Decl. ¶ 41).

The Adiana System includes this element.  For example, Hologic has stated that "the Matrix is compressed within the electrode sheath. After release from the electrode sheath, the matrix expands to its approximate original shape and volume as permitted by patient anatomy." (Ex. 11 at 99) (Glasser Decl. ¶ 43).

> **(4)** **Detaching the expanded contraceptive device from the elongate body so that the contraceptive device remains within the ostium to inhibit conception**

Consistent with the '667 patent's specification, this term refers to the separating, decoupling or disengaging of the contraceptive device from the elongate body so that the device remains within the ostium and optionally beyond the ostium into the uterotubal junction and/or the fallopian tubes, to inhibit conception.  (See, e.g., Ex. 2 at 5:61-64 ("As used herein, a structure is inserted 'within a tubal ostium' whenever the structure is advanced from the uterus into (and optionally beyond) the

Baker & McKenzie LLP
San Diego

tubal ostium into the uterotubal junction and/or the fallopian tubes"), 7:17-19, 8:35-39, 10:40-44)

(Glasser Decl. ¶ 42).  The Adiana System includes this element.  For example, Hologic has stated

that:

> "the physician places the Delivery Catheter into the ostium of the fallopian tube" (Ex. 11
> at 878); "After delivery of RF energy, the Matrix is released from the catheter" (Ex. 11
> at 530); "the non-absorbable matrix … is designed to provide a permanent scaffold
> which allows for 'space-filling' and occlusive tissue in-growth" (Ex. 8 at 4); "The
> Adiana Transcervical Sterilization System is indicated for women who desire permanent
> birth control" (Ex. 11 at 7); see also Figures 4, 6 and 7 above.  (Glasser Decl. ¶ 43).

**h.      The Adiana System Infringes Claim 10 of the '667 Patent**

> Claim 10: The contraceptive method of claim 9, further comprising manipulating a
> hysteroscope with another hand of the healthcare worker to orient the contraceptive
> device toward the ostium while the health care worker views an image of the ostium
> with the hysteroscope.

No additional construction is necessary for this term.  (Glasser Decl. ¶ 45).  The Adiana

System includes this element.  For example, Hologic has stated that "The catheter is delivered to the

intramural section of the fallopian tube through a conventional hysteroscope ….  Confirmation of

device placement within the intramural tube is achieved by means of direct visual assessment

through the hysteroscope optics (visually confirming the black mark has reached the tuba1 ostium)."

(Ex. 11 at 89) (Glasser Decl. ¶ 46).

**i.      The Adiana System Infringes Claim 14 of the '667 Patent**

> Claim 14: A contraceptive delivery system comprising: a contraceptive device having at
> least a portion which is pre-formed and resiliently expandable from a small profile
> configuration to a large profile configuration, wherein the at least a portion is configured
> for insertion into an ostium of a fallopian tube when in the small profile configuration; a
> sheath having a proximal end, a distal end and a lumen therethrough, the lumen forming
> a receptacle at the distal end, the receptacle configured to releasably receive the at least a
> portion; a first elongate body having a proximal end and a distal end releasably attached
> to the contraceptive device; a proximal handle connected with the proximal end of the
> first elongate body, the handle having a size and shape suitable for gripping with a single
> hand; and at least one actuator mounted on the handle, wherein movement of the at least
> one actuator by the hand while the hand grips the handle moves the proximal end of the
> sheath proximally relative to the handle exposing at least a portion of the contraceptive
> device to allow resilient expansion to the large profile configuration and affixation of the
> contraceptive device within the ostium of the fallopian tube.

