M. PATRICIA THAYER (STATE BAR NO. 90818)
pthayer@sidley.com
SIDLEY AUSTIN LLP
555 California Street
San Francisco, CA 94104
Telephone:     (415) 772-1200
Facsimile:      (415) 772-7400

NICHOLAS A. BROWN (STATE BAR NO. 198210)
nick.brown@weil.com
PAUL T. EHRLICH (STATE BAR NO. 228543)
paul.ehrlich@weil.com
JILL J. HO (STATE BAR NO. 236349)
jill.ho@weil.com
L. OKEY ONYEJEKWE, JR. (STATE BAR NO. 250354)
okey.onyejekwe@weil.com
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA  94065
Telephone:     (650) 802-3000
Facsimile:      (650) 802-3100

Attorneys for Plaintiff
CONCEPTUS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONCEPTUS, INC., <br><br> Plaintiff, <br><br> v. <br><br> HOLOGIC, INC., <br><br> Defendant. | Case No.  09-cv-02280-WHA <br><br> **CONCEPTUS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** <br><br> Complaint Filed:  5/22/09 <br> Trial Date:  None Set <br> The Honorable William H. Alsup |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................1

II. BACKGROUND: CONCEPTUS'S INVENTIONS.................................................2

    A.    The Inventions Of The '361 Patent........................................................2

    B.    The Inventions Of The '650 Patent........................................................5

III. LEGAL BACKGROUND ........................................................................................6

IV. ARGUMENT ............................................................................................................7

    A.    The Disputed Terms In The '361 Patent ...............................................7

        1.    "resilient elongate body/pre-formed resilient structure" (Claims 8, 37, 38) ...........................................................7

        2.    "a bond affixing the retention structure to the resilient body" (Claim 8) ................................................................9

        3.    "permanently affixing the resilient structure within the fallopian tube" (Claims 37, 38) .......................................10

            a.    The Plain Meaning Of "Permanently" Supports Conceptus's Proffered Construction ...............................11

            b.    The '361 Specification Supports Conceptus's Position .................11

        4.    "lumen-traversing region of the resilient structure" (Claims 37, 38).........12

            a.    "Lumen-Traversing" Has An Established Meaning To One Of Ordinary Skill In The Art.................12

            b.    The '361 Specification Teaches Traversing The Width Of The Lumen, Not The Entire Length Of The Fallopian Tube .........13

        5.    "so that at least a portion of the fallopian tube is open" (Claims 37, 38).........................................................15

            a.    The Claim Language Shows That Conceptus's Construction Is Correct.................16

            b.    The Specification Of The '361 Confirms That "Open" Means "Not Completely Occluded".................17

            c.    Claims 37 And 38 Are Not Indefinite ...........................................18

    B.    The Disputed Terms In The '650 Patent ...............................................18

a.     Conceptus's Construction, Unlike Hologic's, Is Consistent With The Use Of "Coupled To" In The Claims And The Specification.................................................................................19

b.     Hologic Is Inappropriately Reading Features From An "Exemplary" Embodiment Into The Claim....................................20

V. CONCLUSION .......................................................................................................21

1

## TABLE OF AUTHORITIES

2

### CASES

3

4 *Acumed LLC v. Stryker Corp.*,
483 F.3d 800 (Fed. Cir. 2007)........................................................................ 7

5
*Exxon Research & Eng'g Co. v. United States*,
6 265 F.3d 1371 (Fed. Cir. 2001)...................................................................... 18

7 *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
493 F.3d 1358 (Fed. Cir. 2007)...................................................................... 7
8
*Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*,
9 540 F.3d 1337 (Fed. Cir. 2008)...................................................................... 6

10 *Kara Techs., Inc. v. Stamps.com Inc.*,
582 F.3d 1341 (Fed. Cir. 2009)................................................................. 8, 20
11
*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*,
12 445 F.3d 1348 (Fed. Cir. 2006)...................................................................... 7

13 *Linear Tech. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009)...................................................................... 6
14
*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
15 474 F.3d 1323 (Fed. Cir. 2007)...................................................................... 7

16 *Nazomi Comm'ns, Inc. v. ARM Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005)...................................................................... 6
17
*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
18 521 F.3d 1351 (Fed. Cir. 2008)...................................................................... 6

19 *Oatey Co. v. IPS Corp.*,
514 F.3d 1271 (Fed. Cir. 2008).......................................................... 7, 8, 10, 16
20
*OSRAM GmbH v. Int'l Trade Comm'n*,
21 505 F.3d 1351 (Fed. Cir. 2007)...................................................................... 7

22 *Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)............................................. 2, 6, 8, 9
23
*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
24 563 F.3d 1358 (Fed. Cir. 2009)................................................................. 8, 21

25 *Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed.Cir.2007)....................................................................... 7
26

27

28

*Vitronics Corp. v. Conceptronic, Inc.,*
      90 F.3d 1576 (Fed. Cir. 1996) ......................................................................................... 7, 8

# I.

## INTRODUCTION

Conceptus, Inc.'s ("Conceptus's") pioneering Essure product was the first to allow permanent female sterilization without invasive surgery.  It was approved by the U.S. Food and Drug Administration ("FDA") in 2002, and was the only transcervical permanent sterilization product on the market for seven years.  This feat was made possible by Conceptus's invention of what Hologic, Inc.'s ("Hologic's") expert acknowledged as a "completely new successful mechanism" that was a "significant breakthrough."  Conceptus's Essure product combines a permanent implant that is inserted into the patient's fallopian tubes with promoting tissue ingrowth from the fallopian tubes into the implants, in order to secure the implants in place and block the tubes.  Aspects of Conceptus's pioneering approach are disclosed and claimed in the patents that are at issue in this case, United States Patent Nos. 6,634,361 ("the '361 patent") and 7,506,650 ("the '650 patent").  *See* Exhs. A & B.[1]  The inventions claimed in the '361 patent relate to the technique of promoting tissue ingrowth into a permanent implant, and the inventions claimed in the '650 patent relate to the mechanism used to insert the implant into the fallopian tubes.

