**ARNOLD & PORTER LLP**
MATTHEW M. WOLF (*pro hac vice*)
matthew.wolf@aporter.com
JOHN E. NILSSON (*pro hac vice*)
john.nilsson@aporter.com
SARA P. ZOGG (*pro hac vice*)
sara.zogg@aporter.com
555 Twelfth Street, NW
Washington, DC 20004
Telephone:     202-942-5000
Facsimile:     202-952-5999

JENNIFER A. SKLENAR (SBN 200434)
jennifer.sklenar@aporter.com
NICHOLAS H. LEE (SBN 259588)
nicholas.lee@aporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90071
Telephone:     213-243-4000
Facsimile:     213-243-4199

MICHAEL A. BERTA (SBN 194650)
michael.berta@aporter.com
One Embarcadero Center, 22nd Floor
San Francisco, CA  94111-3711
Telephone:     415-356-3000
Facsimile:     415-356-3099

Attorneys for Defendant
HOLOGIC, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONCEPTUS, INC., | Case No.: 3:09-cv-02280-WHA |
| Plaintiff, | **DECLARATION OF NICHOLAS H. LEE IN SUPPORT OF HOLOGIC INC.'S MOTIONS IN LIMINE NOS. 1-5** |
| v. | |
| HOLOGIC, INC., | Date:        September 16, 2011 |
| Defendant. | Time:        9:00 a.m. |
| | Courtroom:  9; 19th Floor |
| | Judge:       Hon. William Alsup |

I, Nicholas H. Lee, declare as follows:

1.      I am an associate of Arnold & Porter LLP, counsel for plaintiff Hologic, Inc. ("Hologic") in this matter.  I have personal knowledge of the facts stated herein, and, if called upon, could and would testify competently to them.  I make this declaration in support of Hologic, Inc.'s Motions In Limine Nos. 1-5.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the deposition of Kathryn Tunstall (Rule 30(b)(6)) dated August 30, 2010 (pages 1, 63-66, 78-79, 90-91, 93, 94, 177, 178, 203-204, 209-211, 222, 226-227, 229-233).

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the deposition transcript of Ulric Cote dated August 19, 2010 (pages 1, 181).

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the deposition transcript of Mark Sieczkarek dated August 12, 2010 (pages 1, 200-201, 223-230).

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the deposition transcript of Steven Bacich dated August 31, 2010 (pages 1, 190).

6.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts of the Reply Expert Report of Dr. Ted Anderson, M.D., Regarding U.S. Patent No. 6,634,361, dated September 23, 2010 (pages 12, 13).

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 10, 2011                Respectfully submitted,

                              By:     /s/ Nicholas H. Lee
                                      Nicholas H. Lee (SBN 259588)
                                      **ARNOLD & PORTER LLP**
                                      777 South Figueroa Street, 44th Floor
                                      Los Angeles, CA  90071
                                      Telephone:  (213) 243-4000
                                      Facsimile:  (213) 243-4199
                                      Email:  nicholas.lee@aporter.com

                                      *Attorneys for Defendant HOLOGIC, INC.*

- 2 -

# Exhibit 1

Case3:09-cv-02280-WHA Document390 Filed09/12/11 Page4 of 33
VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL
CONFIDENTIAL PORTIONS REDACTED

1 (Pages 1 to 4)

**Page 1**

```
 1
 2          IN THE UNITED STATES DISTRICT COURT
 3        FOR THE NORTHERN DISTRICT OF CALIFORNIA
 4             SAN FRANCISCO DIVISION
 5                    --oOo--
 6   CONCEPTUS, INC., A DELAWARE   )
 7   CORPORATION              )
 8        Plaintiff,       )
 9        vs.              ) Case 09-CV-02280 WHA
10   HOLOGIC, INC., A DELAWARE    )
11   CORPORATION              )
12        Defendant.      )
13   _____ )
14
15          VIDEOTAPED DEPOSITION OF
16             KATHRYN TUNSTALL
17   _____
18        Monday, August 30, 2010
19
20   OUTSIDE COUNSEL ONLY, HIGHLY CONFIDENTIAL PORTION
21   PRODUCED SEPARATELY:
22   Pages 145-146, 206-211
23
24   REPORTED BY: COREY W. ANDERSON, CSR 4096
25
```

**Page 2**

```
 1               I N D E X
 2          INDEX OF EXAMINATIONS
 3   EXAMINATION                    Page
 4   EXAMINATION BY MS. ZOGG              7
 5   CONTINUED EXAMINATION BY MS. ZOGG    145
 6   CONTINUED EXAMINATION BY MS. ZOGG    147
 7   CONTINUED EXAMINATION BY MS. ZOGG    206
 8   CONTINUED EXAMINATION BY MS. ZOGG    212
 9
10             EXHIBITS
11   No.      Description      Page
12   Exhibit 624  Defendant's Amended First And    12
13           Second Notices Of Rule 30(b)(6)
14           Deposition Of Plaintiff
15           Conceptus, Inc.
16
17   Exhibit 625  License Agreement (CON00028610   37
18           through 629)
19
20   Exhibit 626  Plaintiff's Objections And       54
21           Responses To Defendant's Second
22           Set Of Interrogatories (Nos. 2-6
23           and 8-14)
24
25
```

**Page 3**

```
 1   Exhibit 627  Document entitled I'm Sure.,     119
 2           Let's talk Essure (CON00034313
 3           through 314)
 4
 5   Exhibit 628  Document eneitled Essure offers  119
 6           what no other birth control does
 7           (CON 00034356)
 8
 9   Exhibit 629  Plaintiff's Objections And       161
10           Responses To Defendant's Third
11           Set Of Interrogatories (Nos.
12           15-19)
13
14   Exhibit 630  Settlement And License Agreement  203
15           between Ovion, Inc., William S.
16           Tremulis and Jeffrey P. Callister
17           and Conceptus, Inc. (CON00028504
18           through 8609)
19
20   Exhibit 631  Graph Consisting of Six Pages     243
21           (CON00127169)
22                    --oOo--
23
24
25
```

**Page 4**

```
 1          A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      SIDLEY AUSTIN, LLP
 5      555 California Street
 6      San Francisco, California  94104
 7      BY:  M. PATRICIA THAYER, ESQUIRE
 8        415-772-7469
 9
10
11   FOR THE DEFENDANT:
12
13      HOWREY, LLP
14
15      1299 Pennsylvania Avenue, Northwest
16
17      Washington, DC  20004-2402
18
19      BY:  SARA P. ZOGG, ESQUIRE
20
21        202-383-7371
22
23            --oOo--
24   ALSO PRESENT:
25      VIDEO SOLUTIONS, a Merrill Legal
        Solutions Company
        PATRICK MURRAY, VIDEOGRAPHER
```

Case3:09-cv-02280-WHA Document390 Filed09/13/11 Page5 of 33
VIDEOTAPED DEPOSITION OF KATHRYN KUNTSTALL
CONFIDENTIAL PORTIONS REDACTED

16 (Pages 61 to 64)

61
1      So again, can you repeat back my question,
2  please?
3      (Whereupon, the reporter read back
4       the record as follows:
5      "Okay.  And sitting here today, do
6       you have any idea who those people
7       are?")
8      THE WITNESS:  I imagine that they are --
9  there is a list of people for each one of these
10 categories that have been identified.  I...
11     MS. ZOGG:  Okay.
12     THE WITNESS:  I'm not sure I know what you
13 are asking.
14     MS. ZOGG:  Okay.
15     THE WITNESS:  I'm sorry.
16     MS. ZOGG:  That's okay.
17     THE WITNESS:  Yeah.
18     BY MS. ZOGG:
19     Q.  To address your counsel's objection and
20 maybe to clarify the issue for you.
21     **A.  Okay.**
22     Q.  So for the first factor for commercial
23 success, apparently there are current and former
24 Conceptus employees who are knowledgeable about
25 that.

62
1      Do you know who those current and former
2  employees are?
3      **A.  Well, there -- it would be me, and**
4  **certainly Mark Sieczkarek, the current CEO, and I**
5  **would imagine Rick Cody and Greg Lichtwardt.**
6      **But there is also, you know, well,**
7  **actually, these are, you know, there is analyst**
8  **reports, for example.  So there are a lot of**
9  **analysts who could testify to it as well.**
10     Q.  Okay.  Well, let's break it down.
11     **A.  Okay.**
12     Q.  We'll go through it step by step.
13     **A.  Okay.**
14     Q.  Just to see if we can crystallize this a
15 little bit better.
16     **A.  Sure.**
17     Q.  Okay.  So we just talked about the
18 commercial success.
19     **A.  Uh-huh.**
20     Q.  The next factor that Conceptus listed was
21 prior failure by others.
22     **A.  Yeah.**
23     Q.  So do you know who the current and former
24 Conceptus employees are who would have information
25 related to prior failure of others?

63
1      **A.  Yeah.  I certainly think Julian Nikolchev**
2  **would, and Betsy Swann, and I would, and possibly**
3  **Steve Bacich.**
4      Q.  Okay.  Anyone else that you can think of
5  as you are sitting her today?
6      **A.  I'm not sure about the others.  They may**
7  **have, but that group I'm sure of.**
8      Q.  Okay.  For licensing or industry respect,
9  are there current or former Conceptus employees that
10 you think may have information relating to that
11 topic?
12     **A.  Mark Sieczkarek and Greg Lichtwardt.**
13 **Partial knowledge, because he is not with the**
14 **company any more, but Steve Bacich may have some**
15 **knowledge of that as well from the time that he was**
16 **at the company.**
17     Q.  Okay.  Anyone else you can think of as you
18 are sitting here today?
19     **A.  And certainly Julian Nikolchev.**
20     Q.  Okay.  And then for the longstanding
21 problem or need, are there current or former
22 Conceptus employees who would have knowledge about
23 longstanding problem or need?
24     **A.  Julian and I certainly would, Steve**
25 **Bacich.  I would think Mark Sieczkarek would as**

64
1  **well.**
2      Q.  Okay.  Anyone else that you can think of
3  as you are sitting here today?
4      **A.  Can't be sure on the others.**
5      Q.  Okay.  Did you speak with Ms. Swann in
6  preparation for your deposition today?
7      **A.  No.**
8      Q.  Did you speak with Mr. Bacich in
9  preparation for your deposition today?
10     **A.  No.**
11     Q.  Did you speak with Mr. Sieczkarek in
12 preparation for your deposition today?
13     **A.  No.**
14     Q.  Did you speak with Mr. Lichtwardt in
15 preparation for your deposition today?
16     **A.  No.**
17     Q.  Okay.  The next category that's listed in
18 line 14, it's "Conceptus consultants."
19     Do you see that?
20     **A.  I'm sorry, line 14 on page 17?**
21     Q.  I'm sorry, page 17, line 14?
22     **A.  Yes.**
23     Q.  So for Conceptus consultants, with, in
24 respect to commercial success, do you know who that
25 refers to?