Baker & McKenzie LLP
San Diego

(1)   **A contraceptive device having at a least a portion which is pre-formed and resiliently expandable from a small profile configuration to a large profile configuration, wherein the at least a portion is configured for insertion into an ostium of a fallopian tube when in the small profile configuration**

Consistent with the '667 patent's intrinsic evidence, this term refers to a contraceptive device having a portion that is resiliently expandable and pre-formed, where pre-formed means that the expandable portion is given its form prior to introduction into the fallopian tube (as distinguished in the prosecution history from the Erb RE 29,345 reference, in which fluid elastomeric material is injected into the fallopian tubes and solidifies in place). (Exs. 19, 20). This term further refers to the portion being expandable from a small configuration suitable for ostium insertion to a larger configuration. (Glasser Decl. ¶ 48).

The Adiana System includes this element. For example, Hologic has stated that "the physician places the Delivery Catheter into the ostium of the fallopian tube" (Ex. 11 at 878) and "The matrix is compressed within the electrode sheath. After release from the electrode sheath, the matrix expands to its approximate original shape and volume as permitted by patient anatomy" (Ex. 11 at 99) (Glasser Decl. ¶ 53).

(2)   **A sheath having a proximal end, a distal end and a lumen therethrough, the lumen forming a receptacle at the distal end, the receptacle configured to releasably receive the at least a portion**

Consistent with its plain meaning and the '667 patent's intrinsic evidence, this term refers to a sheath having a lumen, which lumen forms a receptacle at the distal end, the receptacle designed to releasably hold the pre-formed, expandable portion of the device. (Glasser Decl. ¶ 49).

The Adiana System includes this element. For example, Figure 7 above shows the "electrode sheath" and the pre-formed and expandable matrix released from it. Figure 6 above shows the sheath's lumen in which there is a push rod and a receptacle holding the matrix. (Glasser Decl. ¶ 53).

(3)   **A first elongate body having a proximal end and a distal end releasably attached to the contraceptive device**

Consistent with the '667 patent's specification, this term refers to an elongate body having a distal end coupled or engaged with the contraceptive device and having the ability to separate,

17

decouple or disengage from it.  (See, e.g., Ex. 2 at 7:17-19, 8:35-39, 10:40-44) (Glasser Decl. ¶ 50).

The Adiana System includes this element.  For example, Figure 6 above shows the push rod coupled with the matrix and Figures 4 and 7 show the matrix separated/separating from the push rod. In addition, Hologic has stated that "a full catheter length push rod assembly … [is] located within the electrode sheath … The distal end of the push rod is … against the proximal end of the matrix …. Upon depressing the matrix delivery button on the delivery catheter handle, the electrode sheath retracts while the push rod assembly remains static leaving the matrix in the tubal lumen." (Ex. 8 at 7) (Glasser Decl. ¶ 53).

> **(4)  A proximal handle connected with the proximal end of the first elongate body, the handle having a size and shape suitable for gripping with a single hand**

No further construction is necessary for this term.  (Glasser Decl. ¶ 51).  The Adiana System includes this element.  For example, Hologic has stated that its catheter has "A full catheter length push rod assembly" and "The proximal end of the push rod is attached to the chassis of the slide assembly in the proximal handle." (Ex. 8 at 7).  In addition, the handle has "an ergonomic hand grip and release actuation control for the clinician." (Ex. 11 at 91).  See also Figure 3.  (Glasser Decl. ¶ 53).

> **(5)  At least one actuator mounted on the handle, wherein movement of the at least one actuator by the hand while the hand grips the handle moves the proximal end of the sheath proximally relative to the handle exposing at least a portion of the contraceptive device to allow resilient expansion to the large profile configuration and affixation of the contraceptive device within the ostium of the fallopian tube**

Consistent with the '667 patent's specification, this term refers to a handle with an actuator that moves the sheath proximally to expose at least a portion of the contraceptive device and allow resilient expansion to the larger configuration and affixation of the device within the ostium, and optionally beyond the ostium into the uterotubal junction and/or the fallopian tubes.  (See, e.g., Ex. 2 at 5:61-64) (Glasser Decl. ¶ 52).