In 2009, Hologic entered the transcervical permanent sterilization market when its Adiana Transcervical Sterilization System ("Adiana") was approved by the FDA.  *See* Exh. C.  Hologic's Adiana product follows in Conceptus's footsteps, using the same approach of inducing tissue ingrowth into a transcervically inserted implant in order to achieve permanent sterilization.  There are two differences between Conceptus's Essure product and Hologic's Adiana product that are helpful to understand the claim construction disputes here.  First, the Essure implant is made of metal coils, whereas the Adiana implant is made of silicone, with a solid core surrounded by a porous architecture that provides a scaffold for tissue ingrowth.  Exh. D at 50-51.  Second, Adiana promotes tissue ingrowth in part by injuring the fallopian tubes at the location of the implant using radiofrequency energy, while Essure promotes tissue ingrowth in part through

---

[1] As used herein, "Exh. ___" refers to Exhibits to the Declaration of Nicholas A. Brown in Support of Conceptus, Inc.'s Opening Claim Construction Brief.

1   polyethylene terephthalate ("PET") fibers which are attached to its inner metal coil.  *Compare*

2   Exh. E at 1 *with* Exh. F at 3.

3            The claim construction disputes in this case stem primarily from Hologic's

4   attempts to limit the asserted claims to the Essure-like embodiments disclosed in Conceptus's

5   patents, notwithstanding the fact that neither the claims nor the disclosures of Conceptus's patents

6   are limited to the specifics of its Essure product, and in fact are directed more generally to

7   Conceptus's invention of a "completely new successful mechanism" that combined a permanent

8   implant with promoting tissue ingrowth.  Thus, for example, Hologic seeks to limit the terms

9   "body" and "structure" in the '361 patent to objects containing metal, despite the patent's

10  disclosure of non-metallic embodiments.  Similarly, Hologic seeks to limit the "bond" in claim 8

11  of the '361 patent to "solder or a similar type material," when solder is only one of several types

12  of bonds disclosed in the specification.  As described in further detail below, Hologic's attempts

13  to import limitations from the specification into the claims violate long-standing principles of

14  claim construction, and should be rejected.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323

15  (Fed. Cir. 2005) (*en banc*) (holding that "although the specification often describes very specific

16  embodiments of the invention, we have repeatedly warned against confining the claims to those

17  embodiments").

**II.**

**BACKGROUND: CONCEPTUS'S INVENTIONS**

20  **A.      The Inventions Of The '361 Patent**

21           The commercial embodiment of the '361 patent is Conceptus's pioneering Essure

22  product.[2]  As noted above, Essure was the first medical device to obtain FDA approval for

23  ***permanent transcervical*** female sterilization.  Hologic's expert, Dr. Anderson, described this

24  achievement as the "holy grail of sterilization":

25           Q.      When did you first learn about research into hysteroscopic
                 techniques for permanent female sterilization?

26
             A.      Well, this has sort of been the holy grail of sterilization for

27
─────────────────────────
28  [2] *See* Exh. E at 6 (showing Essure is marked with '361 patent).

many years, and attempts to achieve sterilization by hysteroscopic technique date way back to the '70s and '80s, as far as I'm aware.

Q.     And why do you say that -- Why do you say that transcervical techniques for permanent female sterilization are the holy grail?

A.     Well, up until the availability of these techniques, women, in order to achieve permanent sterilization, had to undergo surgical procedures that carried with them risk and inconvenience and recovery time and time away from work, time away from home, whereas the transcervical sterilization procedures do not involve that.  They basically achieve the equivalent of the male vasectomy, something that can be done in the office very quickly with minimal amount of discomfort and inconvenience. And so the ability for women to have that available certainly improves their access to sterilization.

*See* Exh. G at 11:14-12:12.[3]

Essure was the only permanent transcervical female sterilization device approved by the FDA for seven years, from 2002 until 2009.  *See* Exhs. C and H.   Conceptus's pioneering device was made possible by its invention of what Hologic's expert called a "completely new successful mechanism" that was a "significant breakthrough":

A.  I think that many average—just call them doc on the street— many average OB/GYNs didn't have a full appreciation of the history and did not have an appreciation of the fact that this had been attempted many times before and had been unsuccessful.  And I don't think that they really appreciated how this might change the way that women would have access to and avail themselves of permanent sterilization in the future.

Q.  When you say "the history," what are you saying in terms of the history of the attempt to make a—devise a transcervical technique for permanent female sterilization?

A.  Well, many people may not have even been aware that that had ever been attempted before. You have to remember that I consider, many people consider OB/GYN to be a little bit of a schizophrenic

---

[3] As Conceptus's '361 patent explained when it was filed in 1995, while "worldwide demand exists for safe, effective methods of … permanent sterilization," "all of the existing methods have limitations and disadvantages."  Exh. A at 1:27-35.  At the time, permanent sterilization of women was performed using laparoscopic surgery. Exh. G at 11:14-12:12.  Avoiding the need for surgery was obviously desirable, but accomplishing that was difficult.  As Hologic's expert testified, failed attempts "to achieve sterilization by hysteroscopic technique date way back to the '70s and 80s." *Id.* at 11:14-21.  These failed efforts including using devices to plug the tubes, as well as efforts to cause tissue growth to occlude the tubes.  *Id.* at 14:3-15:19.  Reflecting these failed attempts, even after Conceptus' approach became known, "there was a general skepticism" whether it "was going to work," because it just "another mechanism to try to occlude the tube transcervically." *Id.* at 48:21-49:10.

specialty in that OB is very different from GYN, and many docs on the street are out there delivering babies and so they really aren't following the intricacies of GYN surgery. And so when a new technique comes along they might embrace it, but they may not really be fully cognizant of what led to that or what happened in the past, of why that might be such a ***significant breakthrough***.