Case3:09-cv-02280-WHA Document390 Filed09/13/11 Page6 of 33
VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL TAKEN 08/18/2011
CONFIDENTIAL PORTIONS REDACTED

17 (Pages 65 to 68)

65

1      A.   Not specifically.
2      Q.   Okay.  With respect to prior failure by
3   others, do you know who "Conceptus consultants" is
4   meant to refer to?
5      A.   Well, there is just so many of them, I
6   don't know specifically who has been called out, if
7   that's your question.
8      Q.   Okay.
9      A.   There is...
10     Q.   For licensing or --
11          MS. THAYER:  Wait just a second.  I
12   think -- were you about to say something else or are
13   you done?
14          THE WITNESS:  Well, there are just so many
15   physicians who know what happened in the prior
16   failures.
17          BY MS. ZOGG:
18     Q.   Okay.  Well, we'll talk about that in just
19   one second.
20     A.   Okay.
21     Q.   I just want to go through the rest of the
22   categories.
23     A.   Okay.
24     Q.   So for licensing or industry respect, do
25   you know who "Conceptus consultants" is meant to

66

1   refer to?
2      A.   No.
3      Q.   Okay.  And for longstanding problem or
4   need, do you know who "Conceptus consultants" is
5   meant to refer to?
6      A.   Again, I don't know specifically who it's
7   referring to, but I know that there are lots of
8   physicians, consulting and non-consultants who
9   understand the longstanding problem, the need and
10   failures of -- of earlier attempts.
11     Q.   Okay.  How many consultants does Conceptus
12   have?
13     A.   I don't know the answer to that right now.
14     Q.   Do you know who any of the consultants
15   are?
16     A.   I know that Barb Levy is a consultant to
17   the company, I know some of them.  Again, you know,
18   I'm not in an operating role at the company any
19   longer, I don't review consulting agreements.
20     Q.   Okay.
21     A.   I don't have everyday contact with them,
22   so I don't really have an exhaustive list of all the
23   consultants involved with the company.
24     Q.   Okay.  Are there any consultants as you
25   are sitting here today that come to mind who would

67

1   have information about the commercial success or the
2   failure of others?
3      A.   Dr. -- I think Dr. Glasser would because
4   he has been around for a long time.  I think -- I'm
5   going to be talking about people who have been
6   around for a long time because that's when I was
7   running the company.
8          Yeah, I mean, truly the industry respect
9   piece is pretty widespread.  It's pretty obvious.
10   So there are just so many of them, I think almost
11   any of the consultants that are currently working
12   with Conceptus or did in the past get that.
13          It's not -- I mean, it's been a big deal
14   in our industry that we accomplished something that
15   had been attempted for 40 years that is so valuable
16   to women.  So it's well understood.
17     Q.   Okay.  So for the Conceptus consultants
18   that you think would understand the industry in that
19   respect, did you talk to any of them in preparation
20   for your testimony here today?
21     A.   No, I did not.
22     Q.   And other than Dr. Glasser, you haven't
23   mentioned anyone specific.
24          Correct?
25     A.   He's an old-timer that I remember that has

68

1   been around for a long time.
2      Q.   Okay.  But did you not specifically talk
3   to Dr. Glasser?
4      A.   No.
5      Q.   Okay.  So for the third parties that are
6   listed here in line 15, do you know who those third
7   parties referred to?
8      A.   I do not.
9      Q.   So in preparation for your deposition
10   today, were there any third parties that you talked
11   to other than counsel?
12     A.   No.
13     Q.   There is a reference here to those listed
14   authors of various articles.
15     A.   I'm sorry, I'm going to have to correct
16   myself.
17     Q.   Okay.
18     A.   The FDA wrote us a very nice letter at the
19   time of approval and granted us accelerated review
20   because it was such an important advance for women
21   and an enabling technology.  So Collin Pollard, who
22   is the director of the OB-GYN area, kind of lead
23   that effort.
24          So that would be a third party that gave
25   us a really almost unprecedented PR for our product

Case3:09-cv-02280-WHA Document390 Filed09/13/11 Page7 of 33
VIDEOTAPED DEPOSITION OF KATHRYN SURRELL
CONFIDENTIAL PORTIONS REDACTED

20 (Pages 77 to 80)

77

1    Q.  Okay.  And what specifically are you
2  pointing to those analysts for?
3    **A.  They have written reports about the**
4  **company and how well the adoption is going and how,**
5  **you know, much they believe in the technology.  And**
6  **so lots of reports on the company and how well the**
7  **company is doing.**
8    Q.  Okay.  Did you review any analyst reports
9  for your deposition here today?
10   **A.  No.**
11   Q.  Have you been told by counsel what those
12 analyst reports are?
13   **A.  No.**
14      MS. THAYER:  You have got to --
15      THE WITNESS:  Yeah, I got to stop.
16      MS. THAYER:  Okay.
17      THE WITNESS:  No.
18      BY MS. ZOGG:
19   Q.  Okay.  So other than Collin Pollard and
20 analysts, are there any other third parties that you
21 are referring to?
22   **A.  Just thinking through this.  Specifically**
23 **from third parties, you are asking me now?**
24   Q.  Yes.
25   **A.  Well, it sort of crosses over into**

78

1  **industry respect, but certainly J&J's interest in**
2  **licensing the product, and I am aware that, you**
3  **know, they have said several times they are really**
4  **impressed by what we have been able to do**
5  **commercially with the product.**
6    Q.  Anyone specific at J&J that you are
7  thinking about?
8    **A.  I don't know the names.**
9    Q.  Okay.  Maybe we'll talk some more about
10 J&J later today.
11      Okay.  Anyone else as third parties as you
12 can think of as you are sitting here today?
13      MS. THAYER:  Is this just about commercial
14 success still, or is it all four?
15      MS. ZOGG:  Commercial success.
16      THE WITNESS:  Well, yes.  I mean, the
17 company has been four times awarded the Deloitte and
18 Touche Fast 500 award, which is for North America,
19 and an equal number of times has been awarded the
20 Silicon Valley Fast 50, so that certainly is
21 evidence of commercial success.  That's Deloitte and
22 Touche.
23      BY MS. ZOGG:
24   Q.  And do you know specifically what that
25 award is for?

79

1    **A.  It's to recognize -- recognize fastest**
2  **growing companies in various sectors.**
3    Q.  Okay.  Anything else that you can think of
4  as far as commercial success with third parties?
5    **A.  Commercial success and the -- and the**
6  **industry respect sometimes cross over.  But the**
7  **Deloitte and Touche was specifically on sales and**
8  **sales growth, so I'm going to save those other ones**
9  **for industry respect.**
10   Q.  Okay.  So let's talk about prior failure
11 by others.
12   **A.  Okay.**
13   Q.  Third parties.  Who can you think of that
14 relates to prior failures that are third parties?
15   **A.  Well, there is a number of articles in the**
16 **literature on the prior failures.**
17   Q.  Did you review any of those articles for
18 your deposition here today?
19   **A.  I reviewed a document that had a list of**
20 **them in that right there (indicating).  I think it's**
21 **the last tab.  Yeah, that one right there**
22 **(indicating).  You are going to need your glasses**
23 **for it.**
24   Q.  Okay.  We'll talk about those in a little
25 bit as well.

80

1    **A.  Okay.**
2    Q.  Any other failures as far as third parties
3  go?
4    **A.  Let me think.  This is a difficult**
5  **question because virtually every time a physician or**
6  **an analyst or an industry member talks about**
7  **Conceptus, they start by saying here is a company**
8  **that made a success out of something that everyone**
9  **else failed at for 30 to 40 years.**
10     **So there is so many of them that, I mean,**
11 **even Paul Gold who was the founder of Adiana said it**
12 **at a meeting, a memorial, actually, for John Kerin**
13 **who was a physician we all worked with.**
14     **So it's -- everyone always starts any**
15 **discussion about Conceptus with that.  It's just...**
16   Q.  Okay.  We'll come back to the failure of
17 others.
18   **A.  Okay.**
19   Q.  For licensing or industry respect, you
20 mentioned J&J?
21   **A.  Right.**
22   Q.  Is there anyone else besides J&J that you
23 can think of?
24   **A.  Yes.  Frost and Sullivan gave us an award**
25 **probably five years ago which was the -- they award**

Case3:09-cv-02280-WHA Document390 Filed09/13/11 Page8 of 33
VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL, VOL. 2011
CONFIDENTIAL PORTIONS REDACTED

23 (Pages 89 to 92)

89
1 him in preparation for your deposition today?
2 **A. No, I did not.**
3 Q. Do you know specifically what information
4 Mr. Lichtwardt might have related to secondary
5 considerations of nonobviousness?
6 **A. Well, certainly he is our CFO, so**
7 **certainly he has information on, you know, our**
8 **financial documents. He prepares them, and he also**
9 **works very closely with the analysts.**
10 Q. But you did not talk to Mr. Lichtwardt?
11 **A. No.**
12 Q. Did you review any of the financial
13 documents in preparation for today?
14 **A. No.**
15 Q. Are there any specific financial documents
16 that you were thinking of?
17 **A. I'm sorry?**
18 Q. When you said financial documents, were
19 there any specific financial documents that you were
20 thinking of?
21 **A. Income statements, sales reports.**
22 Q. Did you review any income statements in
23 preparation for today?
24 **A. No.**
25 Q. Did you review any sales reports in

90
1 preparation for today?
2 **A. No.**
3 Q. Looking through the response to
4 interrogatory No. 9 --
5 **A. Yes.**
6 Q. -- do you see any reference in this
7 response to Collin Pollard?
8 **A. No, I don't. But there is a lot of**
9 **document numbers here that I have never seen the**
10 **documents, so I don't know if they include any**
11 **documents related to Collin or not.**
12 Q. Okay. And looking through the response to
13 interrogatory No. 9, do you see any reference to
14 Johnson & Johnson in that response?
15 **A. Not specifically.**
16 Q. Do you see any reference in the response
17 to interrogatory No. 9 to Deloitte and Touche?
18 **A. Not specifically.**
19 Q. Do you see any reference in response to
20 interrogatory No. 9 about the Phoenix award?
21 **A. Not specifically.**
22 **There is another award too that I failed**
23 **to mention which was a Congressional certificate,**
24 **and that was last year, I believe, which was given**
25 **to us for essentially service to the community for**