The Adiana System includes this element.  For example, Hologic has stated that

"Upon depressing the matrix delivery button on the delivery catheter handle, the electrode sheath retracts ... leaving the matrix in the tubal lumen" (Ex. 8 at 7).  "the Matrix is compressed within the electrode sheath. After release from the electrode sheath, the matrix expands to its approximate original shape and volume as permitted by

18

patient anatomy" (Ex. 11 at 99); "the physician places the Delivery Catheter into the ostium of the fallopian tube" (Ex. 11 at 878); see also Figures 3, 4, 6 and 7.  (Glasser Decl. ¶ 53).

**j.      The Adiana System Infringes Claim 1 of the '552 Patent**

Claim 1: A contraceptive method comprising: guiding a contraceptive device distally into an ostium of a fallopian tube wherein a sheath covers the contraceptive device; avoiding perforation of the fallopian tube and facilitating tubal navigation of the fallopian tube with a distal ball tip of a distal portion of the contraceptive device, the ball tip having a diameter in a range from about 0.020 to about 0.050 inches; uncovering the contraceptive device by withdrawing the sheath from the contraceptive device; and releasing the uncovered contraceptive device so that the contraceptive device inhibits conception permanently.

**(1)      Guiding a contraceptive device distally into an ostium of a fallopian tube wherein a sheath covers the contraceptive device**

Consistent with its plain meaning and the intrinsic evidence, this term refers to inserting a contraceptive device into an ostium of a fallopian tube where a sheath covers the contraceptive device.  (Glasser Decl. ¶ 55).  The Adiana method includes this element.  For example, Hologic has stated that "the physician places the Delivery Catheter into the ostium of the fallopian tube" (Ex. 11 at 878) and "the Matrix is compressed within the electrode sheath."  See also Figures 6 and 7 above. (Glasser Decl. ¶ 60).

**(2)      Avoiding perforation of the fallopian tube and facilitating tubal navigation of the fallopian tube with a distal ball tip of a distal portion of the contraceptive device**

No additional construction is necessary for this term and the Adiana System includes this element.  (Glasser Decl. ¶ 56).  For example, see Figure 5 above on which Hologic has labeled the "distal ball tip."  Hologic has also described the distal tip as a "tapered atraumatic tip." (Ex. 11 at 95). (Glasser Decl. ¶ 60).

**(3)      The ball tip having a diameter in a range from about 0.020 to about 0.050 inches**

No additional construction is necessary for this term and the Adiana System includes this element.  (Glasser Decl. ¶ 57).  The distal ball dip of an Adiana device has been measured to be 0.028 inches.  (Glasser Decl. ¶ 60).

**(4)      Uncovering the contraceptive device by withdrawing the sheath from the contraceptive device**

No additional construction is necessary for this term and the Adiana method includes this

19

step (Glasser Decl ¶ 58).  For example, Hologic has stated that "upon depressing the matrix delivery button on the delivery catheter handle, the electrode sheath retracts ... leaving the matrix in the tubal lumen." (Ex. 8 at 7; see also Figures 6 and 7 above).  (Glasser Decl. ¶ 60).

> **(5)   Releasing the uncovered contraceptive device so that the contraceptive device inhibits conception permanently**

Consistent with its ordinary meaning and the '552 patent intrinsic evidence, this term refers to releasing the uncovered contraceptive device so that it remains in the fallopian tube and inhibits conception permanently. (Glasser Decl. ¶ 59).

The Adiana method includes this step.  For example, see the following excerpts from Hologic's FDA Panel Pack:

> "upon depressing the matrix delivery button on the delivery catheter handle, the electrode sheath retracts ... leaving the matrix in the tubal lumen" (Ex. 8 at 7); "The implanted matrices provide attachment sites for tissue in-growth, which secures the matrices in place by filling the voids in the implant" (Ex. 8 at 4); "the non-absorbable matrix ... is designed to provide a permanent scaffold which allows for 'space-filling' and occlusive tissue in-growth" (Ex. 8 at 4); "The Adiana Transcervical Sterilization System is indicated for women who desire permanent birth control" (Ex. 11 at 7). (Glasser Decl. ¶ 60).