Q.   When you say "significant breakthrough," what are you referring to?

A.  The fact that it offered ***a completely new successful mechanism*** to achieve sterilization that did not involve making incisions in the abdomen.

Q.  Are you referring to the Conceptus?

A.  Correct.

Exh. G at 32:5-11 (emphasis added).

Conceptus's breakthrough mechanism is summarized in the Essure Instructions For Use as follows:

Using a ***transvaginal approach***, one Essure micro-insert is placed in the proximal portion of each fallopian tube lumen.  When the Essure micro-insert expands upon release, it acutely anchors itself in the fallopian tube.  Subsequently, the Essure micro-insert elicits an intended benign, occlusive tissue response, ***resulting in tissue in-growth into the device that anchors the device and occludes the fallopian tube, resulting in permanent contraception***.

Exh. E at 1.

Aspects of this mechanism, which relies on "tissue in-growth" into a permanent device, where the tissue ingrowth anchors the device in place and occludes the fallopian tube, were the subject of two Conceptus patent applications filed by Julian Nikolchev and Dai Ton in 1995.  One of these applications eventually issued as the '361 patent, which is at issue here, and the other eventually issued as the '904 patent, which was asserted in the preliminary injunction proceedings.[4]

As set forth below, asserted claims 37 and 38 of the '361 patent reflect the tissue ingrowth mechanism which Essure uses to accomplish sterilization:

---

[4] *See* Exh. A (claiming priority to App. No. 08/475,252 and Exh. I (claiming priority to App. No 08/474,779).  The '904 patent is no longer at issue in this case.

36. An intrafallopian contraceptive method comprising:

*transcervically introducing a pre-formed resilient structure* into a target region of a fallopian tube;

imposing an anchoring force against a tubal wall of the fallopian tube by resiliently engaging an inner surface of the tubal wall with the resilient structure; and

*permanently affixing the resilient structure within the fallopian tube* with a lumen-traversing region of the resilient structure so that at least a portion of the fallopian tube is open.

37. A method as claimed in claim 36, *wherein the affixing step comprises promoting tissue ingrowth* of the tubal wall surrounding the resilient structure.

38. A method as claimed in claim 37, *wherein the tissue ingrowth occludes the fallopian tube* to inhibit conception.

Exh. A at claims 36-38 (emphasis added).

The other asserted claim in the '361 patent, claim 8, describes a contraceptive device that is designed to use Conceptus's breakthrough mechanism, claiming "A tissue ingrowth contraceptive device" which includes a "microporous material which promotes tissue ingrowth therein." Exh. A at claim 8.

### B. The Inventions Of The '650 Patent

The '650 patent was filed in 1999, four years after the application that led to the '361 patent, and after the development of Essure had further progressed. The '650 patent is generally directed to an improved delivery mechanism for intrafallopian contraceptive devices. Specifically, it discloses a delivery mechanism that has a handle adapted for one-handed use by a healthcare provider. Claim 5 of the '650 patent is representative:

5. A contraceptive method comprising:

*inserting a contraceptive device transcervically* into an ostium of a fallopian tube *by gripping a handle with a hand and moving the hand*, the handle coupled to the contraceptive device by an elongate body;

*withdrawing a sheath* surrounding the elongate body and at least a portion of the contraceptive device by moving the sheath proximally relative to the elongate body to expose the contraceptive device, *such movement effected by moving an actuator on the handle with the hand while the hand grips the handle*;

and detaching the contraceptive device from the elongate body within the ostium to inhibit conception.

Exh. B at claim 5. This claim is directed to a method for transcervically delivering a contraceptive device, using a handle coupled to the contraceptive device (*i.e.*, the "elongate body"). Once inserted, a sheath surrounding the contraceptive device is withdrawn by "moving an actuator on the handle with the hand while the hand grips the handle."

## III.

## LEGAL BACKGROUND

The fundamental principles of claim construction are well known to the Court and are only briefly summarized herein. The goal of claim construction is to determine the meaning and scope of the terms for which "the parties present a fundamental dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). This does not mean, however, that the court must construe all claim terms. *Id.*

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Phillips*, 415 F.3d at 1313. Where the ordinary meaning of claim language as understood by a person of skill in the art is readily apparent even to a layperson, claim construction may involve "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

"The claims made in the patent are the sole measure of the grant." *Phillips*, 415 F.3d at 1312. Those claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification." *Nazomi Comm'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005). Thus, the claims of the patent are ***not*** normally construed as being limited to express embodiments "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Phillips*, 415 F.3d at 1323. Indeed, the Federal Circuit has "repeatedly held that, even in situations when only one embodiment is disclosed, the claims generally should not be narrowed to cover only the disclosed embodiments or examples in the specification." *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1058 (Fed. Cir. 2009) (internal citations omitted); *Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540 F.3d 1337, 1344 (Fed. Cir. 2008)

1    (holding that "the fact that the specification describes only a single embodiment, standing alone,

2    is insufficient to limit otherwise broad claim language"); *Acumed LLC v. Stryker Corp.*, 483 F.3d

3    800, 805 (Fed. Cir. 2007) (rejecting as contrary to *Phillips* defendant's "attempt to import a

4    feature from a preferred embodiment into the claims").