91
1 **bringing something of such value to women that was**
2 **presented by Anna Eshoo.**
3 Q. That was in 2009?
4 **A. Yes.**
5 Q. And when did Essure launch in the United
6 States?
7 **A. Late 2002.**
8 Q. Do you recall which month?
9 **A. It was after approval, which was in**
10 **November. So...**
11 Q. So the award that you were just talking
12 about, that was in 2009?
13 **A. Correct.**
14 MS. THAYER: Asked and answered.
15 BY MS. ZOGG:
16 Q. So that was at least six to seven years
17 after launch.
18 Is that right?
19 MS. THAYER: Really, Sara. You accuse me
20 of prolonging this deposition?
21 MS. ZOGG: Patty, no, I wanted to ask
22 whatever questions I want to ask. And I'm objecting
23 to your speaking objections. It's just
24 preposterous.
25 Q. So Ms. Tunstall, would you agree that it

92
1 was about six to seven years after launch that the
2 Congressional award was given?
3 **A. Yes.**
4 Q. And do you see any reference in the
5 response to interrogatory No. 9 to that
6 Congressional award?
7 **A. No, not -- not that I can see.**
8 Q. Okay. And we had talked earlier about
9 Dr. Glasser.
10 Is that right?
11 **A. Yes.**
12 Q. Do you see any reference in response to
13 interrogatory No. 9 about Dr. Glasser?
14 **A. No. But again, you know, these numbers, I**
15 **don't -- I don't know what they refer to. So...**
16 Q. Sure.
17 **A. I don't see his name listed.**
18 Q. And in response to interrogatory No. 9, do
19 you see any reference to Ms. Swann?
20 **A. No.**
21 Q. Do you see any reference to Mr. Bacich?
22 **A. Well, I don't know what the, you know, the**
23 **list of numerous current and former Conceptus**
24 **employees are, so again, they are not called out**
25 **specifically, neither Betsy nor Steve Bacich.**

93

1    Q.   And do you see any specific reference in
2 the response to interrogatory No. 9 to
3 Mr. Sieczkarek?
4    A.   No.
5    Q.   Okay.  So going back to the first item
6 that's listed here, Commercial Success?
7    A.   Yes.
8    Q.   Okay.  What products is Conceptus pointing
9 to as evidence of commercial success?
10   A.   Essure.
11   Q.   Only Essure?
12   A.   Yes.
13   Q.   Why does Conceptus consider Essure to be
14 commercially successful?
15   **A.   Because of our sales trends, because the
16 company is profitable and generating a lot of cash
17 flow because there is -- there has been widespread
18 adoption of the product by clinicians.**
19   Q.   Anything else you can think of as you sit
20 here today?
21   **A.   That's how I would define commercial
22 success.**
23   Q.   So you are looking basically, then, at the
24 sales and revenue that were generated by the
25 product?

94

1    **A.   For this particular one.  There is, you
2 know, there is also...**
3    Q.   I'm just talking specifically about
4 commercial success.
5    **A.   Yeah, that's the primary.  I mean, for me
6 it's treating a half a million women who, you know,
7 a large number, probably 7,000 or so, would have
8 gotten pregnant otherwise.**
9    **But commercial generally refers to
10 revenues and sales growth and trends and that,
11 adoption by clinicians.**
12   Q.   Okay.  So you mentioned earlier that
13 Essure launched in the United States in late 2002.
14    Is that right?
15   **A.   Yeah.  I mean, when we got started, there
16 wasn't much time with the holidays.  But yeah.**
17   Q.   Do you know how many units were sold in
18 2002?
19   **A.   I didn't refresh my memory on any -- any
20 sales, sales trends other than -- no, so I don't
21 know specifically.**
22   Q.   And in 2003, when, did you refresh your
23 recollection about how many units were sold in 2003?
24   **A.   I didn't refresh my recollection about the
25 sales line as all.**

95

1    Q.   Okay.
2    **A.   I know that we had pretty much, because i
3 have seen this several times and I prepared them in
4 the past to -- we have a trend that's very similar
5 to, for example, the NovaSure product in terms of
6 product adoption and growth, so the trend lines are
7 pretty similar.  Successful med tech products tend
8 to look pretty similar.**
9    Q.   Do you know how much money Conceptus has
10 spent to develop Essure?
11   **A.   I couldn't tell you precisely.**
12   Q.   Do you have an approximate?
13   **A.   Are you asking me how much money was
14 raised?  Or what are you asking, exactly?  What the
15 net operating losses are?  Or specifically what are
16 you asking?**
17   Q.   Well, first I'm asking about the research
18 and development costs for the Essure.  Do you know
19 what that number is?
20   **A.   I'm sorry, I can't.  I can't break that
21 out for you.**
22   Q.   Who would know the answer to that?
23   **A.   Greg Lichtwardt probably and Mark
24 Sieczkarek.**
25   Q.   Do you know if Conceptus is operating at a

96

1 profit currently?
2    **A.   On an annual basis, we are.**
3    Q.   And when was the first time that Conceptus
4 was operating on a profit?
5    **A.   For a full year or for quarter?  What --**
6    Q.   Let's talk about a full year first.
7    **A.   Okay.  I believe last year was the first
8 full year of profits.**
9    Q.   Okay.  And the quarter?
10   **A.   I -- I'm not -- you know what, I'm not
11 going to guess that because I just can't remember.**
12        THE VIDEOGRAPHER:  Ms. Tunstall, you can't
13 touch that wire.
14        THE WITNESS:  Sorry.
15        THE VIDEOGRAPHER:  Thank you.
16        BY MS. ZOGG:
17   Q.   So why is it that it took from 2002 to
18 2009 for Conceptus to be operating at a profit?
19   **A.   Well, you know, medicine is evolutionary.
20 It's definitely not revolutionary.  And when
21 Conceptus started out, as we have talked about here,
22 you know, there was a lot of skepticism, the prior
23 failures of others, all these various devices that
24 I'm sure we'll talk about in a minute.  So there was
25 a lot of skepticism.**

VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL 8/30/2010
CONFIDENTIAL PORTIONS REDACTED

175

1  catheter, all parts of the actual micro-insert?
2  **A.  It all works together to provide all of**
3  **the benefits combined.**
4  **And I -- you are really talking to the**
5  **wrong person here, I'm sorry.  I don't know how to**
6  **write patents, I don't know how to specifically**
7  **interpret them.  So you probably need to direct**
8  **those questions to somebody else.**
9  Q.  Do you know how many -- I'm sorry, strike
10 that.
11 Do you know if the Essure device went
12 through more than one design iteration during the
13 course of its development?
14 MS. THAYER:  I'll instruct you not to
15 answer that.  It's beyond the scope.
16 BY MS. ZOGG:
17 Q.  Are you going to take your counsel's
18 advice?
19 **A.  Yup.**
20 Q.  For the long-felt need that we have been
21 talking about for a less invasive, highly effective,
22 safe device or method, would you agree that there
23 are other methods that could have addressed that
24 same need other than Essure?
25 MS. THAYER:  Objection, calls for

176

1  speculation, assumes facts not in evidence.
2  THE WITNESS:  I wouldn't -- I wouldn't
3  know how to answer that question.  I'm sorry.
4  BY MS. ZOGG:
5  Q.  So for instance, if there was a device
6  that operated in a different way to prevent
7  contraception other than by tissue ingrowth, could
8  that device have met that same need for a less
9  invasive, highly effective, safe contraceptive
10 method?
11 MS. THAYER:  Objection, incomplete
12 hypothetical, calls for speculation.
13 THE WITNESS:  Yeah, you are just really
14 talking to the wrong person here.  Economics
15 background.  Remember?
16 BY MS. ZOGG:
17 Q.  So sitting here today, you don't know if
18 there was any other way for the long-felt need to be
19 met?
20 **A.  (No response).**
21 MS. THAYER:  Same objections.
22 THE WITNESS:  Yeah, I can't -- I can't
23 really say.  I'm sorry.
24 MS. ZOGG:  Okay.  We can go off the
25 record, take a quick break.

177

1  THE VIDEOGRAPHER:  We are off the record
2  at 3:41.
3  (Whereupon, a recess was taken)
4  THE VIDEOGRAPHER:  We are back on the
5  record at the beginning of tape three, volume one of
6  Kathryn Tunstall.  The time is 3:50.
7  BY MS. ZOGG:
8  Q.  Ms. Tunstall, turning back to the '361
9  patent, Exhibit 558, looking at claim 8, which is in
10 column 20?
11 **A.  Okay.**
12 Q.  Are there any of these limitations of
13 claim 8 that you can specifically point to as
14 contributing to the commercial success of Essure?
15 **A.  You know, I'm sorry, as I said before, 36**
16 **through 38, I understand that and how it relates to**
17 **our success.  I don't see the same thing with 8.**
18 **And again, I am not an engineer.  But I**
19 **just -- I can't really answer that.**
20 Q.  Okay.  And with claim --
21 **A.  I am not seeing it.**
22 Q.  I'm sorry, are you finished?
23 **A.  Yeah.**
24 Q.  Okay.  And with claims 36 through 38, the
25 things that you would point to are claims --

178

1  **A.  Well --**
2  Q.  -- that contributed to the commercial
3  success of Essure would be what?
4  **A.  The --**
5  MS. THAYER:  Asked and answered.
6  THE WITNESS:  Yeah.  The totality of the
7  inventions here delivered the procedure that was
8  less invasive, highly effective, that was in
9  long-felt need.
10 So this, that's pretty by clear to me.
11 BY MS. ZOGG:
12 Q.  Okay.  And other than saying the totality
13 of the procedure, you can't put any finer point on
14 it?
15 **A.  No.**
16 Q.  Going to hand you what's already been
17 marked as Exhibit 100.  Sorry, can't reach very far
18 across the table.
19 **A.  Oh, boy.  Okay.**
20 Q.  Do you recognize this document?
21 **A.  It's the IFU, the Instructions For Use.  I**
22 **haven't actually looked at an IFU in a long time,**
23 **so -- but I did at one time.**
24 Q.  If you can flip to the back page?
25 **A.  Okay.**

Case3:09-cv-02280-WHA Document390 Filed09/12/11 Page11 of 33
VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL 9/30/2010
CONFIDENTIAL PORTIONS REDACTED

51 (Pages 203 to 212)