## B.   Conceptus Will Suffer Irreparable Harm If An Injunction Is Not Granted

Irreparable harm has been found when, for example, 1) infringement threatens a loss of goodwill or an injury to reputation and 2) there exists a potential or actual loss of market share and 3) when other would-be infringers are encouraged.  *See*, *e.g.*, *Sanofi-Synthelabo v. Apotex, Inc*., 470 F.3d 1368, 1381 (Fed. Cir. 2006) (upholding a finding of irreparable harm based in part on "loss of good will"); *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1362 (Fed. Cir. 2008) (loss of market share and revenue is evidence of irreparable harm); *Acumed LLC v. Stryker Corp.,* 551 F.3d 1323, 1329 (Fed. Cir. 2008) (adding a new competitor to the market may create irreparable harm); *Boehringer Ingelheim Vetmedica v. Schering-Plough*, 106 F.Supp.2d 696, 703 (D.N.J. 2000)("if this Court does not grant [plaintiffs] request for an injunction at this time, other would-be infringers will no doubt be invited to infringe").

## 1.   Hologic Will Harm Conceptus' Goodwill and Reputation

Conceptus has established substantial goodwill in the market through its innovative technical

Baker & McKenzie LLP
San Diego

achievements and market development.  Conceptus has invested over 300 million dollars in researching, developing, and marketing the *Essure* system and on training numerous OB/GYNs on hysteroscopy and the *Essure* procedure.  (Sloan Decl. ¶ 6).  As a result of this investment, *Essure* now enjoys a strong reputation in the market among both doctors and patients.  (Sloan Decl. ¶ 7).  The *Essure* system has been featured on The Today Show, The Doctor's Show, on MSNBC.com and in Time magazine.  (Sloan Decl. ¶ 7).  Many physicians now conduct sterilization procedures in the office and Conceptus recently achieved its first profitable quarter in 2008.  (Sloan Decl. ¶ 7, 8).

If Hologic is now allowed to sell its infringing devices and take advantage of Conceptus' goodwill, Conceptus' reputation as an innovator and market developer will be permanently injured in a manner not curable by money damages.  *Bio-Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (loss of goodwill is evidence of irreparable harm); *3M Unitek Corp. v. Ormco Co.*, 96 F. Supp. 2d 1042, 1051 (C.D. Cal. 2000) ("the fact that plaintiffs will lose … goodwill for the duration of this litigation weighs in favor of the plaintiffs").

Hologic has made clear that it intends to ride on the reputation Conceptus has built.  (Ex. 16 at 25) ("…we're thrilled that [Conceptus is] going to do this DTC [direct to consumer] campaign. We encourage them to spend lots of money on it, and we think we'll certainly be a direct beneficiary of that"; "we would benefit from that (sic) investments that [Conceptus] will be making").  *3M Unitek,* 96 F. Supp. 2d at 1051 ("the fact that plaintiffs have invested more time and effort into marketing their patented invention also weighs in favor of plaintiffs … Defendant has virtually admitted that it is attempting to capitalize on plaintiffs' success").

**2.    Conceptus Will Lose Market Share**

If Hologic is not enjoined, Conceptus will be forced into head-to-head competition, causing a loss of market share and irreparable harm.  *See Novozymes A/S v. Genecor Intern., Inc*., 474 F.Supp.2d 592, 613 (D. Del. 2007) ("These are head-to-head competitors, and [plaintiff] has a right, granted by Congress, not to assist its rival with the use of proprietary technology"); *Acumed,* 551 F.3d at 1329 (loss of market share is irreparable harm with no adequate remedy at law).