5          At the same time, claims should be construed to include the embodiments

6    described in the specification.  Courts have long held that a claim interpretation that excludes a

7    preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary

8    support."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  Indeed, the

9    Federal Circuit has consistently rejected constructions that exclude disclosed embodiments from

10   the scope of the claim.  *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008);

11   *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed.Cir.2007); *OSRAM*

12   *GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007); *Honeywell Int'l, Inc. v.*

13   *Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1364 (Fed. Cir. 2007); *MBO Labs., Inc. v. Becton,*

14   *Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007); *Lava Trading, Inc. v. Sonic Trading*

15   *Mgmt., LLC*, 445 F.3d 1348, 1353-55 (Fed. Cir. 2006).

**IV.**

**ARGUMENT**

**A.      The Disputed Terms In The '361 Patent**

**1.      "resilient elongate body/pre-formed resilient structure"
             (Claims 8, 37, 38)**

| Term | Conceptus's Construction | Hologic's Construction |
|---|---|---|
| resilient elongate body | a resilient elongate intrafallopian device | a resilient elongate intrafallopian device that includes, at least in part, metal |
| pre-formed resilient structure | pre-formed resilient intrafallopian device | a pre-formed resilient intrafallopian device that includes, at least in part, metal |

The dispute here boils down to whether the terms "body" and "structure"—which

refer to the devices that are placed in the fallopian tubes to inhibit conception—are limited to

structures that include metal.  They should not be.[5]

"The words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics*, 90 F.3d at 1582).  The terms "body" and "structure" are broad, generic terms whose ordinary meaning includes both metal and non-metal devices.  Glasser Decl. at ¶ 11.  To limit these common, broad terms to metal-containing devices, Hologic would have to make a showing that non-metal devices had been disclaimed with "deliberateness" and "reasonable clarity."  *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1368 (Fed. Cir. 2009).

Hologic cannot show that non-metal devices were disclaimed, because the specification includes specific examples of the invention that are not made of metal:

- "Alternative embodiments may include an open cell ingrowth promoting structure, such as the open cell foams used to attach some breast implants."

- "Still further alternative retention structures may be used in place of a helical secondary coil 204 and slotted tube 320.  For example, a Malecott [*sic* Malecot] retention structure 324 or a braided filament retention structure 326 might be expanded to engage a surrounding tubal wall."

Exh. A at 14:1-3 and 18:19-23.  These examples confirm what the chosen claim language implies: that the invention was not intended to be limited to metal devices, but was instead meant to encompass devices made of a variety of materials.  This would include, for example, the silicone used for the "open cell ingrowth promoting structure" used to attach some breast implants.  *See* Glasser Decl. at ¶¶ 12-14.  Accordingly, the claims should not be limited to metal.  *See, e.g.*, *Oatey.*, 514 F.3d at 1276-77 (rejecting proposed claim interpretation that would exclude an example in the specification).

While Hologic will no doubt point out that the embodiment described in the most detail in the specification uses metal coils, this is not a legitimate reason to limit the claims.  *See,*

---

[5]  In accordance with the Court's November 6, 2009 Case Management Order, Conceptus is including a footnote for each disputed term identifying how resolution of the claim construction dispute might affect summary judgment issues.  Here, the intrafallopian device in Hologic's Adiana product is made of silicone, not metal.  If the court limits the terms "body" and "structure" to devices that include metal, Hologic may seek summary judgment of non-infringement.

*e.g.*, *Kara Techs., Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347-48 (Fed. Cir. 2009) (refusing to limit claims even where "the only detailed embodiments in the patent" contain a particular limitation and "the specification repeatedly discusses" that limitation); *Phillips*, 415 F.3d at 1323.

**2.    "a bond affixing the retention structure to the resilient body" (Claim 8)**

| Term | Conceptus's Construction | Hologic's Construction |
|------|--------------------------|------------------------|
| a bond affixing the retention structure to the resilient body | plain meaning applies - does not require construction | solder or a similar type material for affixing the retention structure to the resilient body |

Here, the parties' dispute arises from Hologic's attempt to limit the term "bond" to the use of "solder or a similar type material." This attempt should be rejected for reasons similar to those discussed above in the context of the term "body."[6]

As stated above, "the words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13. The term "bond" would not ordinarily be limited to "solder." Glasser Decl. at ¶ 16 ("[t]he word 'bond' is a generic term that does not have any special meaning in the field: it could refer to a physical bond, a chemical bond, or any other type of bond that joins the retention structure and the resilient body."). *See also* Exh. J (*bond*: "something that binds, fastens, confines, or holds together").

The specification confirms that the term "bond" should not be limited to solder. To be sure, a bond made of solder is one example provided by the specification. *See* Exh. A at 12:15-18. But the specification also provides examples of bonds that are not made of solder. For example, the specification describes bonds made of micro-porous materials, bio-glass, and ceramics, in addition to bonds made of metal. *See* Exh. A at 4:56-60; 13:60-63. The disclosure of bonds made of a variety of materials demonstrates that "bond" includes more than just "solder or a similar type material."[7] Thus, the specification supports Conceptus's proposal that "bond"

---

[6] Potential summary judgment issue: The intrafallopian device in Hologic's Adiana product is a silicone structure with an open-cell foam retention structure surrounding and connected to a solid core. Hologic will likely argue that its silicone device does not infringe a claim that requires "solder or a similar type material."

[7] Another problem with Hologic's proposed construction is that "solder or a similar type material" is ambiguous. It is not clear what Hologic intends to be encompassed by "a similar type material."

should not be limited to "solder," and should be read in accordance with its plain and ordinary meaning. *See, e.g. Oatey*, 514 F.3d at 1276-77 (rejecting proposed claim interpretation that would exclude an example in the specification).