203
1  number, please.
2       (Whereupon, Exhibit 630 was marked
3       for identification).
4       MS. THAYER:  This was already marked.
5       MS. ZOGG:  I don't have the marked copy,
6  so...
7       THE WITNESS:  Thank you.
8       BY MS. ZOGG:
9   Q.  Ms. Tunstall, before you flip through all
10  these pages, have you ever seen the Ovion settlement
11  before?
12      **A.  I'm not sure if I did or just saw a kind**
13  **of a summary of the primary provisions of it.**
14      MS. ZOGG:  And just for the record, I'll
15  just state that Exhibit 630 has the Bates number
16  CON00028504 through 28609.
17      Q.  Now, we mentioned earlier that Conceptus
18  is pointing to licensing as secondary considerations
19  of nonobviousness.
20      Is that right?
21      **A.  Yeah, I meant -- yes, licensing**
22  **discussions, I meant licensing our technology.**
23      Q.  And who at Conceptus has the information
24  relating to licensing?
25      MS. THAYER:  Objection, vague as to what

204
1  you mean by licensing.  Are you referring to her
2  answer there or something else?
3       BY MS. ZOGG:
4   Q.  The person, the people at Conceptus who
5  would have information relating to whatever
6  licensing is being referred to as far as secondary
7  considerations goes.
8       **A.  Mark Sieczkarek.**
9   Q.  Did you speak with Mr. Sieczkarek
10  specifically about licensing?
11      **A.  Ever?**
12      Q.  In preparation for today.
13      **A.  No.**
14      Q.  Has Conceptus licensed the '361 patent?
15      **A.  Not to my knowledge.**
16      Q.  Has Conceptus offered a license to the
17  '361 patent to anyone?
18      **A.  I can't really say discussions got that**
19  **far.**
20      Q.  So the licensing that you were referring
21  to, does it relate specifically to the '361 patent?
22      **A.  It's expressions of interest in being able**
23  **to market Essure and licensing being one way to do**
24  **that, is what I was referring to.**
25      Q.  Okay.  So let's break that down a little

205
1  bit.
2       **A.  Okay.  Sure.**
3       **(The following testimony was designated**
4       **"Outside Counsel Only, Highly**
5       **Confidential" and was produced in**
6       **a separately-bound document)**
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

212
1       CONTINUED EXAMINATION BY MS. ZOGG
2       BY MS. ZOGG:
3   Q.  Do you know how many patents are in
4  Conceptus' patent portfolio?
5       **A.  I don't know specifically.**
6   Q.  Do you know if Conceptus has licensed any
7  of its patents?  And I mean specifically the
8  patents.
9       **A.  I don't know specifically.**
10      Q.  And other than the Target license and the
11  Ovion license, has Conceptus taken a license to
12  anyone else's patents?
13      MS. THAYER:  I'll instruct you not to
14  answer that question.
15      BY MS. ZOGG:
16      Q.  Do you know if Conceptus currently intends
17  to license the '361 patent?
18      **A.  I don't know.**
19      Q.  Do you know if Conceptus receives any
20  royalties from any companies with respect to
21  products that those other companies may sell?
22      **A.  Not to my knowledge.**
23      Q.  Do you know if Conceptus pays any
24  royalties to another company with respect to Essure?
25      MS. THAYER:  I'll instruct you not to

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL - 8/30/2010
OUTSIDE COUNSEL ONLY - HIGHLY CONFIDENTIAL PORTIONS ONLY

Page 209

1      BY MS. ZOGG:
2      Q.  So the co-marketing agreement that we are
3   discussing, would Conceptus have had the ability to
4   market ThermaChoice under this agreement?
5      A.  Okay, as I said, I am not -- I can't
6   remember.  I can't recall the specifics about it.
7   There were a number of combinations and permutations
8   that were discussed.
9         I do remember that it was the impetus for
10  us to get a license to the Ovion technology because
11  J&J said if you want to do a licensing agreement
12  with us or a co-marketing agreement, you will go
13  get, you know, you will go get a license agreement
14  to the Ovion technology.  I recall that.
15        It's a very high level.  I can't really
16  tell you any of the details.  Mark's your guy for
17  that.
18     Q.  Okay.
19     A.  He negotiated that, and...
20     Q.  Okay.  I believe you said earlier that you
21  thought that there were licensing provisions that
22  were part of this co-marketing agreement.
23        Is that correct?
24     A.  No.  If I did, I didn't mean to say that.
25     Q.  Okay.

Page 210

1      A.  What I said was that there was -- there
2   have been a number of times where companies have
3   expressed an interest in licensing our technology or
4   some other way of having access to our technology to
5   sell it, co-marketing, licensing, different, you
6   know, marketing agreements, whatever, and so the J&J
7   is one example of that.
8         I do remember that we had a licensing --
9   or excuse me, a co-marketing agreement that we
10  signed in 2003, and it was related to the Ovion
11  license agreement, as I just mentioned.
12        But that's all I remember about it.
13     Q.  Okay.  And I just want to, I need to
14  clarify this point, I'm sorry.
15     A.  Okay.
16     Q.  It's a legal point.
17        Was there anything in the co-marketing
18  agreement that you would consider to be a license of
19  the '361 patent in particular?
20     A.  I can't be -- I can't really respond to
21  that.  I don't -- couldn't even tell you what's in
22  that agreement.  But Mark could.
23     Q.  Okay.  So other than the co-marketing
24  agreement with J&J, has any other company come to
25  Conceptus and asked for a license to the '361

Page 211

1   patent?
2      A.  There was a European company in France.  I
3   don't -- but I don't know if it was a license.  I
4   don't know what the legal arrangement was between
5   the companies.  But it was an entity that sold the
6   product in Europe and had a legal right to do so,
7   and Mark can tell you more about it.
8         I just don't remember what, if it was a,
9   you know, under a license or if it was just a
10  marketing agreement sore what it was.
11     Q.  Do you remember the name of that company?
12     A.  Well, ultimately it was called Conceptus
13  SAS.
14     Q.  Did it start out with a different name?
15     A.  I'm not sure about that.
16        (The following testimony resumed
17         without  "Outside Counsel Only,
18         Highly Confidential" designation
19         and continued from the previous
20         designation)
21
22
23
24
25

Page 243

1
2         (Whereupon, the deposition was
3          adjourned at 5:11 P.M.)
4               --oOo--
5         I declare under penalty of perjury the
6   foregoing is true and correct.  Subscribed at
7   _____, California, this _____ day
8   of _____ 2010.
9
10        _____
10        KATHRYN TUNSTALL
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4 (Pages 209 to 243)

Case3:09-cv-02280-WHA Document390 Filed09/12/11 Page13 of 33
VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL 9/30/2010
CONFIDENTIAL PORTIONS REDACTED

54 (Pages 221 to 224)

221

1 really thought I was coming here to talk about,
2 which is how that might have affected us in the
3 founding period, because it really did.
4      I mean, this I can tell you.  One of the
5 things I have answered today are either things I
6 wasn't directly in charge of because I had already
7 moved into a governance role and out of an operating
8 role or, you know, or have to do with engineering
9 that I am not an engineer and I didn't have
10 responsibility for, obviously, other than the
11 general overall responsibility.
12      But I was out there trying to raise money,
13 and no one wanted to invest on -- invest in a, you
14 know, minimally invasive hysteroscopic sterilization
15 device.
16      And that's the reason why -- one of the
17 reasons why we were raising money based on our
18 infertility products.  And to a large extent the
19 infertility approach was for us to develop
20 something, number one, more quickly to get it on the
21 market, but it was also to be self-sufficient so
22 that we wouldn't have to go back to the market and
23 try to raise money in order to develop a
24 contraceptive device because there was so much
25 skepticism about it.

222

1      Q.  And who specifically do you recall was
2 skeptical?
3      A.  Oh, VCs we talked to.
4      Q.  And anyone in particular?
5      A.  Oh Nancy Olson at -- you name it.
6 Everyone was.
7      And even to the time of IPO, there was a
8 lot of skepticism still about it in February of '96.
9      Q.  Okay.  I just want to go back to
10 the founding --
11      A.  Okay.
12      Q.  I'm sorry, I keep doing that, go back to
13 the founding period of 1992.
14      A.  Yeah.
15      Q.  How many venture capitalists did Conceptus
16 approach?
17      A.  I can't give you a precise number, but I'm
18 sure it was, you know, more than six and less than
19 20.
20      Q.  Okay.
21      A.  I can give you some names.  I remember
22 Frazier Ventures, I remember Weiss, Peck and Greer,
23 St. Paul Ventures, Sprout Ventures.  Let's see here.
24      Q.  I won't have you list --
25      A.  Okay.

223

1      Q.  -- necessarily every company.
2      A.  Okay.
3      Q.  It's hard to remember that far back.
4      A.  Yeah.
5      Q.  But looking back at the venture
6 capitalists that you do remember, would you consider
7 any of them to be well versed in contraceptive
8 methods?
9      A.  Well, the minute you go in to present to
10 them, if they have any interest at all in what you
11 are doing, they get well versed.  That's why they
12 are smart investors.
13      So they go out and immediately do their
14 research.  You don't just have one meeting and they
15 say yea or ney, not with something as dramatically
16 new as what Conceptus was working on.
17      Q.  So these venture capitalists, though, they
18 are conducting research after you come in and after
19 you approach them.
20      Is that right?
21      A.  Yes.  Yeah.
22      Q.  So these are not people who are working in
23 the field of contraception prior to being approached
24 by Conceptus?
25      A.  Well, some, some may have.

224

1      Q.  Do you recall --
2      A.  Because they were involved, you know, with
3 drugs as well.  Usually they are not just investing
4 in med tech, but in the whole segment.
5      So --
6      Q.  And I just want to clarify one point that
7 you just said.
8      MS. THAYER:  Wait a second.  This is twice
9 now.  You have got to let her finish her sentence
10 before you start your question, because she was
11 mid-stream on that one.
12      BY MS. ZOGG:
13      Q.  Did you have something else to add,
14 Ms. Tunstall?
15      A.  Yeah.  So what I was going to say is, you
16 know, they are -- they are used to investing in
17 drugs or they have colleagues who address -- who are
18 investing in drugs.
19      And the typical thing they will do is they
20 will -- you'll send them your executive summary, you
21 come in, you present what you are doing, and they
22 will derive from that a set of due diligence
23 questions, even before they give you the first
24 please come back and see, they just say okay, thank
25 you very much, and they start doing research.