Conceptus faces a real and immediate threat of losing customers.  The Chief Financial Offer of Hologic's predecessor Cytyc boldly claimed that it had "the potential to be ahead of Conceptus in

21

terms of market share within a couple of years after commercial launch." (Ex. 13 at 11). More recently, Hologic stated that "Adiana will be a highly competitive offering in the permanent sterilization market." (Ex. 14 at 4). To further disadvantage Conceptus, Hologic already has a manufacturing facility "ready to go" and it intends to market the Adiana System with its 100+ person NovaSure sales force—which has existing relationships with the OB/GYNs that perform sterilization procedures. (Ex. 14 at 16; Ex. 15 at 12). Hologic has referred to the synergistic sales of Adiana by its NovaSure representatives as "just terrific." (Ex. 16 at 14).

Hologic's improper competition will also erode Conceptus' exclusive market share at a critical time in the market's development. Because transcervical sterilization is still a nascent market, with relatively recent medical insurance reimbursement and doctor adoption, it is an important time for Conceptus to recoup its significant investment. *See TiVo Inc. v. EchoStar Comm. Co.*, 446 F.Supp.2d 664, 669 (E.D. Tex. 2006) ("Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm—plaintiff is losing market share at a critical time in the market's development, market share that it will not have the same opportunity to capture once the market matures"). For a smaller company like Conceptus, a loss of market position and price erosion for its only product may threaten the company's financial welfare and operations.

Lost market share will cause irreparable damage to Conceptus. Because doctors must undergo significant training to be able to use either the Conceptus or Hologic product, it may be difficult to reconvert a lost customer and require that they go through additional training. (Sloan Decl. ¶ 9). Staff must also be trained on technical, billing and insurance issues, and must order different supplies for a new system, further increasing the burden. (Sloan Decl. ¶ 9). Importantly, the inferiority of the Hologic product (the Adiana System had 12 pregnancies in its clinical trials while Conceptus had none, see Ex. 8 at 32, Ex. 12 at 7 and Ex. 9 at 17) and the Adiana System's increased risk of potentially serious complications such as ectopic pregnancy and dilutional hyponatremia will damage the nascent transcervical sterilization market and potentially sour doctors and patients on transcervical sterilization altogether. (Sloan Decl. ¶ 9).

Finally, Conceptus' lost market share will limit Conceptus' ability to invest in developing new devices, product improvements or alternative uses for the *Essure* system. Such harm is not

22

correctable by money damages.  *Bio-Technology General*, 80 F.3d at 1566 (loss of revenue and research and development support indicate irreparable harm).

### 3.  Other Would-Be Infringers Will Be Encouraged

If an injunction is not entered, other players in the market may be encouraged to infringe—a recognized basis for finding irreparable harm.  *Boehringer,* 106 F.Supp.2d at 703 ("if an injunction does not issue at this time, [plaintiff's] reputation will be injured as it will be perceived as a company which is unable to enforce the exclusivity of its patent rights").  Hologic has admitted that this supports granting a preliminary injunction.  (Ex. 18, Hologic Motion for Preliminary Injunction, p. 22) ("if [defendant] suffers no adverse consequences from its continued infringement, then that will send a message to other potential competitors that they can infringe as well, knowing that no consequences will follow").

## C.   The Balance of Hardships Clearly Tips in Conceptus' Favor

In contrast to the irreparable harm Conceptus would suffer, Hologic's harm if an injunction is ordered will be minimal as it is a large, multi-product company having over $1.5 billion in sales last year—before approval of the Adiana System.  (Ex. 17 at F-3); *Acumed*, 551 F.3d at 1329-1330 (finding hardship tipping in favor of patentee when infringing device "only a small portion" of defendant's sales compared to plaintiff's "flagship" product).  In fact, Hologic admitted in a recent conference call that sales of Adiana will have only a small affect on its overall revenue:

> we are targeting total revenues of $1.625 billion to $1.65 billion. Our revenue guidance at this point includes U.S. sales of both Cervista HPV and Adiana once approved, realizing we will only get a modest contribution from these products in the current fiscal year.  (Ex. 14 at 6).