> **3.** **"permanently affixing the resilient structure within the fallopian tube" (Claims 37, 38)**

| Term | Conceptus's Construction | Hologic's Construction |
|---|---|---|
| permanently affixing the resilient structure within the fallopian tube | affixing the resilient structure within the fallopian tube, such that it remains (or is intended to remain) affixed in the fallopian tube for a long, indefinite period | affixing the resilient structure within the fallopian tube so long as it is in the tube, e.g., is not expelled or absorbed |

The disputed issue is whether the claim language "***permanently*** affixing … within the fallopian tube" should include "***temporarily*** affixing … within the fallopian tube." Conceptus's proposed construction seeks to give effect to the word "permanently," whose meaning is at the core of the dispute, by replacing it with its ordinary English meaning as shown in dictionaries from the relevant time.[8]  Hologic's proposed construction, in contrast, is designed to include a ***temporarily*** attached structure (i.e. one that is affixed with the intention that it will dissolve or be expelled) within the scope of the phrase "***permanently*** affixing the resilient structure within the fallopian tube."  Under Hologic's construction, a biodegradable device that was affixed to the tube for a day before it dissolved would still be "permanently affixed … within the tube" because it would be affixed "within the fallopian tube" for "so long as it is in the tube."[9]  Similarly, a device that was designed to be affixed to the tube for a week and then expelled would be considered "permanently affixed .. within the tube."   That is inconsistent with common sense, and is also inconsistent with the nature of the invention that is claimed in the '361 patent.  No one of ordinary skill in the art would consider a device that was absorbed or expelled within a matter

---

[8] Though Conceptus has submitted a claim construction that it believes reflects the plain meaning of "permanently," Conceptus also believes that the word "permanently" is understandable by a jury.  Thus, in resolving this dispute the court need only decide whether "permanently affixed … within the fallopian tube" includes something which is temporarily affixed, *i.e.*, affixed only "so long as it is in the tube."

[9] Potential summary judgment issue: If "permanently affixing" is given Hologic's proposed construction, Hologic will likely argue that the Vancaillie patent, which discloses the use of a biodegradable intrafallopian device that is intended to be quickly absorbed by the body, invalidates Claims 37 and 38.

of weeks or months to be "permanently affixed" within a fallopian tube, nor could such a device provide the permanent contraception that is described in the '361 patent.  *See* Glasser Decl. at ¶ 20.  Accordingly, as shown below, Conceptus's construction should be adopted.

### a.     The Plain Meaning Of "Permanently" Supports Conceptus's Proffered Construction

The ordinary English meaning of the word "permanently" shows that a structure that is "permanently affixed .. within the tube" is one that remains (or at is intended to remain) affixed within the fallopian tube for a long, indefinite period of time.  Below is a set of dictionary definitions of the word "permanently":

- "lasting, or intended to last or function, indefinitely (opp. TEMPORARY).

- "1. existing perpetually: everlasting.  2. intended to serve, function, etc. for a long, indefinite period. *permanent headquarters*. 3. long-lasting or nonfading. *permanent pleats*.

- "continuing or enduring without fundamental or marked change: STABLE."

Exhs. K-M.  Thus, Conceptus's proffered construction should be adopted because it comports with the ordinary meaning of the word "permanently."

### b.     The '361 Specification Supports Conceptus's Position

The intended purpose of the invention, as described in the '361 patent, provides further support for the view that "permanently affixing … within the fallopian tube" should be construed to have its ordinary meaning of affixing the device within the fallopian tube for a long, indefinite period of time.  The specification repeatedly critiques the preexisting contraceptive methods for failing to prevent conception due to their failure to retain their contraceptive devices permanently within the fallopian tube.  *See, e.g.*, Exh. A at 1:50-53 (describing how IUDs are subject to unplanned expulsion); 2:18-46 (describing other devices that fail to remain permanently within the fallopian tube).  In contrast, the inventive device is consistently described as being retained within the fallopian tube to inhibit conception and ***not*** expelled or absorbed. *See, e.g.*, *id.* at 5:63-64 ("The device is adapted to be retained within the fallopian tube so as to

inhibit conception."); *id.* at 6:26-28 ("The body is anchored within the fallopian tube so that the affixed resilient body inhibits conception.").

A person of ordinary skill in the art would therefore understand that the '361 patent is directed to a contraceptive device that is permanently, not temporarily, affixed within the fallopian tube, exactly as recited in the claim language. *See* Glasser Decl. at ¶¶ 19-24.

**4.    "lumen-traversing region of the resilient structure" (Claims 37, 38)**

| Term | Conceptus's Construction | Hologic's Construction |
|------|--------------------------|------------------------|
| lumen-traversing region of the resilient structure | region of the resilient structure that crosses the width of the fallopian tube | a section of the resilient structure that crosses the entire length of the fallopian tube lumen |

The parties' dispute here is whether the "lumen-traversing region of the resilient structure" must traverse the "width" (Conceptus's position) or the "entire length" (Hologic's position) of the fallopian tube lumen. Conceptus's proffered construction is consistent with the claim language, specification, and other evidence. In contrast, Hologic's insistence that the *entire* length of the fallopian tube must be traversed by the contraceptive device would improperly exclude several of the disclosed embodiments.[10]

**a.    "Lumen-Traversing" Has An Established Meaning To One Of Ordinary Skill In The Art**

As Dr. Glasser opines, a person of ordinary skill in the art would expect the phrase "lumen-traversing" as used in the context of the claimed contraceptive method to mean traversing the width, not the length, of the fallopian tube. *See* Glasser Decl. at ¶ 25. When a person of ordinary skill envisions the lumen within the fallopian tube, he or she thinks of a cross-section, not the length of the tube. *Id.* at ¶ 26. Moreover, all existing contraceptive methods that attempt to inhibit conception by occluding the fallopian tube do so by traversing the width of the lumen, not the length of the fallopian tube. *Id.* at ¶ 27. This makes sense if one considers a garden hose—to prevent water from flowing through the hose, one would need to block the cross-section

---

[10] Potential summary judgment issue: Hologic's Adiana device, like Essure and the embodiments in the patent, does not traverse the "entire length" of the fallopian tube. Accordingly, if the Court were to adopt Hologic's construction, Hologic would argue that Adiana does not infringe the asserted claims.

of the hose.  A piece of string that extended along the length of the hose would be completely ineffective.  While any three-dimensional object inserted into the fallopian tube will occupy some amount of the length of the tube, and some amount of its width, it is spanning the width that matters when the goal is blocking the tube; spanning the length is ineffective.  Thus, Hologic's position that "lumen-traversing" refers to spanning the length of the tube does not make sense in the context of the claim.