Case3:09-cv-02280-WHA Document390 Filed09/12/11 Page14 of 33
VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL 6/30/2010
CONFIDENTIAL PORTIONS REDACTED

55 (Pages 225 to 228)

225

```
 1          And they have also people in the field who
 2   are highly experienced who are consultants that they
 3   hired to do a lot of work.
 4          There was a guy by the name of Norton, as
 5   I recall, who was an expert in -- what was his first
 6   name?  In contraception that did a little consulting
 7   for a lot of these VC firms.  So if they don't know,
 8   they get smart real fast.  They are investing a lot
 9   of money, so they are not going to go in blindly.
10      Q.  Okay.
11      A.  And they were very skeptical about the
12   contraceptive applications.
13      Q.  Okay.  Well, I'm going to go back and talk
14   about that specifically.
15      A.  Sure.  Okay.
16      Q.  So you mentioned that these companies,
17   these venture capitalists that we have talked about
18   were working in pharmaceuticals or drugs.
19          Is that right?
20      A.  Somewhere, yes.
21      Q.  Okay.  And of those, are there any that
22   were specific to contraception?
23      A.  You know, I can't tell you.  But it
24   doesn't really matter because what they do is
25   innovation, so they are not -- they can't possibly
```

226

```
 1   be in everything that's being innovative because it
 2   doesn't exist.
 3          So they have to go out and do their
 4   research after you present to them.  If it's really
 5   something new and different, they go out and they do
 6   primary research.  They talk to physicians,
 7   sometimes they do focus groups, they certainly read
 8   a lot of market reports on various things.  But so
 9   they do their work on it.
10          And there was a lot of skepticism.  I
11   mean, and as I mentioned, even up until the time of
12   the IPO and even after.
13      Q.  Okay.  And what specifically were they
14   skeptical about?
15      A.  That you could actually have something
16   that would deliver the benefits we have been talking
17   about today, that you could actually develop
18   something that would deliver the benefits.
19      Q.  And the benefits are the ones we were
20   talking about such as the incision, the
21   anesthesia --
22      A.  Less invasive, highly effective, permanent
23   birth control.
24      Q.  Did you have any of these venture
25   capitalists that specifically stated to Conceptus
```

227

```
 1   that they were skeptical about a tissue ingrowth
 2   device?
 3      A.  No, not at that point.  They said there
 4   have been a lot of failures, you know.  They have
 5   this -- they have access to the same documents that
 6   we did, over 40 years, you know.  This may just not
 7   be able to be done.  This may be an impossible task.
 8          And again, that's what all the industry
 9   people who go to medical conferences who talk about
10   women's health, they always start with that in their
11   introduction to their talks, whatever they are, it's
12   very common for people to say "And you know,
13   Conceptus fought the skepticism and developed this
14   great product when, you know, no one had been able
15   to to so for 40 years."
16          So it was very common, and again, I don't
17   know what documents are in here, but I -- I
18   certainly experienced it trying to raise money.  And
19   I soon learned that, you know, really I just needed
20   to talk about infertility.
21      Q.  Okay.  And of these venture capitalists
22   that we were discussing, are there any in particular
23   that you can give me a name of an individual at that
24   company that expressed skepticism about --
25      A.  Sure.
```

228

```
 1      Q.  -- Conceptus' idea?
 2      A.  Sure.  Rob Cooling at Onset Ventures who
 3   later, you know, who became one of our primary VCs.
 4      Q.  And what was Rob Cooling's background?
 5      A.  He was tech -- he was a technologist on
 6   the IT side, but he had partners on the med tech
 7   side.
 8          And then he has actually worked as a
 9   general manager, one of the few VCs who has actually
10   had a real job, as we say in operations, for a
11   medical company.
12          And he even wrote me a note when we went
13   over a hundred million dollars in sales that said,
14   you know, "Gosh, I can't even believe that you did
15   this.  Nobody thought you could do this."
16          Which I can probably find.
17      BY MS. ZOGG:
18      Q.  Okay.  And Mr. Cooling at Onset, what was
19   his specific background prior to become involved at
20   Conceptus relating to contraceptive devices?
21      MS. THAYER:  Objection, vague.
22      THE WITNESS:  I don't know.  He was --
23   worked in the high-tech industry and managed a
24   medical device company at one point in time.
25      BY MS. ZOGG:
```

229

1    Q.   And would you consider someone who had
2 worked on IT, for instance, to be knowledgeable
3 about the contraceptive field?
4        MS. THAYER:  Objection.  Incomplete
5 hypothetical.
6        THE WITNESS:  Well, that's not the way
7 they make decisions on their own knowledge.  They
8 make decisions by calling on experts, physicians in
9 the field, doing research, and based upon that they
10 make a decision.
11       BY MS. ZOGG:
12    Q.   So other than Mr. Cooling at Onset, can
13 you think of any particular individual who expressed
14 skepticism about Conceptus' idea?
15    **A.   Well, I believe Tom McConnell at New**
16 **Enterprise Associates did as well, and...**
17    Q.   Before you go on, we'll get to the other
18 people too.
19    **A.   Yeah.**
20    Q.   I just want to get a sense of why
21 Mr. McConnell --
22    **A.   Yeah.**
23    Q.   I'm sorry, Mr. McConnell at New
24 Enterprises, what was his background?
25    **A.   He was a med tech investor, and by that**

230

1 **time I think he had had about ten years of**
2 **experience, something like that.**
3    Q.   And do you know specifically when you say
4 med tech what kind of technology he had invested in?
5    **A.   He had -- I know some of them, but I don't**
6 **have the exhaustive list.  I mean, I know he's done**
7 **some pharmaceutical investments because I met some**
8 **of the other CEOs and I know did he a lot of med**
9 **tech investing.**
10    Q.   Do you know if he had done anything
11 specific to contraception?
12    **A.   I don't know.**
13    Q.   Okay.  Besides Mr. Cooling and
14 Mr. McConnell, anyone else, any individual that you
15 can think of who expressed skepticism?
16    **A.   Yeah, there was a VC at Frasier whose name**
17 **is escaping me right now.**
18        **I believe David Douglas at Delta also, I**
19 **know he didn't invest.**
20    Q.   Okay.  Before we continue with the list, I
21 want go back to the VC at Frasier.  You can't
22 remember that person's name?
23    **A.   I cannot remember his name.**
24    Q.   Okay.  Do you remember what his background
25 was?

231

1    **A.   No.**
2    Q.   Do you remember if he had had any
3 experience with contraception?
4    **A.   Don't know.**
5    Q.   Was he a developer of contraception?
6    **A.   Don't know that either.**
7    Q.   And Mr. Douglas at Delta, do you know what
8 his background was?
9    **A.   Not before VC.  He's done, he's probably**
10 **one of the most prolific VC investors in the med**
11 **tech area, but I don't know his background before**
12 **that.**
13    Q.   Do you know if he had had any
14 involvement --
15    **A.   He was an investor in Adiana at one point.**
16    Q.   Sorry, I just want to make sure we get a
17 clear record.
18    **A.   Yes.**
19    Q.   So let me go back to my original question.
20        Do you know if he had had any background
21 or experience in developing a contraceptive device?
22    **A.   Don't know that.**
23    Q.   Do you know if he had any experience
24 designing or developing a contraceptive device?
25    **A.   Don't know that.**

232

1    Q.   And with Mr. Cooling at Onset, do you know
2 if he had had any experience developing a
3 contraceptive device?
4    **A.   Don't know that.**
5    Q.   We talked about the VC at Frasier whose
6 name is escaping us at the moment.  Do you know if
7 that person had any experience developing a
8 contraceptive device?
9    **A.   Don't know that.**
10    Q.   And Tom McConnell we already talked about.
11 Do you know if he had any experience developing
12 contraceptive devices?
13    **A.   Don't know that.**
14    Q.   Okay.  Other than those individuals, is
15 there anyone else you can specifically recall as you
16 sit here today?
17    **A.   Yes.**
18    Q.   Who?
19    **A.   The one I just mentioned.  David.**
20    Q.   David Douglas?
21    **A.   David Douglas, yeah.**
22    Q.   Okay.  We just spoke about David Douglas.
23    **A.   Okay.  Did we answer all those same**
24 **questions?  You went back over some other ones, and**
25 **I --**

Case3:09-cv-02280-WHA Document390 Filed09/12/11 Page16 of 33
VIDEOTAPED DEPOSITION OF KATHRYN TULLY KSTALL 8/30/2010
CONFIDENTIAL PORTIONS REDACTED

57 (Pages 233 to 236)

233

1    Q.  Sorry, I made you lose your train of
2  thought.
3    A.  -- lost my train of thought.  Yeah.
4    Q.  Okay.
5    A.  So...
6    Q.  Other than David Douglas, is there anyone
7  else you can recall as you sit here today?
8    A.  Kathy LaPorte.
9    Q.  Where was she from?
10    A.  Sprout.  And the answer to all the
11  questions is I don't know what her background was.
12    Q.  Okay.  And just to be clear for the
13  record, then, you don't know if Ms. Sprout had any
14  experience in developing or designing --
15    A.  I don't know.
16    Q.  Sorry, I have to get my whole question
17  out.
18        Just for the record, then, you don't know
19  if Ms. LaPorte had any experience in developing or
20  designing a contraceptive device.
21        Is that correct?
22    A.  That's correct.
23    Q.  Is there anyone else that you can think of
24  as you sit here today?
25    A.  That's all I remember right now.

234

1    Q.  Okay.  So earlier on when we came back
2  from the break we were talking about marketing.  Do
3  you believe that training of physicians has
4  contributed to the success of Essure?
5    A.  It's probably played a role.
6    Q.  Does Conceptus have a customer service
7  group?
8    A.  Yes.
9    Q.  And is it the goal of Conceptus to meet
10  its customer needs through its customer service
11  group?
12    A.  Sure.  Yes.
13    Q.  Do you think the customer service
14  contributes to sales of Essure?
15    A.  They can hurt you.  I'm not sure they can
16  help you.
17    Q.  Do you think that Conceptus has built up a
18  reputation for itself in the contraceptive market?
19    A.  Yes.
20    Q.  Would you consider Conceptus' reputation
21  to be positive?
22    A.  Yes.
23    Q.  And why do you say that?
24    A.  Because when I go to conferences,
25  physicians often will stop me and thank me for, you

235

1  know, this great advance for women.
2        And yeah, so I get direct feedback when I
3  go to meetings, especially from some of the
4  oldtimers who knew me when I was, had an operating
5  role in the company.
6    Q.  Do you think that Conceptus' reputation
7  contributes to the success of Essure?
8    A.  I think it's just the opposite, that the
9  success of Essure contributes to the reputation of
10  Conceptus.
11    Q.  Do you think that there is any amount of
12  goodwill that's associated with the name of
13  Conceptus?
14        MS. THAYER:  Objection, vague.
15        THE WITNESS:  Are you talking about that
16  in the financial sense of goodwill, or just warm
17  feelings?
18        BY MS. ZOGG:
19    Q.  Well, let's talk about it in the first
20  instance, warm feelings.  Do you believe --
21    A.  Yeah.
22    Q.  -- that --
23    A.  Sorry.
24    Q.  I'm sorry, go ahead.
25        MS. THAYER:  Well, there is no pending