In addition, Hologic does not stand to lose a significant investment in personnel or infrastructure because it plans to use its existing manufacturing facility and sales force to make and sell the Adiana System:

> The infrastructure is in place for manufacturing the Adiana product. The approvable letter that we received was at the Costa Rica facility where we do manufacture the NovaSure product. So we have already a manufacturing facility ready to go. … And we use the same sales force as we use into that GYN surgical market that sells the NovaSure product.  (Ex. 14 at 16).

The fact is—just as Hologic argued itself in a recent motion—an injunction against this large

23

1   manufacturer with multiple products will leave it "no worse off than it was just a few weeks ago."

2   (Ex. 18 at 24).  Hologic previously stated that a year long delay should not have a material adverse

3   impact on results of operations.  (Ex. 17 at 51).

4          Finally, the balance of hardships does not favor a defendant whose harm is "the result of its

5   own calculated risk."  *Sanofi-Synthelabo,* 470 F.3d at 1383.  This especially includes situations

6   where the defendant knew of the possibility of infringing the plaintiff's patents, yet proceeded with

7   production and sale of the infringing products despite that knowledge.  *Id.*  As previously discussed,

8   Conceptus twice provided notice of its patents in letters dated February 1, 2007 and March 16, 2007

9   and filed suit on May 22, 2009.  (Ex. 6 and 7).  Hologic took a calculated risk and any hardships

10  claimed by Hologic as a result of an injunction should be given little consideration by the Court.

11  Moreover, the inability to profit from the sale of an infringing product is not a hardship that will

12  defeat a preliminary injunction.  *Acumed,* 551 F.3d at 1330.

13  **D.     An Injunction Will Advance the Public Interest**

14         The public interest strongly favors the enforcement of patent rights.  *See Abbott Labs.,* 544

15  F.3d at 1362 (recognizing strong public policy favoring the enforcement of patent rights without

16  which incentive for discovery and development of new products is adversely affected).  "We have

17  long acknowledged the importance of the patent system in encouraging innovation.  Indeed, the

18  encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based

19  directly on the right to exclude."  *Sanofi-Synthelabo*, 470 F.3d at 1383.

20         The public interest will be further advanced by a preliminary injunction order that will save

21  hospitals and doctors from prematurely investing in the infringing Adiana System that is likely to be

22  permanent enjoined at a later date.

23         Finally, this is not a situation where the public will be left without access to medical

24  treatment if a preliminary injunction issues.  Conceptus can meet customer demand for this elective

25  procedure with its *Essure* system, which is significantly more reliable than the Adiana System.

26  (Sloan Decl. ¶ 10) (Ex. 8 at 32, Ex. 12 at 7 and Ex. 9 at 17).

27  **IV.    BOND**

28         Given that the infringing Adiana System has no legal value and, as discussed above, Hologic

has stated that not being able to sell the Adiana System does not "have a material adverse impact on our results of operations," Conceptus respectfully submits that a nominal bond, if any, is adequate. (Ex. 17 at 51). *See Printers Servs. Co. v Bondurant*, 20 USPQ2d 1626, 1633 (C.D. Cal. 1991) (imposing a nominal $1,000 bond).

## V.    CONCLUSION

All four injunction factors strongly favor granting Conceptus' motion for preliminary injunction and for the reasons set forth above a preliminary injunction should issue. Because Hologic only received FDA approval several days ago, the present motion seeks to maintain the status quo.


Dated:  July 9, 2009                          BAKER & McKENZIE LLP


                                              By:/s/ Howard N. Wisnia
                                                 Howard N. Wisnia
                                                 Attorney for Conceptus, Inc.
                                                 howard.n.wisnia@bakernet.com