In addition, Hologic's argument that the ***entire*** length of the fallopian tube must be traversed is overreaching.  Indeed, it would be very difficult for a contraceptive device to traverse the entire length of the fallopian tube, given the many folds and twists and turns of the tube.  *Id.*

### b.   The '361 Specification Teaches Traversing The Width Of The Lumen, Not The Entire Length Of The Fallopian Tube

Several passages in the specification show that Conceptus's proffered construction of "lumen-traversing" is correct.  First, the '361 patent teaches that the contraceptive device "is anchored within the fallopian tube by a lumen-traversing region of the resilient structure" and is biased to have a shape with a "larger ***cross-section*** than the fallopian tube."  *See* Exh. A at Abstract (emphasis added).  The contraceptive device is designed in this way so that it will remain within the fallopian tube, much like a cork is made wider than the lumen in the neck of a wine bottle to anchor it in place and seal the bottle.

Second, the sections of the specification discussing the lumen of the fallopian tube describe the cross-sectional diameter of the lumen.  *See id.* at Figure 15A (replicated below) and 16:52-65.



FIG. 15A.

These portions of the specification would be understood by a person of ordinary skill to mean that the claimed resilient structure of the '361 patent must cross the width of the lumen.

Even the portions of the specification cited by Hologic in its portion of the Joint Claim Construction Statement confirm that Conceptus's proposed construction is correct. *See* Exh. N. For example, Hologic points to Figure 1 of the '361 patent, reproduced below, as evidence that the lumen-traversing region (24) is traversing the length of the fallopian tubes instead of the width.



FIG. 1.

*See* Exh. A at Figure 1. The fact that the arrows showing the "lumen-traversing region (24)" of the device are pointing along the length of the fallopian tube (when the device is inserted) might seem to suggest that the lumen-traversing region spans the length of the tube. In fact, that is not the case, as is shown by the specification's description of this figure. The specification shows that the "lumen-traversing region" does not span the length of the fallopian tube. The arrows are oriented the way they are not to suggest that the lumen must be traversed length-wise, but to distinguish the "lumen-traversing region" of the "primary coil" that is shown in Figure 1 from the two looped "anchor portions" of the primary coil. Moreover, the specification's description of the "lumen-traversing region 24" shows that this region must cross the width of the tube in order to function as described.

Specifically, the specification states that device shown in Figure 1 is formed from a "primary coil 12" which "includes three portions: a proximal anchor portion 20, a distal anchor portion 22, and a lumen-traversing region 24." Exh. A at 9:11-14. As this suggests, and as can be seen in the figure, the primary coil is divided roughly into thirds, with the two end portions

"biased to form anchoring loops."  The primary coil has a total length "in the range from 20 mm to 150 mm," and "[i]deally … a length in the range from 30 mm to 125 mm."  *Id.* at 9:27-33. Given that about two-thirds of that length is designed to curl up in the anchor portions, the uncurled region of the device would span about 50mm in the longest (150mm) embodiment, and about 7mm in the shortest (20mm) embodiment.  *See* Glasser Decl. at ¶ 31.  Since the length of a typical fallopian tube is 12 cm (120mm), *see* Glasser Decl. at Exh. B, it is clear that the "lumen-traversing region" illustrated in Figure 1 was not intended to span the entire length of the tube.

The specification goes on to show that the "lumen-traversing region 24" is in fact intended to span the width of the tube.  Referring to Figure 1, the specification explains that "[r]ibbon 28 includes ***sharp outer edges 29, which firmly anchor lumen-traversing region 24 in the fallopian tube wall when torque is applied*** to intrafallopian device 10."  *See* Exh. A at 9:19-21.  If the lumen-traversing region did not cross the width of the tube, then its "sharp outer edges" would not anchor in the fallopian tube wall when torque was applied—they would simply twist within the open lumen.

In sum, Hologic's construction should be rejected because it is inconsistent with how a person of ordinary skill in the art would understand the claim language, and because it would improperly exclude disclosed embodiments, even the embodiments described in connection with Figure 1.  *See, e.g.*, *Oatey Co. v. IPS Corp.*, 514 F.3d at 1271 ("At lease [sic] where claims can reasonably to interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the contrary").  Accordingly, the Court should adopt Conceptus's proposed construction, which is consistent with the specification and a common-sense reading of the claim language.

### 5.    "so that at least a portion of the fallopian tube is open" (Claims 37, 38)

| Term | Conceptus's Construction | Hologic's Construction |
|---|---|---|
| so that at least a portion of the fallopian tube is <u>open</u> | so that at least a portion of the fallopian tube <u>is not completely occluded</u> | Indefinite subject to 35 U.S.C. § 112. To the extent that this term can be understood, it means that there is no |

| | | obstruction in the fallopian tube preventing the meeting of sperm and ovum. |
|---|---|---|

The parties dispute whether the phrase "so that at least a portion of the fallopian tube is open" can be construed and, if so, whether it means that the fallopian tube "is not completely occluded" (Conceptus's position) or that "there is no obstruction in the fallopian tube preventing the meeting of sperm and ovum" (Hologic's position).   Conceptus's proffered construction should be adopted because, unlike Hologic's position, it is consistent with the claim language, the specification, and with common sense.[11]

### a. The Claim Language Shows That Conceptus's Construction Is Correct

The context provided by the claims as a whole makes clear what this limitation requires: that the contraceptive device leave open space in the lumen of the fallopian tube so that tissue ingrowth can occur to occlude the tube and anchor the device.   Below is the relevant portion of claims 37 and 38:

> ***permanently affixing the resilient structure*** within the fallopian tube with a lumen-traversing region of the resilient structure ***so that at least a portion of the fallopian tube is open***.