236

1  question.  What is the pending question?
2        BY MS. ZOGG:
3    Q.  Do you believe that Conceptus -- I'm
4  sorry, strike that.
5        Do you believe that there is goodwill
6  associated with the name of Conceptus?
7        MS. THAYER:  Objection, vague.
8        THE WITNESS:  Well, I think really that's
9  the same question as do we have a good reputation.
10  And I think we do.
11        BY MS. ZOGG:
12    Q.  And just to be clear, then, what does
13  goodwill mean to you?
14    A.  Well, I think the way you are using it,
15  you know, there is a goodwill as a term, a financial
16  term, but I think you are using it in terms of
17  reputation and people feeling good about your
18  company and wanting good things to happen to it.
19    Q.  And you mentioned that there may be a
20  financial goodwill as well?
21    A.  Uh-huh.
22    Q.  What do you mean by that?
23    A.  Well --
24        MS. THAYER:  Well, I'm not sure --
25        THE WITNESS:  It --

Exhibit 2

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ULRIC COTE
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

| | |
|---|---|
| CONCEPTUS, INC., a Delaware Corporation, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 09-02280-WHA ) |
| HOLOGIC, INC., a Delaware Corporation, | ) ) ) |
| Defendant. | ) ) |
| _____ | ) |

VIDEOTAPED DEPOSITION OF

ULRIC COTE

_____

August 19, 2010

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887

79d4a6dc-b306-4569-8d47-e5dc49bb0e4d

CONFIDENTIAL VIDEOTAPED DEPOSITION OF ULRIC COTE
CONDUCTED ON THURSDAY, AUGUST 19, 2010

Page 178

1  please?
2      A.  "2006 Customer Survey."
3      Q.  Have you seen this document before?
4      A.  Likely.
5      Q.  Were you involved in its preparation at
6  all?
7      A.  Again, a marketing research tool.
8      Q.  Who would have been responsible for
9  preparing these customer surveys?
10     A.  Our marketing team.  Specifically?
11     Q.  Yeah.
12     A.  I am trying to think if it would be --
13  Lisa Pohmajevich would have been our head of
14  marketing in 2006.
15     Q.  Who would have prepared the most recent
16  customer survey?
17     A.  Our marketing team.
18     Q.  Who would have that been?
19     A.  It depends.  If we did it based on
20  consumer awareness of our product, that would be
21  Tracey Moses.  If we did it on professional -- and I
22  am not sure which one we did -- on professional
23  marketing, the doctors' opinions of our product, it
24  could have been Todd Sloan.
25     Q.  When you first implant the Essure -- we

Page 179

1  are talking about the wait period -- how long does
2  it typically take before the fallopian tube closes?
3      A.  I am sure it varies, and there are some
4  speculations as to why it varies.  But at three
5  months about 95 percent of our patients are
6  occluded.  And when properly placed, it says, in six
7  months they are all occluded.
8      Q.  Is there an earlier time when a
9  substantial percentage are occluded?  Have you ever
10  measured that?
11     A.  Somebody has, I am sure, somewhere.  But I
12  haven't, you know -- personally, I am not sure.
13     Q.  Do you know what the earliest time any
14  meaningful number of patients might be fully
15  occluded?
16     A.  Purely just speculating, six to eight
17  weeks.
18     Q.  At what point does the implant become
19  affixed permanently to the fallopian tube wall?
20         MR. ANDERSON:  Objection.  Foundation.
21         THE WITNESS:  I don't know.  I am not a
22  pathologist or a histologist.
23         MR. WOLF:  Q.  Do you have any
24  understanding at all?
25     A.  I sell the product.  I don't.

Page 180

1      Q.  Is the time at which the implant is
2  permanently affixed --
3         For the record, Ms. Sklenar has just
4  walked into the room.
5         Let me start over.
6         Is the time at which an implant is
7  permanently affixed ever the subject of any
8  marketing materials?
9      A.  Not that I can recall.
10     Q.  To your knowledge, are any sales made
11  based on the timing of the affixation of the implant
12  in the fallopian tubes?
13     A.  Are you referring specifically to
14  occlusion or affixing?  Because that's --
15     Q.  Let's talk -- no, affixing, not occlusion.
16     A.  I don't believe so.
17     Q.  To your knowledge, has anyone at Conceptus
18  ever tried to make a sale based on when its product
19  affixed to the fallopian tube?
20     A.  Not to my knowledge.
21     Q.  Do you know whether the Essure product has
22  any contraceptive effect prior to the occlusion of
23  the fallopian tube?
24         MR. ANDERSON:  Objection.  Foundation.
25         THE WITNESS:  I couldn't -- I couldn't --

Page 181

1  no, I don't know.
2         MR. WOLF:  Q.  Do you know whether anyone
3  in the sales organization has ever marketed Adiana
4  based on potential contraception when the fallopian
5  tube is still open?
6         MR. ANDERSON:  Counsel, do you mean
7  Adiana?
8         THE WITNESS:  You confused me with the
9  question.  You went from Essure to Adiana.  Can you
10  restate it?
11         MR. WOLF:  Q.  I misstated.  I am sorry.
12         Are you aware of anyone in the Conceptus
13  sales force that has ever marketed Essure based on
14  when the fallopian tube is or is not open?
15     A.  Not marketed.  I am not aware of anybody
16  who has marketed it that way.
17     Q.  Do you understand generally the structure
18  of the Adiana device?
19     A.  Generally, I do.
20     Q.  Do you know what it's made of?
21     A.  Silicone.
22     Q.  Do you know whether silicone is resilient
23  or not?
24     A.  Please give me a definition of resilient.
25     Q.  Do you have an understanding in the

46 (Pages 178 to 181)

79d4a6dc-b306-4569-8d47-e5dc49bbe0e4d

Exhibit 3

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARK SIECZKAREK
CONDUCTED ON THURSDAY, AUGUST 12, 2010

Page 1

1

2             IN THE UNITED STATES DISTRICT COURT

3           FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                 SAN FRANCISCO DIVISION

5                      --oOo--

6    CONCEPTUS, INC., A DELAWARE     )

7    CORPORATION                     )

8             Plaintiff,             )

9          vs.                       ) Case No. 09-02280 WHA

10   HOLOGIC, INC., A DELAWARE        )

11   CORPORATION                     )

12            Defendant.             )

13   _____ )

14

15             VIDEOTAPED DEPOSITION OF

16                MARK SIECZKAREK

17   _____

18            Thursday, August 12, 2010

19

20

21

22    HIGHLY CONFIDENTIAL, OUTSIDE ATTORNEYS EYES ONLY

23

24   REPORTED BY: COREY W. ANDERSON, CSR 4096

25   JOB NO.: 24-182412

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARK SIECZKAREK
CONDUCTED ON THURSDAY, AUGUST 12, 2010

Page 198

1    Q.  Are there any areas of the United States
2  that Conceptus doesn't specifically target?
3        MS. THAYER:  Objection, vague.
4        THE WITNESS:  Are you asking is there any
5  area in the U.S. that is not covered?
6        BY MS. SKLENAR:
7    Q.  Well, where there aren't really active
8  efforts to sell product.
9    A.  We have efforts throughout the U.S. to sell
10  product.
11    Q.  What is the profit margin on the Essure
12  product?
13    A.  Are you talking about the gross margin?
14    Q.  Let's do all possible profit margins that
15  you are aware of.  What is the gross margin?
16    A.  The gross margin is upwards of 80 percent.
17    Q.  How is that calculated?
18    A.  Again, it's the cost to manufacture the
19  product, and then any internal overhead that gets
20  applied that is part of the operations department.
21    Q.  Are there particular accounting standards
22  that Conceptus uses in calculating its gross margin?
23    A.  Yes.  We use GAAP.
24    Q.  Are there any other types of margin numbers
25  that Conceptus keeps with respect to the Essure

Page 199

1  product?
2    A.  State that again?
3    Q.  Are there any other types of profit margin
4  numbers that Conceptus tracks for Essure?
5    A.  Well, we look at the overall operating
6  profit of the company.
7    Q.  What is the overall operating profit?
8    A.  Well, it has varied.  As I mentioned
9  previously, we just became profitable in 2009 after
10  spending nearly $330 million to get to the point where
11  we are today.
12    Q.  As far as the gross margin, you said it's
13  upward 80 percent.  Has that number remained
14  relatively constant since the commercial release of
15  Essure?
16    A.  No, it has risen since -- as we get more
17  volume.  Obviously the -- not so obviously.  The costs
18  have gone down.
19    Q.  What was -- I'm sorry, did you finish your
20  answer?
21    A.  Yeah, I'm done.
22    Q.  What was the gross margin in 2009?
23    A.  The gross margin for the full year 2009 was
24  right around 80 percent.
25    Q.  And what about for 2010 to date, what's the

Page 200

1  gross margin been?
2    A.  We are between somewhere between 81 and 83,
3  depending on the quarter.
4    Q.  Does Conceptus have any policy, corporate
5  policy with regards to the licensing of intellectual
6  property?
7    A.  There is no policy.
8    Q.  Has Conceptus ever granted anyone licenses
9  to any of its patents?
10    A.  None that I am aware of.
11    Q.  Has anyone ever asked Conceptus for a
12  license to any of its patents?
13    A.  Yes, they have.
14    Q.  Who is that?
15    A.  That was American Medical Systems.
16    Q.  And when did American Medical Systems ask
17  for a license?
18    A.  I don't recall.
19    Q.  Who specifically at American Medical Systems
20  asked for a license?
21    A.  Marty Emerson was the president.
22    Q.  And why, did Mr. Emerson indicate why he
23  wanted a license to Conceptus' patents?
24    A.  Because -- I'm sorry.  He wanted to develop
25  a product.

Page 201

1    Q.  Do you know whether that's before or after
2  AMS acquired Ovion?
3    A.  That was after AMS acquired Ovion.
4    Q.  Did Mr. Emerson ask for a license to
5  specific Conceptus patents?
6    A.  Mr. Emerson in a discussion asked me for a
7  license to the Conceptus patents.
8    Q.  Did you have an understanding of what
9  patents he was referring to?
10    A.  Not specifically in terms of the number, no.
11    Q.  So the discussion was never any more
12  specific than that?
13    A.  The specificity around it was once again to
14  develop a product for permanent birth control.
15    Q.  Did you -- what was your response to
16  Mr. Emerson's request for a license?
17    A.  No.
18    Q.  And why did you say no?
19    A.  We had no interest in licensing out our
20  patents.
21    Q.  Was that prior to the time -- strike that.
22        And why didn't Conceptus have an interest in
23  licensing out its patents?
24    A.  There was no interest in giving license to
25  somebody given the market that we were in.