> 37. A method as claimed in claim 36, ***wherein the affixing step comprises promoting tissue ingrowth*** of the tubal wall surrounding the resilient structure.

> 38. A method as claimed in claim 37, ***wherein the tissue ingrowth occludes the fallopian tube*** to inhibit conception.

These claims require that the resilient structure be permanently affixed, that the affixing step include "promoting tissue ingrowth," and that the "tissue ingrowth occludes the fallopian tube."   Common sense dictates that if tissue ingrowth occurs, and that ingrowth occludes the tube, then the device when initially inserted must not, itself, have completely occluded the tube.   Rather, after insertion of the device, open space remains so that the ingrowth can occur.   Thus, a person of ordinary skill in the art would understand that claims 37 and 38

---

[11] Potential summary judgment issue: Hologic's Adiana device, like Essure and the embodiments described in the patent, partially blocks the fallopian tube when implanted.   Accordingly, if the Court were to adopt Hologic's construction, Hologic may argue that Adiana does not infringe the asserted claims because it provides some obstruction of the tube, not "no obstruction" as required by its proposed construction.

1   require that the resilient structure does not completely occlude the tube when inserted. *See*

2   Glasser Decl. at ¶¶ 35-39.

3           In addition, the claim language shows that Hologic's proposed construction—that

4   there can be "no obstruction in the fallopian tube"—is incorrect.  The disputed phrase itself—"so

5   that at least a portion of the fallopian tube is open"—implies that while a portion of the fallopian

6   tube is open, another portion is not.  Simple common sense confirms this, because the complete

7   claim limitation requires "permanently affixing the resilient structure within the fallopian tube

8   with a lumen-traversing region of the resilient structure so that at least a portion of the fallopian

9   tube is open."  Obviously, at least a portion of the tube will necessarily be blocked by the resilient

10  structure.   The point of this limitation is not that the tube is completely open, with "no

11  obstruction."   Rather, the point is that there is some space in the tube after insertion of the

12  resilient structure, in order to allow the claimed tissue ingrowth to occur. *See id.* at ¶ 35.

### b.   The Specification Of The '361 Confirms That "Open" Means "Not Completely Occluded"

15          The '361 patent includes several passages that make clear that, in at least some

16  embodiments, the claimed intrafallopian contraceptive devices do not completely occlude the

17  fallopian tube themselves, but rely on promoting tissue ingrowth for occlusion. *See* Exh. A at

18  11:19-50 (explaining that leaving some open space will "minimize distention of the delicate tubal

19  tissue" and simultaneously provide space for tissue ingrowth to provide total occlusion); 13:54-

20  14:3 (describing embodiments such as open cell foams, which have space for tissue ingrowth);

21  17:16-26 (describing how the contraceptive effect of the device is "enhanced by the formation of

22  scar tissues and the growth of tissues from the tubal wall so as to occlude [the] lumen").   The

23  repeated descriptions in the specification of using tissue ingrowth to occlude an otherwise

24  partially open tube confirm that Claims 37-38 are intended to describe a system wherein the

25  fallopian tube is not completely occluded by the device, but eventually become occluded as the

26  tissue ingrowth occurs.

27

28

### c.   Claims 37 And 38 Are Not Indefinite

Hologic's argument that this disputed term is indefinite should be rejected. As a preliminary matter, indefiniteness (like other claims of invalidity) must be proven by clear and convincing evidence. The Federal Circuit has explained that claim language need only be "amenable to construction, however difficult that task may be," in order to overcome an indefiniteness argument. *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1374 (Fed. Cir. 2001) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.") Here, Hologic's indefiniteness position does not come close to meeting this stringent test. Indeed, the mere fact that Hologic is capable of proffering a construction at all belies its contention that this term is indefinite and cannot be construed. And, as explained above, the claim language is readily understood by reference to the specification.

### B.   The Disputed Terms In The '650 Patent

| Term | Conceptus's Construction | Hologic's Construction |
|---|---|---|
| the handle coupled to the contraceptive device by an elongate body | the handle paired to or joined with the contraceptive device by an elongate body | the handle is mechanically attached to the contraceptive device by the elongate body by threads, cooperating key/slots, connectors, or the like |
| a deployment shaft having a proximal end and a distal end releasably coupled to the contraceptive device | a deployment shaft having a proximal end and a distal end paired to or joined with the contraceptive device | a deployment shaft having a proximal end and a distal end that is configured to mechanically attach and detach from the contraceptive device by threads, cooperating key slots, connectors, or the like |

The only terms in the '650 patent whose construction are disputed relate to the term "coupled." The issue is whether the term "coupled" should be limited to things which are "mechanically attached … by threads, cooperating key slots, connectors, or the like," as Hologic suggests, or whether it should have its broader, ordinary-English meaning. "Coupled" should not be limited, because neither the claims, the specification, nor the file history support Hologic's

interpretation of the term, and the law is clear under such circumstances, importing limitations from the specification is improper.[12]

### a. Conceptus's Construction, Unlike Hologic's, Is Consistent With The Use Of "Coupled To" In The Claims And The Specification

In claim 5, the '650 patent uses the phrase "coupled to" to refer to the connection between the handle and an intrafallopian contraceptive device, and states expressly that this coupling is accomplished "by an elongate body":

> inserting a contraceptive device transcervically into an ostium of a fallopian tube by gripping a handle with a hand and moving the hand, **the handle coupled to the contraceptive device by an elongate body**;

This language clearly shows the term "coupled to" is broad enough to encompass an indirect connection – the handle gripped by the doctor's hand is plainly not directly joined or attached to the contraceptive device that is inserted transcervically into the fallopian tubes. Rather, as the claim says, they are joined by means of "an elongate body."