51 (Pages 198 to 201)

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARK SIECZKAREK
CONDUCTED ON THURSDAY, AUGUST 12, 2010

Page 222

1    (Whereupon, Exhibit 557 was marked
2    for identification)
3    (Whereupon, Exhibit 558 was marked
4    for identification)
5    (Whereupon, Exhibit 559 was marked
6    for identification)
7    (Whereupon, Exhibit 560 was marked
8    for identification)
9    (Whereupon, Exhibit 561 was marked
10    for identification)
11    (Whereupon, Exhibit 562 was marked
12    for identification)
13    (Whereupon, Exhibit 563 was marked
14    for identification)
15    THE VIDEOGRAPHER: Back on the record. The
16    time is 3:23.
17    MS. SKLENAR: So during the break I asked
18    Ms. Thayer if she would stipulate to the authenticity
19    and admissibility of certain documents so we could
20    speed things up with Mr. Sieczkarek, which I'm sure he
21    is very sad about, and she has agreed for this list of
22    documents.
23    So I am going to read the list. It's
24    CON00130824 through 854; CON00131927 through 990;
25    CON00131991 through 132060; CON00130754 through 823;

Page 223

1    CON00128593 to 660 -- by "to" I meant through, if that
2    was clear. Let me just repeat that one. 128593
3    through 128660; and then CON00129121 through 129113.
4    Thank you.
5    You want this stack?
6    MS. THAYER: I was going to say I probably
7    should do that just in case there is a typo or
8    something and we have a question later on as to what
9    we have stipulated to.
10    Thank you.
11    MS. SKLENAR: Okay.
12    Q.   The next exhibit I want to put in front of
13    you has been previously marked Exhibit 510. Do you
14    recognize this as the Essure Instructions For Use?
15    A.   Yes, I do.
16    Q.   Can you explain to me what instructions for
17    use are?
18    A.   Well, this is, appears to be a copy of the
19    package insert that is included with every procedure,
20    yeah, every -- every catheter, pair of catheters that
21    is shipped out to a physician or hospital.
22    Q.   Thank you.
23    If you could turn to the last page of the
24    Instructions For Use, in the lower right-hand corner
25    there is the heading "Conceptus."

Page 224

1    Do you see that?
2    A.   Yes, I do.
3    Q.   And under that, there is the copyright date,
4    and then in the next paragraph there is a reference to
5    some trademarks.
6    Do you see that?
7    MS. THAYER: Jennifer, where is this going?
8    MS. SKLENAR: I can talk to you outside if
9    you want to know.
10    MS. THAYER: You are sure you are not
11    starting discovery --
12    MS. SKLENAR: No.
13    MS. THAYER: -- in another lawsuit?
14    MS. SKLENAR: And if you'll let me finish,
15    you'll see why.
16    MS. THAYER: Okay.
17    THE WITNESS: Could you repeat the question?
18    BY MS. SKLENAR:
19    Q.   Sure. There is a reference in that
20    paragraph to "Trademarks." Do you see that under the
21    copyright notice?
22    A.   Yes, I do.
23    Q.   And then at the end of that paragraph it
24    says "The Essure system is covered under the following
25    patents."

Page 225

1    Do you see that?
2    A.   Yes.
3    Q.   And can you tell me how many patents are
4    listed there?
5    MS. THAYER: All right.
6    MS. SKLENAR: I can talk to you outside and
7    tell you why.
8    MS. THAYER: That's fine.
9    MS. SKLENAR: Okay.
10    THE VIDEOGRAPHER: Going off? Shall we go
11    off?
12    MS. THAYER: Oh, yes, off the record.
13    THE VIDEOGRAPHER: Going off the record, the
14    time is 3:27.
15    (Whereupon, a recess was taken)
16    THE VIDEOGRAPHER: Back on the record. The
17    time is 3:28.
18    MS. SKLENAR: Mr. Sieczkarek, I had a
19    discussion with your counsel off the record and she
20    has indicated that she does not want me to ask you
21    questions about two of the patents on this list, which
22    are 6,679,266, and 6,145,505, and that she would
23    instruct you not to answer questions regarding those
24    two patents.
25    Is that fair, Ms. Thayer?

57 (Pages 222 to 225)

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARK SIECZKAREK
CONDUCTED ON THURSDAY, AUGUST 12, 2010

Page 226

1      MS. THAYER: Yes.
2      BY MS. SKLENAR:
3      Q.  While I don't agree with that, I will
4  exclude from my questioning so we don't have a dispute
5  those two patents.
6      Okay?
7      A.  Okay.
8      Q.  So I'm going to ask you as to the other
9  patents that are listed there, first of all, can tell
10  me how many total patents are listed there?
11      A.  And if you could be clear, including the two
12  that you just said not to talk about?
13      Q.  I guess that's a confusing instruction,
14  isn't it.
15      You see where in the last paragraph before
16  the patent numbers, it says "The Essure system is
17  covered under the following patents."
18      You see it says that?
19      A.  Yes.
20      Q.  Okay.  And then there is a list of patents?
21      A.  Yes.
22      Q.  And let's exclude the '266 and the '505.
23  How many remaining patents are listed?
24      A.  There are ten U.S. patents listed.
25      Q.  Other than the '266 and '505?

Page 227

1      A.  Yes.
2      Q.  Okay.  Are you familiar with those ten
3  listed that we are permitted to talk about?
4      A.  Could you define familiar?
5      Q.  Have you read them?
6      A.  I have read parts of them over time.
7      Q.  Do you have an understanding as to whether
8  the Essure product practices one or more claims of any
9  of those ten patents?
10      MS. THAYER: I'll instruct you not to answer
11  that one.
12      That's not in the territory that you said
13  you were going into.
14      MS. SKLENAR: Those ten.
15      MS. THAYER: We are not going there.
16      Instruct you not to answer.
17      BY MS. SKLENAR:
18      Q.  Do you have an understanding as to whether
19  the fact that the Essure system is covered by those
20  ten patents contributes to the success of Essure?
21      MS. THAYER: Objection, calls for
22  speculation, and vague.
23      THE WITNESS: I'm not going to answer that.
24      BY MS. SKLENAR:
25      Q.  You don't know or you are refusing to

Page 228

1  answer?
2      A.  I don't know.
3      Q.  So let's take them individually.  The '650
4  patent, the first one listed, do you have an
5  understanding as to whether the fact that Essure is
6  covered by that patent contributes to the success of
7  the product?
8      MS. THAYER: Asked and answered.
9      How does -- if he says he doesn't know for
10  the ten, how does you are not just repeating it for
11  you to go through each one of the ten?
12      MS. SKLENAR: I need to make my record.
13      MS. THAYER: Okay.
14      THE WITNESS: I do not know.
15      BY MS. SKLENAR:
16      Q.  What about the '833 patent?  Do you know
17  whether the fact that Essure is covered by that patent
18  contributes to the success of the product?
19      A.  I don't know.
20      Q.  And what about for the '667 patent?  Would
21  it be the same answer?
22      A.  Yes, it would.
23      Q.  And what about for the '323 product --
24  patent?  Would it be the same answer?
25      A.  Yes, would it.

Page 229

1      Q.  What about for the '884 patent, would it be
2  the same answer?
3      A.  Yes, it would.
4      Q.  What about for the '361 patent, would it be
5  the same answer?
6      A.  Yes, it would.
7      Q.  What about for the '979 patent, would it be
8  the same answer?
9      A.  Yes, it would.
10      Q.  What about for the '240 patent, would it be
11  the same answer?
12      A.  Yes, it would.
13      Q.  What about for the '769 patent, would it be
14  the same answer?
15      A.  Yes, it would.
16      Q.  What about for the '600 patent, would it be
17  the same answer?
18      A.  Yes, it would.
19      Q.  Do you know what the "other patents pending"
20  there refers to?
21      MS. THAYER: You can answer that yes or no.
22      THE WITNESS: Yes.
23      BY MS. SKLENAR:
24      Q.  Do you know whether any of those pending
25  patents contribute to the success of the Essure

58 (Pages 226 to 229)

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF MARK SIECZKAREK
CONDUCTED ON THURSDAY, AUGUST 12, 2010

Page 230

1    product?
2        A.  I don't know.
3        Q.  Let me ask you about Mr. Nikochev.  Do you
4    know a Mr. Nikochev?
5        A.  Yes, I do.
6        Q.  How do you know him?
7        A.  Been introduced to him again at conferences.
8        Q.  When was that?
9        A.  Many times over the past eight years.
10       Q.  Do you have any understanding as to what
11   Mr. Nikochev's role was with respect to the formation
12   of Conceptus?
13       A.  Well, oftentimes he is referred to as the
14   inventor of the Essure product.
15       Q.  And who refers to him as that?
16       A.  Many people.
17       Q.  Who are those people?
18       A.  Past employees of Conceptus.
19       Q.  Do you know Dai Ton?
20       A.  Yes, I do.
21       Q.  Who is Mr. Ton?
22       A.  He is a former employee.
23       Q.  What was his role at Conceptus?
24       A.  I believe he was in engineering.
25       Q.  Did you work with Mr. Ton at Conceptus?

Page 231

1        A.  I believe Dai crossed over in my time.
2        Q.  Do you have an understanding as to where
3    Mr. Ton works now?
4        A.  No, I do not.
5        Q.  Do you know why Mr. Ton left Conceptus?
6        A.  No, I do not.
7        Q.  What about Ashish Khera?  Have you ever met
8    Mr. Khera?
9        A.  Yes, I have.
10       Q.  When have you met Mr. Khera?
11       A.  At various times over the last eight years.
12       Q.  Did you work with Mr. Khera at Conceptus?
13       A.  No, I did not.
14       Q.  Do you have an understanding as to whether
15   Mr. Khera is still employed by Conceptus?
16       A.  No, he is not, to my knowledge.
17       Q.  Do you know why he left Conceptus?
18       A.  No, I do not.
19       Q.  What about Don Gurskis?  Do you know him?
20       A.  Yes, I do.
21       Q.  Did you work with him at Conceptus?
22       A.  Yes, I did.
23       Q.  What his role at Conceptus?
24       A.  He was also in the engineering group.
25       Q.  And he is no longer at Conceptus either.

Page 232

1        Is that correct?
2        A.  That is correct.
3        Q.  Do you know why he left, where he works now?
4        A.  No, I do not.
5        Q.  Do you know why he left Conceptus?
6        A.  No, I do not.
7        MS. SKLENAR:  Let's mark as next in order.
8        (Whereupon, Exhibit 564 was marked
9        for identification)
10       BY MS. SKLENAR:
11       Q.  Do you recognize this, Exhibit 564?
12       A.  Yes, I do.
13       Q.  What is this?
14       A.  This is a strategic map, it is part of our
15   strategic planning process.
16       Q.  I wanted to ask you to turn to page 129965.
17       And just for the record, the document is
18   129951 through 129976.
19       Q.  If you turn to 129965, there is a title page
20   that says "Adiana War Games."
21       Do you see that?
22       A.  Yes, I do.
23       MS. THAYER:  I believe -- did you say "War
24   Games"?
25       MS. SKLENAR:  "War Game."