In contrast, in claim 14, the '650 patent uses the term "coupled to" to refer to a more direct joining:

> a deployment shaft having a proximal end and a distal end releasably coupled to the contraceptive device;

Thus, as the claim language shows, the '650 patent sometimes uses "coupled" to refer to an indirect connection, while in other uses it is a direct connection.

This broad use of "coupled" in the claim language is consistent with the diverse ways "coupled" is used throughout the specification. *See, e.g.*, Exh. B at 3:19-20 ("The expansion means will often be coupled to the contraceptive device..."); 4:15-16 ("The handle is coupled to the contraceptive device by an elongate body"); 8:34 ("proximal end coupled to housing via actuator"); 18:4-6 ("positioning catheter may be axially coupled to a distal portion of

---

[12] Potential summary judgment issue:  If the Court were to adopt Hologic's construction, Hologic would likely argue that Adiana does not infringe the asserted claims because the Adiana matrix is not "mechanically attached … by threads, cooperating key slots, connectors, or the like" to the Adiana delivery system.

1  handle."); 12:56-58 ("housing continues to rotationally and axially couple the proximal ends of

2  the release catheter and core shaft...").

3          These diverse examples confirm that the word "coupled" is used in '650 patent in

4  a manner consistent with its ordinary meaning, which is "paired to" or "joined with." *See*, *e.g.*,

5  Exh. O (*couple*: "to form pairs, join"); Exh. P (*couple*: "to join in a pair,"); *see also* Glasser Decl.

6  at ¶¶ 40-45.

### b.     Hologic Is Inappropriately Reading Features From An "Exemplary" Embodiment Into The Claim

9          Hologic seeks to limit the term "coupled" to things which are "mechanically

10 attached … by threads, cooperating key/slots, connectors, or the like."  Hologic appears to be

11 relying on the following language from the specification:

12          "[w]hile the exemplary system uses threads to couple the core wire
           (or other deployment shaft) to the contraceptive device, a variety of
13         alternative detachable connections might be used, including
           cooperating keys/slots, connectors, or the like."

14 Exh. B at 10:30-33.  This is the only passage in the specification where the phrase "cooperating

15 keys/slots, connectors, or the like" appears.[13]

16          Hologic's attempt to inject limitations from this passage into the word "coupled"

17 should be rejected.  Even where "the only detailed embodiments in the patent" contain a

18 particular limitation and "the specification repeatedly discusses" the limitations of the preferred

19 embodiment, the Federal Circuit has held that it is improper to limit the claims.  *See, e.g.*, *Kara*

20 *Techs.*, 582 F.3d at 1348 ("The patentee is entitled to the full scope of his claims, and we will not

21 limit him to his preferred embodiment or import a limitation from the specification into the

22 claims").  Here, there is a single passage in the specification, not repeated discussion, and that

23 single passage is expressly directed to only a single type of coupling, the coupling of the

24 "deployment shaft" to the "contraceptive device."  Moreover, this passage is not part of the

25 Summary of the Invention, and it does not purport to describe the invention as a whole.  Indeed,

26 the passage expressly says it is describing an "exemplary system."  Thus, this passage does not

27
―――――――――――――――
[13] Another problem with Hologic's proffered construction is that it is ambiguous, as it does not
28 explain what is encompassed by the phrase "or the like."

show that Conceptus disclaimed all "coupling" other than direct "mechanical attachment" through "threads, cooperating keys/slots, connectors, or the like," and as a result it does not limit the claims. *See Revolution Eyewear*, 563 F.3d at 1368.

Hologic's attempt to limit the term "coupled" to things which are "mechanically attached" is equally ill-founded. The phrase "mechanically attach" never appears in the specification. The only place where the word "mechanically" appears is where the specification describes "[m]echanically coupling the various elongate deployment components to a common proximal housing...."[14] This passage is inconsistent with Hologic's position that "coupling" requires "mechanical attachment" in the '650 patent because, if that were true, the inventors would have had no need to modify "coupling" with the adverb "mechanically," as they did in this passage. In other words, by using the phrase "mechanically coupling," the '650 patent shows that the unmodified term "coupling" is not limited to mechanical coupling. This conclusion is reinforced by the '650 patent's use of other modifiers with the term "coupling." *See*, *e.g.*, Exh. B at 15:30-33, 15:56-61 ("rotationally") or 17:3-6, 17:54-58, 18:4-12, 18:18-21 ("axially").

In sum, Hologic's effort to limit "coupled" to specific examples in the specification should be rejected.

## V.

## CONCLUSION

For the aforementioned reasons, the Court should adopt Conceptus's proffered constructions of the disputed claim terms.

Dated: February 2, 2010                    WEIL, GOTSHAL & MANGES LLP


                                           By:   */s/ Nicholas A. Brown*
                                                 Nicholas A. Brown
                                                 Attorneys for Plaintiff
                                                 Conceptus, Inc.

---

[14] The adverb "mechanically" also appears in a wholly different context in the background of the invention. *See* Exh. B at 2:3-5 ("...devices which are transcervically inserted into a tubal ostium and *mechanically* anchored within the fallopian tube.") (emphasis added).