Page 233

1        MS. THAYER:  Ah.
2        BY MS. SKLENAR:
3        Q.  Does this appear to you to be a separate
4    document than the pages that precede it?
5        A.  Yes, it does.
6        MS. SKLENAR:  So why don't we mark, why
7    don't we separate these two and mark 129965 through
8    129976 as 565.
9        (Whereupon, Exhibit 565 was marked
10       for identification)
11       BY MS. SKLENAR:
12       Q.  Do you recognize this Exhibit 565?
13       (Pause)
14       A.  Yes, I do.
15       Q.  What is it?
16       A.  It's called "Adiana War Game."
17       Q.  And what's the purpose of this document?
18       A.  It is a communication piece to the board of
19   directors in 2008 that reflects where we stand on the
20   competitive issue.
21       Q.  Do you know who drafted this?
22       A.  Again, this would probably have been, had
23   input from a number of people in the organization,
24   basically sales, marketing, regulatory, certainly
25   would have been people who have had input into this

Exhibit 4

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF STEVEN BACICH
CONDUCTED ON TUESDAY, AUGUST 31, 2010

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

CONCEPTUS, INC., a Delaware          )
Corporation,                         )
                                     )
            Plaintiff,               )
                                     )
      vs.                            ) No. 09-02280-WHA
                                     )
HOLOGIC, INC., a Delaware            )
Corporation,                         )
                                     )
            Defendant.               )
_____)


VIDEOTAPED DEPOSITION OF

STEVEN BACICH

_____

AUGUST 31, 2010


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY




REPORTED BY:  SARAH LUCIA BRANN, CSR 3887

HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF STEVEN BACICH
CONDUCTED ON TUESDAY, AUGUST 31, 2010

Page 190

1  the rabbit under anesthesia and do an open incision
2  and do direct access to the fallopian tube, and
3  implant my device, sew the animal up, and then
4  follow the animal for any chronic period of time.
5      Q.  But you don't know.
6      A.  I can't speak for sure.
7      Q.  Do you read claim 36 to require any sort
8  of efficacy rate as far as -- for the contraceptive
9  methods it recites?
10     MR. ASCOLESE:  Objection.  Vague.  Calls
11  for a legal conclusion.
12     THE WITNESS:  It just says contraceptive
13  method.  It doesn't describe or prescribe the
14  effectiveness rate.
15     MS. SKLENAR:  Q.  Do you think that it
16  requires some sort of minimal expulsion rate or
17  migration rate?
18     MR. ASCOLESE:  Same objections.
19     THE WITNESS:  It doesn't speak to -- it
20  does talk about permanently affixing.
21     MS. SKLENAR:  Q.  Correct.
22     A.  So permanently means that you want it to
23  be permanent.
24     Q.  So, say I did 10 experiments, and in eight
25  of those I was successful in permanently affixing

Page 191

1  the device within the tube.  Would you agree that at
2  least for those eight experiments I had performed
3  the requirement of the claim?
4      MR. ASCOLESE:  Objection.  Calls for
5  speculation.  Incomplete hypothetical.
6      THE WITNESS:  I don't know if it reads on
7  every aspect of the claim or all the limitations of
8  the claim.  But in terms of eight out of eight
9  permanently staying in place, I know that shows
10  retention.  I don't know if it relates to the claim
11  or not.
12     MS. SKLENAR:  Q.  But you would agree at
13  least for those eight that I -- assuming that I got
14  permanent affixation, that would satisfy the
15  requirement.
16     MR. ASCOLESE:  Objection.
17  Mischaracterizes the witness's testimony.
18     MS. SKLENAR:  Q.  In other words, what I
19  am saying is, do you read claim 36 as requiring, you
20  know, a certain expulsion rate across a group of
21  experiments?
22     MR. ASCOLESE:  Objection.  Calls for a
23  legal conclusion.
24     THE WITNESS:  I don't think it says
25  anything about expulsion rate.  I think we have to

Page 192

1  understand what "permanently affixing" means.  And
2  there are other limitations or discussion in the
3  claim.
4      MS. SKLENAR:  Q.  Of course.
5      A.  Yeah.  But there are a lot of things that
6  could occur because of the -- why an expulsion
7  happens.  Expulsions can happen for reasons not
8  related to the device.  The surgeon misplacing the
9  device.  Not ever being in the fallopian tube, and
10  thinking that they were in the fallopian tube.
11  There are many reasons for expulsions.
12     Q.  I believe you mentioned earlier that you
13  know Amy Thurmond.
14     A.  I have met Amy Thurmond.  I don't know Amy
15  Thurmond well.  She is a radiologist and -- or a
16  gynecological radiologist.  I would say that she
17  would be someone who is by far closer to Julian
18  Nikolchev.
19     Q.  Do you know whether she was ever
20  attributed with development of the S/TOP technique?
21     MR. ASCOLESE:  Objection.  Vague.  Calls
22  for speculation.
23     THE WITNESS:  I know she was one of the
24  early workers on the technique, and I believe she
25  may have done the rabbit work.  I just kind of --

Page 193

1  you just clicked something in my head that she might
2  have been an author on some of the early -- early
3  work.  And I would be speculating if it was the
4  rabbit work, but I know she was one of the early
5  researchers for Conceptus.
6      MS. SKLENAR:  Let's mark as next in order
7  CON00055692 through 93.
8      (Deposition Exhibit 644
9      was marked for identification.)
10     MS. SKLENAR:  Q.  Do you recognize this
11  exhibit, 644?
12     A.  I just looked at the memo.
13     I am reading it right now.
14     Q.  Okay.
15     A.  All right.  I read it.
16     Q.  So Exhibit 644 is a memo from Ashish
17  Khera; correct?
18     A.  Yeah.  It says -- and it says -- yeah.
19  That is what it is.  Sorry.
20     Q.  And he is sending around an article
21  describing S/TOP from the July of '97 issue of
22  Popular Science; is that right?
23     A.  Correct.
24     Q.  If you turn to the article, it refers to a
25  new technique developed by an Oregon radiologist.

49 (Pages 190 to 193)

d7f6ac7c-d161-4fb8-b271-8d59b379e714

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

CONCEPTUS, INC.,

        Plaintiff,                          Case No. C 09-02280 WHA

   v.

HOLOGIC, INC.,

        Defendant.

**REPLY EXPERT REPORT OF DR. TED ANDERSON, M.D.**
**REGARDING U.S. PATENT NO. 6,634,361**

**CONFIDENTIAL – OUTSIDE COUNSELS' EYES ONLY**
**PURSUANT TO PROTECTIVE ORDER**

or she desired to occlude the fallopian tube, a stent-like device for occluding a vessel could be adapted for use.

31.     In addition, there has been and continues to be apprehension of leaving a *metal* foreign body in the body permanently.  As I explained in my prior testimony, "the particular use of metals in the uterus and in the fallopian tube gave a little bit of concern to people because of the possible limitations of things that might be needed to be done in the future; for example, instruments or devices or procedures that might need to be done in the uterus for which these metal coils might interfere."  (Anderson Tr. at 48-50.)  This continues to be a concern even today.  This is not to suggest that individuals working in the field would be dissuaded from using metal devices altogether or would be skeptical of doing so, only that they would have concerns about the use of future procedures including D&C, endometrial ablation and in vitro fertilization procedures.  In addition, there would be concerns about potential interference with MRI procedures.

32.     Dr. Glasser also cites my testimony that hysteroscopic techniques for permanent female sterilization have been considered the "holy grail."  (*Id.* at 11.)  He suggests that Conceptus has somehow found the holy grail and that this is somehow relevant to the asserted claims of the '361 patent.  I disagree.  Prior to Conceptus' work on the Essure product, there were other successful minimally invasive techniques for tubal sterilization reported in the literature and in patents.  Indeed, Mr. Ryan has discussed those techniques in his report. Conceptus was just the first to obtain FDA approval and offer a product for sale in the United States.  However, this does not suggest by any stretch of the imagination that Conceptus has somehow found the holy grail.

33.     As explained in my earlier report, there have historically been multiple types of permanent contraception, including tubal ligation, fulguration and occlusion through clips, bands and other devices, which may be conducted abdominally, laparoscopically or vaginally.  These methods of tubal occlusion, particularly the laparoscopic techniques, remain the mainstay of surgical sterilization even today, despite the introduction of Essure in 2003 and Adiana in 2009.

In addition, as explained above, the Essure product, or use thereof, does not practice any of the asserted claims.

34.     Dr. Glasser also cites to my testimony as evidence that there were unsuccessful attempts at transcervical sterilization prior to the '361 patent. (*Id.* at 17.)  I agree that certain techniques were unsuccessful, but others were not as Mr. Ryan has addressed.  Moreover, Dr. Glasser suggests that I am personally aware of all of the prior art to the '361 patent.  I am not.  I have looked at certain prior art references throughout my work in this case but have not undertaken a comprehensive review of the prior art.  Dr. Glasser also quotes my testimony out of context to suggest that I stated that all prior attempts with plugs "didn't work."  In fact, I was asked specifically about *failed* attempts and why they occurred.  (*See* Anderson Tr. at 17.)

35.     Dr. Glasser also cites to my testimony as evidence of skepticism of experts about the patented method.  He asserts that I "recalled that there was uncertainty about whether the patented method would work, and concern about the use of foreign bodies in the reproductive system."  (Glasser Rebuttal Report at 19.)   I simply could not have been referring to the "patented method" of the '361 asserted claims in my earlier deposition as Dr. Glasser suggests. When I was deposed in October in this case, the Conceptus patent that I had reviewed at that time was U.S. Patent No. 7,428,904 (and two other patents which I understand that Conceptus withdrew).  I understand that the Court agreed with Hologic's arguments that there was a substantial question that the asserted claim of the '904 patent was invalid and not infringed and Conceptus ultimately dropped that patent from the case.

36.     In addition, there has always been, and continues to be, a concern about the use of foreign bodies in the reproductive system, particularly metal as described above.  This is not to say that individuals working in the field of contraception would be deterred from continuing to use them.

37.     Dr. Glasser also cites my testimony about the Adiana and Essure device as evidence of acceptance by others of the '361 patent's inventions.  I disagree.  As I explained

above and in my earlier report, there is no evidence that use of either product practices the asserted claims.

I declare under penalty of perjury under the Laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

_____

Ted Anderson, M.D.

Executed this 23rd day of September, 2010.