**EXHIBIT H**

VIDEOTAPED DEPOSITION OF TED ANDERSON, M.D., M.D.
CONDUCTED ON SATURDAY, OCTOBER 17, 2009

1 (Pages 1 to 4)

---

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2      FOR THE NORTHERN DISTRICT OF CALIFORNIA
3             SAN FRANCISCO DIVISION
4    _____
5                                  )
6    CONCEPTUS, INC., a Delaware )   Case No. 09-02280 WHA
     Corporation,              )
7                              )
          Plaintiff,           )
8                              )
     vs.                       )
9                              )
     HOLOGIC, INC., a Delaware )
10   Corporation,              )
                               )
11       Defendant.            )
     _____)
12
13
14
15         VIDEOTAPED DEPOSITION OF
16            TED ANDERSON, M.D.
17             Washington, D.C.
18          Saturday, October 17, 2009
19                2:10 p.m.
20
21
22
23
24   Job No.:  22-166162
     Pages 1 through 153
25   Reported by:  John L. Harmonson, RPR
```

---

**Page 2**

```
1
2
3          Videotaped Deposition of
4             TED ANDERSON, M.D.
5
6
7    Held at the offices of:
8         WEIL, GOTSHAL & MANGES
9         1300 I Street, N.W.
10        Suite 900
11        Washington, D.C.  20005
12
13
14
15       Taken pursuant to the Federal Rules of Civil
16   Procedure, subject to such stipulations as may be
17   stated herein or attached hereto, before John L.
18   Harmonson, Registered Professional Reporter, Notary
19   Public in and for the District of Columbia, who
20   officiated in administering the oath to the witness.
21
22
23
24
25
```

---

**Page 3**

```
1                  APPEARANCES
2
3    ON BEHALF OF PLAINTIFF:
4        EDWARD R. REINES, ESQUIRE
         Weil, Gotshal & Manges
5        201 Redwood Shores Parkway
         Redwood Shores, California  94065
6        (650) 802-3143
7
8
9    ON BEHALF OF DEFENDANT:
10       JENNIFER A. SKLENAR, ESQUIRE
         Howrey, LLP
11       550 South Hope Street
         Suite 1100
12       Los Angeles, California  90071
         (213) 892-1921
13
14
15
16   ALSO PRESENT:
17       PATRICK RUFFNER, Videographer
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
1              EXAMINATION INDEX
2                              PAGE
3    EXAMINATION BY MR. REINES          6
4    EXAMINATION BY MS. SKLENAR        136
5    EXAMINATION BY MR. REINES         144
6              * * * * *
7
8              EXHIBIT INDEX
9        (Exhibits attached to transcript.)
10   EXHIBIT        DESCRIPTION         PAGE
11   10    U.S. Patent 5,095,917         35
12   11    U.S. Patent 6,309,384         64
13   12    Transcript of FDA hearing; December    67
             13, 2007
14
15   13    Declaration of Dr. Ted Anderson      89
16   14    Connor article, "Essure:  A Review Six   118
             Years Later"; Journal of Minimally
17           Invasive Gynecology; March 2009
18
19
20
21
22
23
24
25
```

VIDEOTAPED DEPOSITION OF TED ANDERSON, M.D., M.D.
CONDUCTED ON SATURDAY, OCTOBER 17, 2009

3 (Pages 9 to 12)

9

1  you've testified many times in deposition, I'll
2  assume you have a basic understanding of the
3  process.  If at any point you have a question, do
4  let me know.
5      A.  I will.
6      Q.  If during the course of the deposition
7  you would like to take a break, stretch your legs,
8  use the lavatory, let me know and we'll do that at
9  an appropriate time.
10     A.  I will.
11     Q.  If during the course of the deposition
12  you don't understand a question or any aspect of the
13  question, let me know and, as appropriate, I'll
14  adjust the question.  If you don't say anything, I'm
15  going to assume that you understood my question.  Is
16  that fair?
17     A.  That is fair.
18     Q.  Is there any reason why you can't give
19  your best and most accurate testimony today?
20     A.  None that I'm aware of.
21     Q.  During the course of the deposition, and
22  you probably know this based on your experience,
23  counsel may interpose objections.  Those objections
24  are just for form and don't impact in any way your
25  obligation to fully and candidly answer the question

10

1  unless there is a specific instruction that's
2  provided to you that you shouldn't answer or you
3  should withhold certain information.
4      Do you understand that?
5      A.  I do.
6      Q.  What was your first exposure to
7  techniques for permanent female sterilization?
8      A.  To the performance of techniques or
9  understanding of techniques?
10     Q.  Just understanding techniques.
11     A.  I've read about techniques for female
12  sterilization over many, many years and have
13  performed them as part of my practice dating back
14  into the late 1980s.
15     Q.  And what were you doing in the late 1980s
16  when you first started educating yourself about
17  permanent female sterilization?
18     A.  It was part of my preparation for medical
19  practice.
20     Q.  When did you first start following
21  potential nonsurgical techniques for permanent
22  female sterilization?
23     A.  What do you mean by "nonsurgical
24  techniques"?
25     Q.  Maybe can you help me there.  That's used

11

1  in the literature and in the patents, and I think in
2  some of the expert reports.  If there is some nuance
3  there you would like me to flesh out, I'll happy to.
4      A.  I would only say that occasionally people
5  refer to hysteroscopic sterilization procedures such
6  as Essure and Adiana as nonsurgical techniques, but
7  they are surgical procedures.  And so I have issue
8  with that term.
9      So if you mean when was I first familiar
10  with hysteroscopic methods of sterilization, I've
11  read about those for several years but began
12  performing them when the Essure product became
13  available in the early 2000s.
14     Q.  When did you first learn about research
15  into hysteroscopic techniques for permanent female
16  sterilization?
17     A.  Well, this has sort of been the holy
18  grail of sterilization for many years, and attempts
19  to achieve sterilization by hysteroscopic technique
20  date way back to the '70s and '80s, as far as I'm
21  aware.
22     Q.  And why do you say that -- Why do you say
23  that transcervical techniques for permanent female
24  sterilization are the holy grail?
25     A.  Well, up until the availability of these

12

1  techniques, women, in order to achieve permanent
2  sterilization, had to undergo surgical procedures
3  that carried with them risk and inconvenience and
4  recovery time and time away from work, time away
5  from home, whereas the transcervical sterilization
6  procedures do not involve that.
7      They basically achieve the equivalent of
8  the male vasectomy, something that can be done in
9  the office very quickly with minimal amount of
10  discomfort and inconvenience.  And so the ability
11  for women to have that available certainly improves
12  their access to sterilization.
13     Q.  For those that are not as familiar as you
14  of what is entailed by these various techniques, can
15  you just describe in some more specifics why it
16  would be so much more desirable to have a
17  transcervical procedure for permanent female
18  sterilization as compared to the traditional
19  surgical procedures?
20     MS. SKLENAR:  Objection; form.
21     THE WITNESS:  Okay.  A traditional
22  sterilization procedure could be performed by one of
23  two basic mechanisms.  One mechanism would be what
24  we call a laparotomy, and that would be making an
25  incision in the abdomen that could vary in size to

**EXHIBIT I**

Case3:09-cv-02280-WHA   Document391-6   Filed09/12/11   Page5 of 42

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--oOo--

CONCEPTUS, INC., A DELAWARE   )

CORPORATION                   )

      Plaintiff,          )

    vs.                       ) Case 09-CV-02280 WHA

HOLOGIC, INC., A DELAWARE     )

CORPORATION                   )

      Defendant.          )

_____ )


VIDEOTAPED DEPOSITION OF

KATHRYN TUNSTALL

_____

Monday, August 30, 2010


OUTSIDE COUNSEL ONLY, HIGHLY CONFIDENTIAL PORTION

PRODUCED SEPARATELY:

Pages 145-146, 206-211


REPORTED BY: COREY W. ANDERSON, CSR 4096

**VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL - 8/30/2010**
**CONFIDENTIAL PORTIONS REDACTED**

Page 222

1    Q.  And who specifically do you recall was
2    skeptical?
3    A.  Oh, VCs we talked to.
4    Q.  And anyone in particular?
5    A.  Oh Nancy Olson at -- you name it.
6    Everyone was.
7        And even to the time of IPO, there was a
8    lot of skepticism still about it in February of '96.
9    Q.  Okay.  I just want to go back to
10   the founding --
11   A.  Okay.
12   Q.  I'm sorry, I keep doing that, go back to
13   the founding period of 1992.
14   A.  Yeah.
15   Q.  How many venture capitalists did Conceptus
16   approach?
17   A.  I can't give you a precise number, but I'm
18   sure it was, you know, more than six and less than
19   20.
20   Q.  Okay.
21   A.  I can give you some names.  I remember
22   Frazier Ventures, I remember Weiss, Peck and Greer,
23   St. Paul Ventures, Sprout Ventures.  Let's see here.
24   Q.  I won't have you list --
25   A.  Okay.

Page 223

1    Q.  -- necessarily every company.
2    A.  Okay.
3    Q.  It's hard to remember that far back.
4    A.  Yeah.
5    Q.  But looking back at the venture
6    capitalists that you do remember, would you consider
7    any of them to be well versed in contraceptive
8    methods?
9    A.  Well, the minute you go in to present to
10   them, if they have any interest at all in what you
11   are doing, they get well versed.  That's why they
12   are smart investors.
13       So they go out and immediately do their
14   research.  You don't just have one meeting and they
15   say yea or ney, not with something as dramatically
16   new as what Conceptus was working on.
17   Q.  So these venture capitalists, though, they
18   are conducting research after you come in and after
19   you approach them.
20       Is that right?
21   A.  Yes.  Yeah.
22   Q.  So these are not people who are working in
23   the field of contraception prior to being approached
24   by Conceptus?
25   A.  Well, some, some may have.

Page 224

1    Q.  Do you recall --
2    A.  Because they were involved, you know, with
3    drugs as well.  Usually they are not just investing
4    in med tech, but in the whole segment.
5        So --
6    Q.  And I just want to clarify one point that
7    you just said.
8        MS. THAYER:  Wait a second.  This is twice
9    now.  You have got to let her finish her sentence
10   before you start your question, because she was
11   mid-stream on that one.
12       BY MS. ZOGG:
13   Q.  Did you have something else to add,
14   Ms. Tunstall?
15   A.  Yeah.  So what I was going to say is, you
16   know, they are -- they are used to investing in
17   drugs or they have colleagues who address -- who are
18   investing in drugs.
19       And the typical thing they will do is they
20   will -- you'll send them your executive summary, you
21   come in, you present what you are doing, and they
22   will derive from that a set of due diligence
23   questions, even before they give you the first
24   please come back and see, they just say okay, thank
25   you very much, and they start doing research.

Page 225

1        And they have also people in the field who
2    are highly experienced who are consultants that they
3    hired to do a lot of work.
4        There was a guy by the name of Norton, as
5    I recall, who was an expert in -- what was his first
6    name?  In contraception that did a little consulting
7    for a lot of these VC firms.  So if they don't know,
8    they get smart real fast.  They are investing a lot
9    of money, so they are not going to go in blindly.
10   Q.  Okay.
11   A.  And they were very skeptical about the
12   contraceptive applications.
13   Q.  Okay.  Well, I'm going to go back and talk
14   about that specifically.
15   A.  Sure.  Okay.
16   Q.  So you mentioned that these companies,
17   these venture capitalists that we have talked about
18   were working in pharmaceuticals or drugs.
19       Is that right?
20   A.  Somewhere, yes.
21   Q.  Okay.  And of those, are there any that
22   were specific to contraception?
23   A.  You know, I can't tell you.  But it
24   doesn't really matter because what they do is
25   innovation, so they are not -- they can't possibly

VIDEOTAPED DEPOSITION OF KATHRYN TUNSTALL - 8/30/2010
CONFIDENTIAL PORTIONS REDACTED

Page 226

1  be in everything that's being innovative because it
2  doesn't exist.
3      So they have to go out and do their
4  research after you present to them.  If it's really
5  something new and different, they go out and they do
6  primary research.  They talk to physicians,
7  sometimes they do focus groups, they certainly read
8  a lot of market reports on various things.  But so
9  they do their work on it.
10     And there was a lot of skepticism.  I
11 mean, and as I mentioned, even up until the time of
12 the IPO and even after.
13     Q.  Okay.  And what specifically were they
14 skeptical about?
15     A.  That you could actually have something
16 that would deliver the benefits we have been talking
17 about today, that you could actually develop
18 something that would deliver the benefits.
19     Q.  And the benefits are the ones we were
20 talking about such as the incision, the
21 anesthesia --
22     A.  Less invasive, highly effective, permanent
23 birth control.
24     Q.  Did you have any of these venture
25 capitalists that specifically stated to Conceptus

Page 227

1  that they were skeptical about a tissue ingrowth
2  device?
3      A.  No, not at that point.  They said there
4  have been a lot of failures, you know.  They have
5  this -- they have access to the same documents that
6  we did, over 40 years, you know.  This may just not
7  be able to be done.  This may be an impossible task.
8      And again, that's what all the industry
9  people who go to medical conferences who talk about
10 women's health, they always start with that in their
11 introduction to their talks, whatever they are, it's
12 very common for people to say "And you know,
13 Conceptus fought the skepticism and developed this
14 great product when, you know, no one had been able
15 to to so for 40 years."
16     So it was very common, and again, I don't
17 know what documents are in here, but I -- I
18 certainly experienced it trying to raise money.  And
19 I soon learned that, you know, really I just needed
20 to talk about infertility.
21     Q.  Okay.  And of these venture capitalists
22 that we were discussing, are there any in particular
23 that you can give me a name of an individual at that
24 company that expressed skepticism about --
25     A.  Sure.

Page 228

1      Q.  -- Conceptus' idea?
2      A.  Sure.  Rob Cooling at Onset Ventures who
3  later, you know, who became one of our primary VCs.
4      Q.  And what was Rob Cooling's background?
5      A.  He was tech -- he was a technologist on
6  the IT side, but he had partners on the med tech
7  side.
8      And then he has actually worked as a
9  general manager, one of the few VCs who has actually
10 had a real job, as we say in operations, for a
11 medical company.
12     And he even wrote me a note when we went
13 over a hundred million dollars in sales that said,
14 you know, "Gosh, I can't even believe that you did
15 this.  Nobody thought you could do this."
16     Which I can probably find.
17     BY MS. ZOGG:
18     Q.  Okay.  And Mr. Cooling at Onset, what was
19 his specific background prior to become involved at
20 Conceptus relating to contraceptive devices?
21     MS. THAYER:  Objection, vague.
22     THE WITNESS:  I don't know.  He was --
23 worked in the high-tech industry and managed a
24 medical device company at one point in time.
25     BY MS. ZOGG:

Page 229

1      Q.  And would you consider someone who had
2  worked on IT, for instance, to be knowledgeable
3  about the contraceptive field?
4      MS. THAYER:  Objection.  Incomplete
5  hypothetical.
6      THE WITNESS:  Well, that's not the way
7  they make decisions on their own knowledge.  They
8  make decisions by calling on experts, physicians in
9  the field, doing research, and based upon that they
10 make a decision.
11     BY MS. ZOGG:
12     Q.  So other than Mr. Cooling at Onset, can
13 you think of any particular individual who expressed
14 skepticism about Conceptus' idea?
15     A.  Well, I believe Tom McConnell at New
16 Enterprise Associates did as well, and...
17     Q.  Before you go on, we'll get to the other
18 people too.
19     A.  Yeah.
20     Q.  I just want to get a sense of why
21 Mr. McConnell --
22     A.  Yeah.
23     Q.  I'm sorry, Mr. McConnell at New
24 Enterprises, what was his background?
25     A.  He was a med tech investor, and by that

56 (Pages 226 to 229)

**EXHIBIT L**

Case3:09-cv-02280-WHA Document391-6 Filed09/12/11 Page9 of 42
HIGHLY CONFIDENTIAL - VIDEOTAPED DEPOSITION OF JULIAN NIKOLCHEV
CONDUCTED ON FRIDAY, AUGUST 20, 2010

1 (Pages 1 to 4)

**1**

1    IN THE UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3    SAN FRANCISCO DIVISION
4    --oOo--
5    CONCEPTUS, INC., a Delaware    )
     Corporation,               )
6                              )
         Plaintiff,        )
7                              )
         vs.        ) No. 09-02280-WHA
8                              )
     HOLOGIC, INC., a Delaware    )
9    Corporation,               )
                             )
10        Defendant.    )
     _____)
11
12
13
14   VIDEOTAPED 30(b)(6) DEPOSITION OF CONCEPTUS, INC
15   BY CORPORATE DESIGNEE JULIAN NIKOLCHEV
16   _____
17        August 20, 2010
18
19   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
20
21
22
23   REPORTED BY:  SARAH LUCIA BRANN, CSR 3887
24
25

**2**

1         I N D E X
2       INDEX OF EXAMINATIONS
3   No.      Description       Page
4   EXAMINATION BY MS. SKLENAR ...............    7
5
6
7       EXHIBITS MARKED FOR IDENTIFICATION
8   No.      Description       Page
9   Exhibit 598 Defendant's First Notice of .....    9
      Rule 30(b)(6) Deposition of
10     Plaintiff Conceptus, Inc.
11  Exhibit 599 Photograph of demonstration .....   16
      board for road show display
12
      Exhibit 600 Photograph of envelope .........   17
13     labeled "Variable Softness
      Catheter"
14
      Exhibit 601 Photograph of prototype .........   18
15     fallopian tube catheter
16  Exhibit 602 Document entitled "PMA Module I     25
      November 21, 2001, Vol. 1
17     of 2," document numbers
      CON00002552 through CON00002745
18
      Exhibit 603 Document entitled "Conceptus ....   66
19     Test Report: Transcervical
      Tubal Occlusion Studies:
20     Preclinical Animal Models
      Portland First Session,"
21     document numbers CON00030510
      through CON00030518
22
      Exhibit 604 Document entitled "Conceptus ....   66
23     Report: Transcervical Tubal
      Occlusion Studies: Preclinical
24     Animal Models Portland Second
      Session," document numbers
25     CON00030519 through CON00030535

**3**

1       EXHIBITS MARKED FOR IDENTIFICATION
2   No.      Description       Page
3   Exhibit 605 Document entitled "Conceptus ....   66
      Test Report: Transcervical
4      Tubal Occlusion Studies:
      Preclinical Animal Models
5      Portland Third Session,"
      document numbers CON00030536
6      through CON00030577
7   Exhibit 606 Letter faxed August 26, 1995 ....   82
      to Julien [sic] Nikolchev from
8      Mick Scanlan, document numbers
      CON00049890 through CON00049892
9
      Exhibit 607 Plaintiff's Objections and ......   99
10     Third Supplemental Responses
      to Defendant's First Set of
11     Interrogatories
12  Exhibit 608 Julian Nikolchev's lab .........   131
      notebook, document numbers
13     CON00027237 through CON00027525
14  Exhibit 609 Letter dated July 29, 2010 to ...   155
      Julian Nikolchev from M.
15     Patricia Thayer, document
      number JN000391
16
      Exhibit 610 Conceptus invention disclosure ..   156
17     form dated September 15, 1994,
      document numbers CON00053783
18     through CON00053788
19  Exhibit 611 Document entitled "Conceptus ....   163
      Project Goals - Selective Tubal
20     Occlusion Project (S/TOP)"
      dated November 27, 1994,
21     document numbers CON00030605
      through CON00030614
22
23
24
25

**4**

1       EXHIBITS MARKED FOR IDENTIFICATION
2          (Continued)
3   No.      Description       Page
4   Exhibit 612 Document entitled "Conceptus ...   173
      Project Goals - Selective Tubal
5      Occlusion Project (S/TOP)"
      dated October 13, 1994, with
6      handwritten notation "1995,"
      document numbers CON00030627
7      through CON00030638
8   Exhibit 613 Fax transmittal dated ...........   173
      April 16, 2002 to Steve Bacich
9      from Mark Barrish with two
      attached invention
10     disclosures, document numbers
      CON00044986 through CON00045005
11
      Exhibit 614 Communication dated .............   182
12     December 20, 1994 to Julian
      Nikolchev from Dai Ton,
13     document number CON00050126
14  Exhibit 615 E-mail dated July 11, 1996 to ...   187
      Ashish Khera from Mike Colon,
15     document numbers CON00045412
      and CON00045413
16
      Exhibit 616 Letter dated November 25, 1996 ..   188
17     to Amy Thurmond from Ekta
      Wilcox with two attached flow
18     charts, document numbers
      CON00047282 through CON00047285
19
         --oOo--
20
21    FIRST REFERENCE TO PREVIOUSLY MARKED EXHIBITS
22  No.                    Page
23  Exhibit 38  ................................    92
24  Exhibit 514  ...............................   190
25       --oOo--

Case3:09-cv-02280-WHA Document391-6 Filed09/13/11 Page10 of 42
HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF JULIEN IMBACH
CONDUCTED ON FRIDAY, AUGUST 20, 2010

10 (Pages 37 to 40)

37

1  gave you the idea to do the anchoring loops for the
2  alpha design?
3      A.  There was a lot of things.  Fallopian
4  tubes are a very unique organ.  They are potential
5  space.  They are not a real space.  They are not a
6  lumen and they are not a channel.  They are not a
7  tunnel.
8          And as a result, we were thinking of a
9  number of ways.  And we learned that most devices
10 that have been tried in the fallopian tube have not
11 worked for a number of reasons, including being --
12 not staying in the fallopian tube.  So a big part of
13 what we were trying to accomplish was to come up
14 with mechanisms for a device that could stay in the
15 fallopian tube.
16     Q.  Did you get some sort of understanding as
17 to why earlier designs had difficulty staying in the
18 fallopian tube?
19     A.  We saw that they didn't stay in the
20 fallopian tube.  And we conjectured and guessed on
21 mechanisms by evaluating each device, more or less,
22 and talked to a lot of folks who were involved in
23 developing devices.
24     Q.  Who did you talk to, to try to understand
25 what you needed to do to improve on earlier devices?

38

1      A.  Primarily gynecologists, but a number of
2  folks that we identified that were involved in
3  designing and testing some of the early devices,
4  both involved in evaluating devices as well as
5  actually designing and developing devices.  They
6  were primarily gynecologists.
7      Q.  Do you recall who those individuals were?
8      A.  I recall some of the names.  One was
9  Dr. Zatuchni.
10     Q.  I am sorry.  Could you spell that?
11     A.  It's spelled Z-a-t-u-c-h-n-i.  And I can't
12 remember his first name off the top of my head.
13     Q.  Where was Dr. Zatuchni from?
14     A.  He was retired, living in Chicago.  He
15 published a summary -- a series of books, actually,
16 reviewing basically all fallopian, intrafallopian
17 tube devices, and had spent a lot of time,
18 obviously, preparing that book and really evaluating
19 pretty much everything that was tried in the space.
20     Q.  Did you get any particular insight from
21 Dr. Zatuchni about what needed to be done to improve
22 upon earlier devices?
23     A.  I think the primary insight we got from
24 him is what didn't work, not necessarily what needed
25 to be done.

39

1      I mean, he was very -- he was excited that
2  we were looking at the problem, but he was also very
3  discouraging in terms of trying to solve the
4  problem.  Because he had published four or six
5  volumes, I can't remember the number of volumes, but
6  several volumes of books showing how devices --
7  various devices that did not work.
8      Q.  Were there any other individuals you
9  talked to, to try to figure out how to improve upon
10 the devices?
11     A.  We did.  I am trying to think of some
12 names.  We talked to Dr. Hamou, which is spelled
13 H-a-m-o-u.  He is a French physician.  He was a
14 gynecologist that also was involved in developing
15 and patenting -- I believe he has a patent on a
16 device, a polymeric device.  And my memory needs to
17 be jogged on exactly his design.  I can't remember
18 exactly his design off the top of my head.  But I
19 know we spent some time with him, because obviously
20 he was involved.
21     Q.  Do you recall any insight that you got
22 from Dr. Hamou as to how to improve upon prior
23 devices?
24     A.  The insight we got is polymeric devices
25 were being expelled, because he was testing them and

40

1  he was having trouble.
2      Q.  Do you recall any other insight you got
3  from Dr. Hamou?
4      A.  That was as far as I remember.  I am sure
5  we had -- I remember we had a couple of meetings
6  with him.  So that's my memory at the time, but...
7      Q.  Do you recall any others that you
8  consulted to try to understand how to improve upon
9  prior devices?
10     A.  There was a number of physicians we talked
11 to.  Local physician Dr. Galen, who was a
12 gynecologist in the Bay Area who has done a lot of
13 infertility work.  As a result he was familiar with,
14 obviously, the fallopian tubes.
15         And we talked a lot about general
16 information about how he envisioned fallopian tubes
17 functioning, what he envisioned to be the challenges
18 in developing devices that could occlude the
19 fallopian tube.
20     Q.  Do you recall any insight that you got
21 from Dr. Galen?
22     A.  Specific insights -- it's -- I can't
23 remember any specific insights.  But general
24 insights, of course, in terms of the fact that, as I
25 mentioned, the biggest realization is that the

Case3:09-cv-02280-WHA Document391-6 Filed09/12/11 Page11 of 42
HIGHLY CONFIDENTIAL - VIDEOTAPED DEPOSITION OF JULIAN NIKOLCHEV
CONDUCTED ON FRIDAY, AUGUST 20, 2010

11 (Pages 41 to 44)

41

1  fallopian tube is not a -- it is not a channel, but
2  it's an organ. It's a functioning organ. And the
3  fact that part of the failure for a number of
4  technologies was related to the organ wanting to
5  heal itself, so when you injure it you have to
6  injure it in a way that the healing will actually
7  help.
8         That was an insight that came up to us
9  over time, but from many different sources of
10 discussions. It's something that we envisioned.
11        So this is the kinds of discussions we had
12 with the physicians.
13     Q.  Did you consult Dr. Richart?
14        MS. THAYER:  Can you spell that?
15        MS. SKLENAR:  R-i-t-c-h-a-r-t [sic].
16        THE WITNESS:  Where was he?
17        MS. SKLENAR:  Q.  Ralph Richart?
18     A.  Ralph -- the name is familiar, and I am
19 trying to remember. Do you remember where he was
20 working?
21     Q.  In New York, I believe at Columbia.
22     A.  I have met with him. I remember meeting
23 with him. And -- but it was in a different context,
24 if I am not mistaken.
25     Q.  Do you recall having any discussions with

42

1  Dr. Richart in the course of coming up with ideas
2  for the alpha Tirbouchon design?
3        MS. THAYER:  Can I have that read back?
4        (Record read as follows:
5        "Q.  Do you recall having any discussions
6     with Dr. Richart in the course of coming up
7     with ideas for the alpha Tirbouchon design?")
8        MS. THAYER:  Object to that as vague.
9        MS. SKLENAR:  Q.  Do you remember having
10 any discussions with Dr. Richart in the course of
11 coming up with ideas for intrafallopian
12 contraceptive devices?
13     A.  I don't remember the timing. I
14 remember -- no, I don't remember the timing. I
15 remember meeting with him in New York. I remember
16 meeting and talking to him about endometrial
17 ablation. And that's all I remember.
18     Q.  You don't recall discussing any other
19 topics with him?
20     A.  I don't recall.
21     Q.  What about Bob Neuwirth? Do you know
22 Dr. Neuwirth?
23     A.  The name sounds familiar. Can you give me
24 more context?
25     Q.  He is also in the New York area. Do you

43

1  recall any discussions with Dr. Neuwirth in the
2  course of --
3     A.  No. I know the name. I remember the
4  name, but maybe from papers. I don't remember
5  meeting him.
6     Q.  Going back to the chart that's shown on
7  2615, you see there the beta one design iteration
8  that's referenced?
9     A.  Yes.
10    Q.  Do you know who came up with the idea for
11 the beta one design?
12    A.  Specifically I can't give you an exact
13 answer.
14    Q.  Do you know when the beta one design was
15 conceived?
16    A.  Not the date. As I said, a lot of the
17 concepts, a lot of the designs and the basis of all
18 the designs from -- all the way through gamma were
19 conceived around -- more or less around the same
20 time.
21    Q.  And what's --
22    A.  But it evolved over time. Certain designs
23 went up and down, depending on what we were doing
24 and -- in the lab and how we were evaluating the
25 different performance characteristics.

44

1     Q.  You said that the designs were conceived
2  more or less around the same time. What time are
3  you referring to there?
4     A.  By that what I mean is a period of time
5  from about '91 through '93, '94, that time frame.
6     Q.  Where would -- do you know what I could
7  look to, to figure out when the beta one design was
8  first conceived of?
9     A.  Well, I think the notebooks and our
10 documentation that we have from -- my notebooks, Dai
11 Ton's notebook, Ashish, Don Grskis', I would say
12 those are the notebooks.
13    Q.  Are there any other documents other than
14 the notebooks that you referenced that I could look
15 to, to figure out when the beta one design was
16 conceived?
17    A.  I'm sure we have internal design documents
18 that we produced as we developed different
19 prototypes and testing protocols and so on. But I
20 can't give you a specific example.
21    Q.  If you could look back at the 2615 chart,
22 there is a reference to the beta two design. Do you
23 see that?
24    A.  Yes.
25    Q.  What is the beta two design?

**EXHIBIT K**

PATENT NUMBER

**6634361**

6634361

**U.S. UTILITY PATENT APPLICATION**

O.I.P.E.

SCANNED _____ Q.A. ____

PATENT DATE

OCT 2 1 2003

| SECTOR | CLASS | SUBCLASS | ART UNIT | EXAMINER |
|--------|-------|----------|----------|----------|
|        |       | 5 3 0    |          |          |

FILED WITH: ☐ DISK (CRF)   ☐ FICHE
(Attached in pocket on right inside flap)

---

## PREPARED AND APPROVED FOR ISSUE

### ISSUING CLASSIFICATION

| ORIGINAL | | CROSS REFERENCE(S) | | | | | |
|----------|----------|--------|----------------------------------------|---|---|---|---|
| **CLASS** | **SUBCLASS** | **CLASS** | **SUBCLASS (ONE SUBCLASS PER BLOCK)** | | | | |
| 128 | 830 | 128 | 831 | | | | |

**INTERNATIONAL CLASSIFICATION**

| | | |
|---|---|---|
| A 6 1 F | 6 / 06 | |
| | | |
| | | |
| | | |

☐ Continued on Issue Slip Inside File Jacket

---

| **TERMINAL DISCLAIMER** | **DRAWINGS** | | | **CLAIMS ALLOWED** | |
|---|---|---|---|---|---|
| ☐ | Sheets Drwg. | Figs. Drwg. | Print Fig. | Total Claims | Print Claim for O.G. |
| | 15 | 46 | 1 | 47 | 1 |

☐ a) The term of this patent subsequent to _____ (date) has been disclaimed.

(Assistant Examiner)    (Date)

**NOTICE OF ALLOWANCE MAILED**

7/15/3

☒ b) The term of this patent shall not extend beyond the expiration date of U.S Patent No. SN 09/093835.

(Primary Examiner) 7/14/03

**ISSUE FEE**

| Amount Due | Date Paid |
|---|---|
| $650 | 8-18-03 |

☐ c) The terminal ____ months of this patent have been disclaimed

(Legal Instruments Examiner) 7-16-03

**ISSUE BATCH NUMBER**

**WARNING:**
The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368 Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form **PTO-436A**
(Rev 6/98)

## ISSUE FEE IN FILE (LABEL AREA)

JC525 U.S. PTO
09/324078
09/01/99



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:    COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 09/324,078 | 06/01/99 | NIKOLCHEV    J | 16355-002530 |

```
           020350                 QM12/1113
  TOWNSEND AND TOWNSEND AND CREW
  TWO EMBARCADERO CENTER
  EIGHTH FLOOR
  SAN FRANCISCO CA 94111-3834
```

| EXAMINER |
|---|
| BROWN, M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3764 | 6 |

DATE MAILED:    11/13/00

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

PTO-90C (Rev. 2/95)                                                                1- File Copy

CON00028876

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 09/324078 | Julian N. Nikolchev et al |
| | Examiner | Group Art Unit |
| | Michael Brown | |

**---The MAILING DATE of this communication appears on the cover sheet beneath the correspondence address---**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE ___3___ MONTH(S) FROM THE MAILING DATE
OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, such period shall, by default, expire SIX (6) MONTHS from the mailing date of this communication .
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).

**Status**

☐ Responsive to communication(s) filed on _____

☐ This action is **FINAL.**

☐ Since this application is in condition for allowance except for formal matters, **prosecution as to the merits is closed** in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 1 1; 453 O.G. 213.

**Disposition of Claims**

☑ Claim(s) _1-55_____ is/are pending in the application.

　Of the above claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☑ Claim(s) _1-55_____ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claim(s) _____ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The proposed drawing correction, filed on_____ is ☐ approved ☐ disapproved.

☐ The drawing(s) filed on_____ is/are objected to by the Examiner.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119 (a)-(d)**

☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 11 9(a)-(d).

　☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

　☐ received.

　☐ received in Application No. (Series Code/Serial Number)_____.

　☐ received in this national stage application from the International Bureau (PCT Rule 1 7.2(a)).

　*Certified copies not received:_____.

**Attachment(s)**

☑ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____　☐ Interview Summary, PTO-413

☑ Notice of Reference(s) Cited, PTO-892　　　　　　　　　　　　　☐ Notice of Informal Patent Application, PTO-152

☑ Notice of Draftsperson's Patent Drawing Review, PTO-948　　　　☐ Other_____

**Office Action Summary**

Part of Paper No. _____

*U.S. GPO: 1998-454-457/97505

Application/Control Number: 09/324,078                                      Page 2

Art Unit: 3764

## DETAILED ACTION

### *Claim Rejections - 35 USC § 102*

1.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless --
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

2.      Claims 1-2 are rejected under 35 U.S.C. 102(b) as being anticipated by Chee '194.

        Chee discloses in figure 1 an occlusion device that anticipates a tissue reaction

contraceptive device, comprising a coil 11 and an element 12 disposed along the coil.

3.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless --
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

4.      Claims 27-34, 36-39, 42-44 and 47-48 are rejected under 35 U.S.C. 102(b) as being

clearly anticipated by Erb '345 .

### *Double Patenting*

5.      The nonstatutory double patenting rejection is based on a judicially created doctrine
grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or
improper timewise extension of the "right to exclude" granted by a patent and to prevent possible

Application/Control Number: 09/324,078                                          Page 3

Art Unit: 3764

harassment by multiple assignees. See *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed.
Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686
F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619
(CCPA 1970);and, *In re Thorington,* 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

 A timely filed terminal disclaimer in compliance with 37 CFR 1.321© may be used to
overcome an actual or provisional rejection based on a nonstatutory double patenting ground
provided the conflicting application or patent is shown to be commonly owned with this
application. See 37 CFR 1.130(b).

 Effective January 1, 1994, a registered attorney or agent of record may sign a terminal
disclaimer. A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

6. Claims 1-55 are provisionally rejected under the judicially created doctrine of obviousness-

type double patenting as being unpatentable over claims 1-50 of copending Application

No. 08/474,779. Although the conflicting claims are not identical, they are not patentably distinct

from each other because the claims recited in the present invention are broader than the claims set

forth in Ser. No. 08/474,779.

 This is a <u>provisional</u> obviousness-type double patenting rejection because the conflicting

claims have not in fact been patented.


## *Conclusion*

7. The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure. No additional prior art was cited in the first office action.

                  

Application/Control Number: 09/324,078                                    Page 4

Art Unit: 3764

8.      Any inquiry concerning this communication or earlier communications from the examiner

should be directed to Michael Brown whose telephone number is (703) 308-2682.

M. Brown
October 2, 2000

**Michael A. Brown**
**Primary Examiner**

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP—APART AND DISCARD CARBON

| FORM PTO-892 (REV. 2-92) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | SERIAL NO. 09/324,078 | GROUP ART UNIT 3764 | ATTACHMENT TO PAPER NUMBER 6 |
|---|---|---|---|---|
| **NOTICE OF REFERENCES CITED** | | APPLICANT(S) *Julian N. Nikolchev et al* | | |

## U.S. PATENT DOCUMENTS

| • | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | | | | | | |
| | B | | | | | | |
| | C | | | | | | |
| | D | | *NONE* | | | | |
| | E | | | | | | |
| | F | | | | | | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

## FOREIGN PATENT DOCUMENTS

| • | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

## OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | |
| S | |
| T | |
| U | |

| EXAMINER *Michael Brown* | DATE 9/25/00 | |
|---|---|---|

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

361 FH 000083

CON00028881

Form PTO 948 (Rev. 8-98)    U.S. DEPARTMENT OF COMMERCE - Patent and Trademark Office    Application No. 374 078

## NOTICE OF DRAFTSPERSON'S
## PATENT DRAWING REVIEW

The drawing(s) filed (insert date) 6/1/99 are:
A. ☒ approved by the Draftsperson under 37 CFR 1.84 or 1.152.
B. ☐ objected to by the Draftsperson under 37 CFR 1.84 or 1.152 for the reasons indicated below. The Examiner will require
submission of new, corrected drawings when necessary. Corrected drawing must be submitted according to the instructions on the back of this notice.

1. DRAWINGS. 37 CFR 1.84(a): Acceptable categories of drawing.
   Black ink. Color.
   ____ Color drawings are not acceptable until petition is granted.
   Fig(s) _____
   ____ Pencil and non black ink not permitted. Fig(s) ____ ___
2. PHOTOGRAPHS. 37 CFR 1.84 (b)
   ____ 1 full-tone set is required. Fig(s) _____
   ____ Photographs not properly mounted (must use brystol board or
   photographic double-weight paper). Fig(s) ____ ___
   ____ Poor quality (half-tone). Fig(s) ____ _____
3. TYPE OF PAPER. 37 CFR 1.84(e)
   ____ Paper not flexible, strong, white, and durable.
   Fig(s) _____
   ____ Erasures, alterations, overwritings, interlineations,
   folds, copy machine marks not accepted. Fig(s) _____
   ____ Mylar, velum paper is not acceptable (too thin).
   Fig(s) _____
4. SIZE OF PAPER. 37 CFR 1.84(f): Acceptable sizes:
   ____ 21.0 cm by 29.7 cm (DIN size A4)
   ____ 21.6 cm by 27.9 cm (8 1/2 x 11 inches)
   ____ All drawing sheets not the same size.
   Sheet(s) _____
   ____ Drawings sheets not an acceptable size. Fig(s) __
5. MARGINS. 37 CFR 1.84(g): Acceptable margins.
   Top 2.5 cm Left 2.5cm Right 1.5 cm Bottom 1.0 cm
   SIZE: A4 Size
   Top 2.5 cm Left 2.5 cm Right 1.5 cm Bottom 1.0 cm
   SIZE: 8 1/2 x 11
   Margins not acceptable. Fig(s) _____
   ____ Top (T)          ____ Left (L)
   ____ Right (R)        ____ Bottom (B)
6. VIEWS. 37 CFR 1.84(h)
   REMINDER: Specification may require revision to
   correspond to drawing changes.
   Partial views. 37 CFR 1.84(h)(2)
   ____ Brackets needed to show figure as one entity.
   Fig(s) _____
   ____ Views not labeled separately or properly.
   Fig(s) _____
   ____ Enlarged view not labeled separetely or properly.
   Fig(s) _____
7. SECTIONAL VIEWS. 37 CFR 1.84 (h)(3)
   ____ Hatching not indicated for sectional portions of an object.
   Fig(s) _____
   ____ Sectional designation should be noted with Arabic or
   Roman numbers. Fig(s) _____

8. ARRANGEMENT OF VIEWS. 37 CFR 1.84(i)
   ____ Words do not appear on a horizontal, left-to-right fashion
   when page is either upright or turned so that the top
   becomes the right side, except for graphs. Fig(s) ____ ____
9. SCALE. 37 CFR 1.84(k)
   ____ Scale not large enough to show mechanism without
   crowding when drawing is reduced in size to two-thirds in
   reproduction.
   Fig(s) _____
10. CHARACTER OF LINES, NUMBERS, & LETTERS.
    37 CFR 1.84(l)
    ____ Lines, numbers & letters not uniformly thick and well
    defined, clean, durable, and black (poor line quality).
    Fig(s) _____
11. SHADING. 37 CFR 1.84(m)
    ____ Solid black areas pale. Fig(s) _____
    ____ Solid black shading not permitted. Fig(s) _____
    ____ Shade lines, pale, rough and blurred. Fig(s) ____ ___
12. NUMBERS, LETTERS, & REFERENCE CHARACTERS.
    37 CFR 1.84(p)
    ____ Numbers and reference characters not plain and legible.
    Fig(s) _____
    ____ Figure legends are poor. Fig(s) _____
    ____ Numbers and reference characters not oriented in the
    same direction as the view. 37 CFR 1.84(p)(1)
    Fig(s) _____
    ____ English alphabet not used. 37 CFR 1.84(p)(2)
    Figs _____
    ____ Numbers, letters and reference characters must be at least
    .32 cm (1/8 inch) in height. 37 CFR 1.84(p)(3)
    Fig(s) _____
13. LEAD LINES. 37 CFR 1.84(q)
    ____ Lead lines cross each other. Fig(s) _____
    ____ Lead lines missing. Fig(s) _____
14. NUMBERING OF SHEETS OF DRAWINGS. 37 CFR 1.84(t)
    ____ Sheets not numbered consecutively, and in Arabic numerals
    beginning with number 1. Sheet(s) _____
15. NUMBERING OF VIEWS. 37 CFR 1.84(u)
    ____ Views not numbered consecutively, and in Arabic numerals,
    beginning with number 1. Fig(s) _____
16. CORRECTIONS. 37 CFR 1.84(w)
    ____ Corrections not made from prior PTO-948
    dated _____
17. DESIGN DRAWINGS. 37 CFR 1.152
    ____ Surface shading shown not appropriate. Fig(s) _____
    ____ Solid black shading not used for color contrast.
    Fig(s) _____

COMMENTS

REVIEWER S. Zild          DATE 12/22/99   TELEPHONE NO. _____

ATTACHMENT TO PAPER NO. 10

CONV00028882

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to:

Assistant Commissioner for Patents
Washington, D.C. 20231

On _February 13, 2001_

TOWNSEND and TOWNSEND and CREW LLP

By: _Patricia Germany_

PATENT
Attorney Docket No.: 16355-002530US

#7/a

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re application of: | Examiner: M. Brown |
| Julian N. Nikolchev et al. | Art Unit: 3764 |
| Application No.: 09/324,078 | AMENDMENT |
| Filed: June 1, 1999 | |
| For: CONTRACEPTIVE TRANSCERVICAL FALLOPIAN TUBE OCCLUSION DEVICES & METHODS | |

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

   In response to the Office Action mailed 11/13/00, please amend the above-identified application as follows:

IN THE SPECIFICATION:

   On page 1, line 11, after "reference." please insert the following sentence:

   --This application is also a continuation-in-part of, and claims the benefit of priority from, U.S. Patent Application No. 08/475252, filed June 7, 1995, which was abandoned on June 22, 1998, the full disclosure of which is incorporated herein by reference.--

IN THE CLAIMS:

   Please **amend** claims 3, 5, 27, 35, 39 and 42 and **cancel** claims 1-2 as follows. All pending claims are reproduced for convenient reference.

RECEIVED
FEB 20 2001
TECHNOLOGY CENTER 3700

CON00028883

Julian N. Nikolchev et al.                                          <u>PATENT</u>
Application No.: 09/324,078
Page 2

Please cancel claims 1 and 2.

3.    (Amended) <u>A tissue reaction contraceptive device for use in a fallopian tube, the fallopian tube having tubal tissues, the contraceptive device comprising:</u>

<u>a coil having a proximal end and a distal end and defining an axis therebetween, the coil being axially flexible and having a cross-section suitable for insertion into the fallopian tube; and</u>

<u>an element disposed along the coil, the element adapted to incite a tissue reaction in the tubal tissues adjacent the coil so as to inhibit conception</u> [**A contraceptive device as claimed in claim 1**], wherein the element comprises a perforate material defining surface pores which promote tissue ingrowth of the tubal tissues.

4.    (As filed) A contraceptive device as claimed in claim 3, wherein the perforate material comprises a member selected from the group consisting of PTFE, ceramic, or microporous polymer.

5.    (Amended) <u>A tissue reaction contraceptive device for use in a fallopian tube, the fallopian tube having tubal tissues, the contraceptive device comprising:</u>

<u>a coil having a proximal end and a distal end and defining an axis therebetween, the coil being axially flexible and having a cross-section suitable for insertion into the fallopian tube; and</u>

<u>an element disposed along the coil, the element adapted to incite a tissue reaction in the tubal tissues adjacent the coil so as to inhibit conception</u> [**A contraceptive device as claimed in claim 1**], wherein the element comprises a polymer coating which promotes at least one of scarring of the tubal tissues, ingrowth of the tubal tissues, and sclerosing of the tubal tissues.

6.    (As filed) A tissue ingrowth contraceptive device for use in a fallopian tube having a tubal tissue, the contraceptive device comprising:

a tubular retention structure having a proximal end, a distal end, and an axis therebetween, the retention structure being axially flexible and insertable within the fallopian tube;

a material which can incite ingrowth of the tubal tissue therein, the ingrowth material attached to the retention structure.

CON00028884

Julian N. Nikolchev et al.                                                           PATENT
Application No.: 09/324,078
Page 3

    7.      (As filed) A contraceptive device as claimed in claim 6, wherein the material comprises braided or woven polyester.

    8.      (As filed) A contraceptive device as claimed in claim 7, wherein the retention structure comprises a perforate frame having at least one radial opening, and wherein the braided or woven polyester extends radially beyond the tubular retention structure through the at least one radial opening.

    9.      (As filed) A contraceptive device as claimed in claim 6, wherein the retention structure comprises a helical outer coil having a sharp edge.

    10.     (As filed) A contraceptive device as claimed in claim 6, further comprising an inner coil disposed within the tubular retention structure, wherein at least a portion of the material is disposed in an annular space between the inner coil and the retention structure.

    11.     (As filed) A contraceptive device as claimed in claim 10, wherein the inner coil extends distally beyond the retention structure with sufficient resilient flexibility to help guide the contraceptive device axially within the fallopian tube.

    12.     (As filed) A tissue ingrowth contraceptive device for use in a fallopian tube, the contraceptive device comprising:
            a resilient elongate body having a proximal end and a distal end and defining an axis therebetween;
            a retention structure disposed along the resilient body, the retention structure adapted to restrain the resilient body within the fallopian tube;
            a bond affixing the retention structure to the resilient body;
            wherein at least one of the resilient body, the retention structure, and the bond comprises a microporous material which promotes tissue ingrowth therein.

    13.     (As filed) A contraceptive method comprising:
            transcervically inserting a contraceptive device within a fallopian tube by resiliently deflecting a distal body of the contraceptive device against a tubal wall so that the distal body guides the contraceptive device axially along the fallopian tube; and
            inciting a tissue reaction of tubal tissues with an element of the contraceptive device so as to affix the contraceptive device within the fallopian tube.

    14.     (As filed) A contraceptive method as claimed in claim 13, wherein the inciting a tissue reaction step comprises promoting tissue ingrowth into the element.

CON00028885

Julian N. Nikolchev et al.                                                    PATENT
Application No.: 09/324,078
Page 4

15.     (As filed) A contraceptive method as claimed in claim 14, wherein the inciting a tissue
reaction step comprises mechanically promoting scar formation by embedding a radially oriented edge into the
tubal wall without penetrating through the tubal wall.

16.     (As filed) A contraceptive method as claimed in claim 13, wherein a polymeric coating
of the contraceptive device incites a tissue reaction selected from the group consisting of scarring, ingrowth, or
sclerosing.

17.     (As filed) A contraceptive device for use in a fallopian tube having a tubal wall, the
contraceptive device comprising:

a tubular retention structure having a proximal end, a distal end, and an axis therebetween, the
retention structure radially expandable in situ from a narrow diameter configuration, the retention structure in the
narrow configuration having a first diameter suitable for axial insertion into the fallopian tube, the expanded
retention structure having a second diameter larger than the first diameter and adapted to engage the surrounding
tubal wall and retain the contraceptive device within the fallopian tube.

18.     (As filed) A contraceptive device as claimed in claim 17, wherein the retention
structure comprises a resilient helical coil.

19.     (As filed) A contraceptive device as claimed in claim 18, wherein the coil expands
resiliently to safely engage the tubal wall throughout a range of tubal cross-sectional sizes.

20.     (As filed) A contraceptive device as claimed in claim 19, wherein the coil resiliently
expands to open diameters throughout the range from about 0.10 to about 1.0 mm with an expansion force
sufficient to help retain the contraceptive device in the fallopian tube and insufficient to penetrate through the
tubal wall.

21.     (As filed) A contraceptive device as claimed in claim 18, wherein the coil has a sharp
outer edge.

22.     (As filed) A contraceptive device as claimed in claim 18, further comprising a
conception inhibiting body attached to the coil.

23.     (As filed) A contraceptive device as claimed in claim 22, wherein a portion of the coil
is affixed to the body and an end of the coil moves relative to the body when the coil expands from the first
diameter.

Julian N. Nikolchev et al.                                                      PATENT
Application No.: 09/324,078
Page 5

24.     (As filed) A contraceptive device as claimed in claim 22, wherein the body extends
distally of the coil and is resiliently flexible to help guide the contraceptive device distally within the fallopian
tube.

25.     (As filed) A contraceptive device as claimed in claim 24, further comprising woven or
braided polyester attached to the body.

26.     (As filed) A contraceptive device for use in a fallopian tube having a tubal wall, the
contraceptive device comprising:
          a conception inhibiting body defining an axis;
          a helical coil disposed about the body, a portion of the helical coil movable relative to the body
so that the helical coil can expand resiliently throughout a range of tubal cross-sectional sizes to radially engage
the surrounding tubal wall and safely affix the contraceptive device within the fallopian tube.

27.     (Amended) A contraceptive method comprising:
          introducing a contraceptive device into a fallopian tube;
          radially expanding a pre-formed retention structure of the contraceptive device
within the fallopian tube so that the retention structure engages a tubal wall and affixes the
contraceptive device within the fallopian tube.

28.     (As filed) An intrafallopian contraceptive device for use in a fallopian tube, the
contraceptive device comprising:
          an elongate coil having a proximal end, a distal end, and an axis therebetween, the axis being
substantially straight when the coil is at rest, the coil being axially resilient to facilitate insertion of the body
axially into the fallopian tube, the device being adapted to be retained within the tube so as to inhibit conception.

29.     (As filed) A contraceptive device as claimed in claim 28, further comprising an
element disposed along the coil, the element adapted to affix the body within the fallopian tube.

30.     (As filed) An intrafallopian contraceptive device for use in a fallopian tube, the tube
having a tubal wall with a tubal cross-section and an axial curvature, the contraceptive device comprising:
          an elongate body having a proximal end and a distal end and defining an axis therebetween, the
body having a cross-section suitable for axial insertion within the tubal cross-section, at least a portion of the body
being straighter than the axial curvature of the fallopian tube, the body being sufficiently flexible to deflect
against the tubal wall without injuring the tubal wall, the body being sufficiently resilient to impose an anchoring
force against the tubal wall when the straight portion flexes along the axial curvature of the fallopian tube.

Julian N. Nikolchev et al.                                            PATENT
Application No.: 09/324,078
Page 6

31. (As filed) A contraceptive device as claimed in claim 30, further comprising an element disposed along the body, the element adapted to affix the body within the fallopian tube.

32. (As filed) A contraceptive device as claimed in claim 31, wherein the body is adapted to resiliently engage the tubal wall with sufficient force to retain the body in the fallopian tube during ingrowth of tubal wall tissues into the element.

33. (As filed) A contraceptive device as claimed in claim 31, wherein the element is adapted to penetrate into the tubal wall without perforating through the tubal wall to mechanically retain the body in the fallopian tube.

34. (As filed) A contraceptive device as claimed in claim 33, wherein the element is adapted to promote scar tissue.

35. (Amended) A contraceptive device as claimed in claim 31[30], wherein the element comprises an electrode attached to the body, the electrode being oriented to engage and desiccate the tubal wall.

36. (As filed) A contraceptive device for use in a fallopian tube having an axis, the contraceptive device comprising:

a structure having a proximal end, a distal end, and an axis therebetween, the structure adapted to provide effective tubal occlusion when disposed substantially coaxially within the fallopian tube;

an elongate member affixed to the occlusion structure, the member extending distally of the occlusion structure and being sufficiently flexible and axially resilient to help guide distal advancement of the occlusion structure within the fallopian tube.

37. (As filed) A contraceptive device as claimed in claim 36, wherein the elongate member comprises a coil and a corewire.

38. (As filed) A contraceptive device as claimed in claim 37, wherein the corewire is removable from the coil when the coil is disposed in the fallopian tube.

39. (Amended) A contraceptive method comprising:

transcervically inserting a[n] pre-formed elongate resilient body into an axially curving fallopian tube so that the fallopian tube imposes an axial bend on the body, and so that the bent body imposes an anchoring force which helps anchor the bent body within the fallopian tube; and

Julian N. Nikolchev et al.                                                                    PATENT
Application No.: 09/324,078
Page 7

6      affixing the anchored body within the fallopian tube so that the affixed resilient
7   body inhibits conception.

1          40.    (As filed) A contraceptive method comprising:
2               transcervically inserting an intrafallopian contraceptive device along the fallopian tube by
3   guiding the contraceptive device with a distal guidewire-like structure of the contraceptive device; and
4               retaining the device, including at least a portion of the guidewire-like structure, within the
5   fallopian tube so that the device inhibits conception.

1          41.    (As filed) A contraceptive method as claimed in claim 40, further comprising removing
2   a corewire of the guidewire-like structure from within a coil of the guidewire-like device while the device is
3   retained within the fallopian tube and promoting ingrowth of tubal tissues into the contraceptive device.

1          42.    (Amended) A contraceptive kit comprising:
2          a[n] pre-formed intrafallopian contraceptive device; and
3          instructions describing methods steps including;
4               transcervically introducing the contraceptive [contractive] device into a
5   fallopian tube; and
6               affixing the contraceptive device within the tube.

1          43.    (As filed) An intrafallopian contraceptive device comprising:
2               a proximal anchor;
3               a pre-formed distal anchor which is adapted for insertion into a fallopian tube, and which is
4   capable of imposing resilient anchoring forces against an inner surface of a tubal wall; and
5               a lumen-traversing region extending between the proximal anchor and the distal anchor, the
6   lumen traversing region comprising means for affixing the intrafallopian contraceptive device to the adjacent
7   tubal wall while the device is restrained within the fallopian tube by the proximal and distal anchors.

1          44.    (As filed) An intrafallopian contraceptive device as claimed in claim 43, wherein the
2   affixing means comprises a helical outer surface which can be embedded into the adjacent tubal wall without
3   perforating the tubal wall.

1          45.    (As filed) An intrafallopian contraceptive device as claimed in claim 43, wherein the
2   affixing means comprises means for promoting tissue growth of the tubal wall so as to permanently affix the
3   intrafallopian contraceptive device within the fallopian tube.

Julian N. Nikolchev et al.                                              PATENT
Application No.: 09/324,078
Page 8

46.    (As filed) An intrafallopian contraceptive device as claimed in claim 45, wherein the
growth promoting means comprises an element selected from the group containing polyester fibers for promoting
tissue ingrowth and an electrically conductive surface coupleable to the tubal wall so as to promote formation of
scar tissues.

47.    (As filed) An intrafallopian contraceptive device comprising:
         a pre-formed proximal anchor having a resilient coil which is restrainable in a straight
configuration for insertion into a fallopian tube, and which is capable of imposing resilient anchoring forces
against an inner surface of a tubal wall;
         a pre-formed distal anchor having a resilient coil which is restrainable in a straight configuration
for insertion into the fallopian tube, and which is capable of imposing resilient anchoring forces against the inner
surface of the tubal wall; and
         a lumen-traversing region extending between the proximal and distal anchors, the lumen-
traversing region comprising a resilient structure having a helical outer surface which is adapted to engage the
inner surface of the tubal wall so as to prevent expulsion of the intrafallopian contraceptive device while the
proximal and distal anchors impose the anchoring forces.

48.    (As filed) An intrafallopian contraceptive method comprising:
         transcervically introducing a pre-formed resilient structure into a target region of a fallopian
tube;
         imposing an anchoring force against a tubal wall of the fallopian tube by resiliently engaging an
inner surface of the tubal wall with the resilient structure; and
         affixing the resilient structure within the fallopian tube with a lumen-traversing region of the
resilient structure.

49.    (As filed) A method as claimed in claim 48, wherein the affixing step comprises
promoting tissue ingrowth of the tubal wall surrounding the resilient structure.

50.    (As filed) A method as claimed in claim 49, wherein the tissue ingrowth occludes the
fallopian tube to inhibit conception.

51.    (As filed) A method as claimed in claim 48, further comprising promoting the
formation of scar tissue by electrically energizing the resilient structure within the fallopian tube.

52.    (As filed) An intrafallopian contraceptive system comprising:
         an elongate delivery body having a proximal end and a distal end with a first energy conduit
extending therebetween;

Julian N. Nikolchev et al.                                              PATENT
Application No.: 09/324,078
Page 9

4       an intrafallopian structure near the distal end of the delivery body, the structure having a first
5   cross-section;
6       an energy source coupled to the structure by the first conduit so that energy from the energy
7   source reconfigures the structure to a second cross-section to restrain the structure within a fallopian tube and the
8   structure inhibits conception.

1       53.     (As filed) The contraceptive system of claim 52, further comprising a second conduit
2   extending from the energy source to the structure so that electrical energy is transmitted through at least a portion
3   of the structure between the conduits, the conduits comprising conductors.

1       54.     (As filed) The contraceptive system of claim 53, wherein the structure comprises a
2   shape memory alloy, the electrical energy effecting a phase change in the shape memory alloy to radially expand
3   the structure.

1       55.     (As filed) An intrafallopian contraceptive system comprising:
2       an elongate delivery body having a proximal end and a distal end with first and second
3   conductors extending therebetween;
4       an intrafallopian contraceptive structure near the distal end of the delivery body; and
5       an electrical power supply can be coupled to the structure by the first and second conductors.

## REMARKS

Claims 1-55 were examined and rejected.  Applicants note that the Examiner
has indicated that claims 3-26, 35, 40-41, 45-46, 49-55 are in condition for allowance except
for the provisional double patenting rejection.  Claims 1-55 were provisionally rejected under
the judicially created doctrine of obviousness-type double patenting as being unpatentable over
claims 1-50 of copending Application No. 08/474,779.  To this end, Applicants submit
herewith a Terminal Disclaimer as described in more detail below.  The remaining claims have
been amended as noted above.  Claims 35 and 42 have been amended for formal reasons only.
Reexamination and reconsideration of the claims, as amended, are respectfully requested.

**Claims 1-2 were rejected under 35 U.S.C. 102(b) as being anticipated by
Chee '194.**  Claims 1-2 have been canceled without prejudice.

**Claims 27-34, 36-39, 42-44 and 47-48 were rejected under 35 U.S.C. 102(b)
as being anticipated by Erb '345.**  Such rejections are traversed in part and overcome in part.

Independent **claim 27** has been amended to specify that the expansion step
involves radially expanding a <u>pre-formed</u> retention structure.  Erb '345 describes injecting an

uncured elastomeric composition into the oviduct in an amount sufficient to fill the portion of
the oviduct adjacent to the uterus.  Although Applicants do not agree that injecting additional
quantities of a viscous fluid into an oviduct is equivalent to expanding a retention structure so
that the retention structure engages a tubal wall, Applicants have amended claim 27 as stated
above in an effort to more quickly further prosecution.  Since an uncured elastomeric
composition is not pre-formed, Applicants believe **claim 27** to be in condition for allowance.

Independent **claim 28** describes an intrafallopian contraceptive device
comprising an elongate coil; the device being, among others, adapted to be retained within the
tube so as to inhibit conception.  Applicants do not see mention of such a coil anywhere in the
Erb '345 patent.  Therefore, Applicants traverse the rejections of **claim 28** and dependent
**claim 29,** which are allowable.

Independent **claim 30** describes an intrafallopian contraceptive device for use in
a fallopian tube comprising an elongate body having, among other elements, a cross-section
suitable for axial insertion <u>within</u> the tubal cross-section and being, among other things,
sufficiently flexible to deflect <u>against the tubal wall</u> without injuring the tubal wall.  Referring
to Erb '345, Applicants assume that the Examiner relies on apparatus 20, particularly tubular
extension 22 and tip 10, to anticipate the elongate body of the claimed invention.  The tubular
extension 22 with tip 10 installed is inserted into the vagina 54 and the tip 10 is then <u>aligned</u>
with the uterine end of one of the oviducts 12 (Col. 4, lines. 51-55).  There is no mention that
the tip 10 is inserted within an ostium of the fallopian tube.  Further, Erb '345 describes that
some of the injected material will flow back around the tip 10 so that the surface of the tip 10
will conform to the shape of the uterine end of the oviduct 12 (Col. 4, lines 67-68; Col. 5, lines
1-2).  This clearly illustrates that the end surface of the tip 10 is positioned outside of or against
the uterine end of the oviduct, not within the oviduct.

If the Examiner intended to rely on the oviduct block 64 of Erb '345 to
anticipate the elongate body of the claimed invention, Applicants maintain traversal of the
rejection.  Claim 30 also specifies that at least a portion of the elongate body is straighter than
the axial curvature of the fallopian tube.  Erb '345 states that the solidified oviduct blocks 64
each have a configuration which conforms to the interior of the oviduct in which it is cast (*Col.*

Julian N. Nikolchev et al.                                              PATENT
Application No.: 09/324,078
Page 11

5, lines 17-19). Therefore, there is no teaching or suggestion that a portion of the block 64 be straighter than the axial curvature of the fallopian tube from which it was molded.

For all of the above reasons, Applicants believe **claim 30** to be in condition for allowance. Further, Applicants believe dependent **claims 31-34** to be in condition for allowance for reasons stated above and because each presents additional features which are not anticipated by Erb '345.

Independent **claim 36** describes a contraceptive device comprising a structure and an elongate member affixed to the occlusion structure. Referring to Erb '345, Applicants assume that the Examiner relies on tip 10 to anticipate the structure of the claimed invention and the injected elastomeric material 60 to anticipate the elongate member of the claimed invention. To begin, claim 36 specifies that the structure is adapted to provide effective tubal occlusion when disposed substantially coaxially <u>within</u> the fallopian tube. Tip 10 does not enter the fallopian tube as shown above in relation to claim 30. Claim 36 also specifies that the elongate member is sufficiently flexible and axially resilient to help guide distal advancement of the occlusion structure within the fallopian tube. Again, the tip 10 is not advanced within the fallopian tube. Further, the injected elastomeric material 60 has been described to solidify to form an oviduct block which has a configuration which conforms to the interior of the oviduct in which it is cast, thus preventing conception (Col. 5, lines 17-19). Thus, conformation is an essential feature for preventing conception. Erb '345 does not teach any capability of the block for guiding distal advancement of the tip 10. Further, such capability would be highly undesirable since it would disrupt conformation and would advance the tip 10 within the fallopian tube making the retrieval process described in the Erb '345 reference difficult.

For these reasons, Applicants believe **claim 36** to be in condition for allowance. Further, Applicants believe dependent **claims 37-38** to be in condition for allowance for reasons stated above and because each presents additional features which are not anticipated by Erb '345.

Independent **claim 39** has been amended to specify that the elongate resilient body is <u>pre-formed</u>. Erb '345 describes injecting an uncured elastomeric composition into the oviduct in an amount sufficient to fill the portion of the oviduct adjacent to the uterus.

Julian N. Nikolchev et al.                                    PATENT
Application No.: 09/324,078
Page 12

Although Applicants disagree that the injection of uncured elastomer into a fallopian tube anticipates any of the features described in claim 39, Applicants have amended claim 39 as stated above in an effort to quickly further prosecution. Since an uncured elastomeric composition is not pre-formed, Applicants believe **claim 39** to be in condition for allowance.

Independent **claim 42** has been amended to correct a typographical error. Claim 42 describes a contraceptive kit comprising an intrafallopian contraceptive device and instructions for use. Nonetheless, Applicants have amended claim 42 to recite a pre-formed contraceptive device. Applicants do not see mention of such a kit anywhere in the Erb '345 patent. Therefore, Applicants traverse rejection of **claim 42** which is allowable.

Independent **claim 43** describes an intrafallopian contraceptive device which is restrained within the fallopian tube by the proximal and distal anchors. Applicants do not see that the Erb '345 device provides any such anchors. Therefore, Applicants traverse rejection of **claim 43** and dependent **claim 44** which are allowable.

Independent **claim 47** describes an intrafallopian contraceptive device comprising, in part, proximal and distal anchors each having resilient coils. Applicants do not see that the Erb '345 device provides any such anchors, particularly with coils. Therefore, Applicants traverse rejection of **claim 47** which is allowable.

Independent **claim 48** describes a method which includes transcervically introducing a pre-formed resilient structure into a target region of a fallopian tube. The Erb '345 reference does not describe a pre-formed resilient structure which is introduced into a fallopian tube. Therefore, Applicants traverse rejection of **claim 48** which is allowable.

**Claims 1-55 were provisionally rejected under the judicially created doctrine of obviousness-type double patenting**. Claims 1-2 have been canceled as stated above. As per the Terminal Disclaimer submitted herewith, Applicants disclaim the terminal part of the statutory term of any patent granted on claims 3-55 of the instant application which would extend beyond the expiration date of the full statutory term, defined in 35 U.S.C. 154 to 156 and 173, of that set forth by copending Application No. 09/474,779 upon issue. It is submitted that the double patenting rejection is overcome by this Terminal Disclaimer and all . claims are in condition for allowance.

361 FH 000096                                                        CON00028894

Julian N. Nikolchev et al.                                    PATENT
Application No.: 09/324,078
Page 13

    In addition, we will be filing a Supplemental Declaration at a later date. The
Supplemental Declaration will reflect the claim in priority made in this Amendment.

CONCLUSION

    In view of the foregoing, Applicants believe all claims now pending in this
Application are in condition for allowance. The issuance of a formal Notice of Allowance at
an early date is respectfully requested.

    If the Examiner believes a telephone conference would expedite prosecution of
this application, please telephone the undersigned at 650-326-2400.

    Respectfully submitted,

    Lynn M. Thompson
    Reg. No. P-47,991

TOWNSEND and TOWNSEND and CREW LLP
Two Embarcadero Center, 8th Floor
San Francisco, California  94111-3834
Tel: (415) 576-0200
Fax: (415) 576-0300
LMT
PA 3121292 v1

**EXHIBIT L**

# United States Patent [19]

**Erb**

[11] E     **Re. 29,345**

[45] Reissued    **Aug. 9, 1977**

[54] **METHOD AND APPARATUS FOR NON-SURGICAL, REVERSIBLE STERILIZATION OF FEMALES**

[75] Inventor: **Robert A. Erb,** Valley Forge, Pa.

[73] Assignee: **The Franklin Institute,** Philadelphia, Pa.

[21] Appl. No.: **679,185**

[22] Filed: **Apr. 22, 1976**

**Related U.S. Patent Documents**

Reissue of:
[64] Patent No.: **3,805,767**
    Issued: **Apr. 23, 1974**
    Appl. No.: **335,816**
    Filed: **Feb. 26, 1973**

[51] Int. Cl.$^2$ .............................................. **A61B 19/00**
[52] U.S. Cl. ..................................... **128/1 R;** 128/130; 128/303 R
[58] Field of Search .......... 128/1 R, 2 R, 130, 303 R, 128/234–236, 151, 152

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 854,399 | 5/1907 | Bridge | 128/236 X |
| 3,042,021 | 7/1962 | Read | 128/130 X |
| 3,182,662 | 5/1965 | Shirodkar | 128/303 R |
| 3,422,813 | 1/1969 | Braley et al. | 128/1 R |
| 3,648,683 | 3/1972 | Brodie | 128/1 R |
| 3,680,542 | 8/1972 | Cimber | 128/1 R |
| 3,707,146 | 12/1972 | Cook et al. | 128/2 R |
| 3,918,443 | 11/1975 | Vennard et al. | 128/130 |

**FOREIGN PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 819,629 | 7/1937 | France | 128/236 |

OTHER PUBLICATIONS

Stevenson et al., Jour. Obstet. & Gynec. of Gt. Brit., Nov. 1972, vol. 79, pp. 1028–1039.
Thompson et al., Human Sterilization – 1971 – Charles C. Thomas, Pub. Chapt. 30, pp. 353–359.
Rakshit – Human Sterilization – 1971, Charles C. Thomas – Pub. Chapt. 20, pp. 213–221.

*Primary Examiner*—Dalton L. Truluck
*Attorney, Agent, or Firm*—Dorfman, Herrell and Skillman

[57] **ABSTRACT**

A method and apparatus is provided for non-surgical reversible sterilization of females. In the method of this invention an apparatus to which a removable tip is attached is inserted into the uterus. The tip is aligned with the uterine end of the oviduct. A curable elastomeric composition is injected, through an aperture in the tip, into the oviduct in an amount sufficient to fill the portion of the oviduct adjacent to the uterus. The elastomeric composition is allowed to solidify and adhere to the above noted tip. The apparatus is then removed with the tip being ejected from the apparatus so as to remain adhered to the resulting oviduct block. The above procedure is repeated for the opposite oviduct. The resulting oviduct blocks prevent the passage of ovum from the ovaries to the uterus and sperm from entering the oviduct thereby preventing conception. The oviduct blocks if desired can be removed non-surgically by utilizing an apparatus which grips the tip portion of the oviduct block and extracts the entire oviduct block from the oviduct.

**29 Claims, 5 Drawing Figures**





Fig. 2

Fig. 1

HOL-CON 0010544



*Fig. 3*

*Fig. 4*

*Fig. 5*

HOL-CON 0010545

Re. 29,345

**1**

## METHOD AND APPARATUS FOR NON-SURGICAL, REVERSIBLE STERILIZATION OF FEMALES

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

The invention described herein was reduced to practice in the course of work under a grant or award from the Department of Health, Education and Welfare.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention is concerned with a method and apparatus for non-surgical, reversible sterilization of females.

2. Description of the Prior Art

One of the more pressing problems which is encountered in the World today is that of over population. The problem of over population which has been a substantial problem for a considerable period of time in certain highly populated areas, such as Asia and the Indian Sub-Continent is now becoming a problem in less populated areas of the World such as Europe and the Americas. Over population results in such long range problems as pollution, famine and even war.

Birth control has been relied on as the principal means to control over population. In the field of birth control the prevention of conception is considerably more acceptable for controlling population growth than abortion. However, the methods heretofore suggested for contraception have had certain inherent problems which limited the applicability and effectiveness.

The ideal contraception method should be 100 percent effective in preventing conception; should not rely on willpower; should not interfere with the satisfaction of sexual relationships, and should be low in cost taking into consideration the effective life of the contraceptive method. In addition the contraceptive method must now have any harmful psychological side effects. An extremely important feature of an ideal contraceptive method especially for family planning is that it be reversible so that it will be possible to have additional children if desired.

The most common methods of contraception which are currently employed on a mass scale each have certain inherent deficiencies which limit their usefulness. The use of such techniques and devices such as rhythm, withdrawal, condoms and diaphragms and vaginal foams all have been found to be highly unreliable. The more recently promoted methods such as intrauterine devices and use of contraceptive pills likewise have certain defects which limit their effectiveness. The intrauterine devices cannot be utilized by all females and there is some indication that they cause irritation and discomfort and are often rejected by females. The contraceptive pill cannot be utilized by many females due to incompatability with their normal hormone balance. Furthermore, the use of the pill has been found to increase the risks of certain [carcigenic] *carcinogenic* conditions.

There are currently two methods in wide use which are generally considered to be effective contraceptive methods. These are oviduct ligation for females and vasectomy for males. In both these methods the ducts

**2**

from the reproductive organs are severed and accordingly the contraceptive technique if properly performed and there is no natural regeneration are 100% effective. However, both methods have the defect that it is difficult, if not impossible, to reverse the procedure so as to restore the normal reproductive capacity.

It has been well established by gynecologists that a primary cause of infertility in females is blockage of the oviducts from the ovary to the uterus. The ovum when discharged from the ovaries is absorbed by the body and is prevented from coming in contact with the sperm and accordingly conception does *not* occur. Females having this natural condition normally do not even realize it exists and do not suffer any adverse side effect besides being infertile. Having been made aware of this natural condition those skilled in the art have suggested artificial blocking of the oviduct to impart sterility.

It was reported by Corfman et al. in [Obstetrices] *Obstetrics* and Gynecology Vol. 27 No. 6 pages 880–883 (June 1966) that various substances could be injected transcervically into the oviducts.

Hefnawi et al. Amr. J. Obst and Gynec, Vol. 99, No. 3 pages 421–427 (Oct. 1, 1967) reported attempts to block the oviducts by the injecting of medical grade elastomeric materials in the uncured state into the oviducts and allowing the material to solidify in the oviducts. The elastomeric material was thinned prior to injection so as to have a relatively fluid mixture for injection. The reported results obtained with rabbits was quite unsatisfactory. The incidence of pregnancy after insertion of the oviduct blocks was quite high. Effective sterilization was only achieved if the plug was placed in the medial portion of the oviduct. To remove the plug it was necessary to conduct laparotomy. A further problem which was reported was the tendency for the plug to migrate from the oviduct into either the uterine cavity or even more dangerously into the peritoneal cavity.

Rakshit reported in the Calcutta Med J 65, No. 3 (Mar., 1968) attempts to use various materials to block the oviducts to prevent conception. It was suggested to use a plastic material of a nature which solidifies after being mixed with a catalyst to form the oviduct blocks. Rakshit specifically taught however that because of high viscosity the silicone rubbers could not be injected transvaginally and laparotomies were conducted to inject the material directly into the uretus. The material was then allowed to flow into the oviducts. It was suggested in this article by Rakshit that it may be possible to introduce a plastic material transcervically into the uterus and then to allow it to flow in the oviducts. Using this method however the resulting oviduct blocks would have to be removed surgically to reestablish fertility.

Rakshit further reported in Human Sterilization edited by Ralph Rechart (1971) pages 213–221 the technique of attempting to form oviduct blocks by inserting a cannula directly into the uterus through the cervix and filling the uterus with a curable liquid silicone plastic. The injected silicone plastic was allowed to flow into the oviducts and cure in place to form the desired oviduct blocks. The excess material was then removed from the uterus. The reported results were not promising. On tests reported on 14 women there were nine satisfactory blockages, three doubtful cases and two negative cases. Further, in order to remove the oviduct blocks it was necessary to conduct a laparotomy.

HOL-CON 0010546

Re. 29,345

3

4

## SUMMARY OF THE INVENTION

In accordance with this invention a method and apparatus is provided to form oviduct blocks which prevent conception when in place and can be non-surgically removed if desires. The apparatus is inserted through the cervical os into the uterus. The tip of the apparatus is then aligned with the uterine end of the oviduct. A mixture of a fluid elastomeric material and a catalyst for polymerizing the elastomeric mixture is injected through an aperture in the tip into the oviduct. The elastomeric material is allowed to solidify and to adhere to the tip. The tip is released so that it remains with the injected elastomeric material to form the oviduct block of this invention. The apparatus is then removed. The oviduct block can be removed nonsurgically by inserting an instrument into the uterus through the cervix which grips the tip of the oviduct block and then withdrawing the oviduct block which restores normal fertility.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is an illustration in partial cross-section of an apparatus especially adopted for use in the method of this invention.

FIG. 2 is an illustration in partial cross-section of a uterus, the cervix and a portion of the vagina. The uterus is illustrated with an oviduct block insert in one of the oviduct and the terminal end of the apparatus of FIG. 1 positioned for insertion of an oviduct block into the opposite oviduct.

FIG. 3 is an enlarged illustration taken in partial cross-section of the terminal end of the apparatus of FIG. 1.

FIG. 4 is an illustration in cross-section of the terminal end of the apparatus of FIG. 3 shown with fluid uncured elastomeric material shown in the internal feed tube.

FIG. 5 is an illustration in cross-section showing the separation of the tip from the apparatus of FIG. 1.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

In the method of this invention an oviduct block is formed in situ in the oviduct. The oviduct block is most preferable formed from a medical inert plastic which has approximately the same modulus of elasticity as the oviduct. The selection of material having the proper modulus of elasticity appears to both prevent expulsion of the oviduct block and substantially eliminates any physical discomfort. The materials which have been found most useful in the method of this invention are the commercially available medical grade silicone elastomers. The uncured silicone elastomer in the fluid state is blended with a catalyst for solidifying the elastomer and a dilution fluid to control the viscosity during injection and also to control the modulus of elasticity of the cured solidified material. It is preferable to also include a radiopaque material in the mixture to facilitate the placement of the oviduct block and to facilitate removal of the oviduct block if [desires] *desired.*

A tip 10 is molded from an inert plastic material to which the injected elastomeric material will adhere on solidification. In this regard it should be noted that silicone-rubber is ideally suited for this purpose when a silicone elastomer is used for formation of the oviduct block.

As shown in the drawing the portion of the tip 10 which will be in contact with uterine end of the oviduct 12 has a spherical configuration. The tip 10 has an aperture 14 which extends throughout the entire length of the tip [14] *10.* In addition the tip as illustrated has a series of annular piston rings 16 molded into the interior [portion] surface of the aperture 14. The tip 10 further includes a loop 18 which is preferably a thread of a material which is inert in uterine fluids, such as nylon.

The apparatus 20 shown in FIG. 1 is specifically designed for use in the method of this invention. The apparatus 20 includes a tubular extension 22, a dispensing apparatus 24, and a control handle 26 for both operating the dispensing means and positioning the tip 10 on the end of the tubular extension 22.

The tubular extension 22 has a rigid section which is adjacent to the control handle 26. The opposite terminal end portion 28 on which the tip 10 is secured is flexible. One end of each control wire 30, 32 is attached to the end portion of the flexible section 28. The control wires 30, 32 are connected at their opposite ends to a pair of separately controlled drums 34 (only one drum is shown) mounted on the control [hand] *handle* 26. By adjustment of the drums 34 to either to collect or release the wires 30, 32 the position of the tip 10 can be adjusted and bent in a curved configuration shown in FIG. 2.

At the flexible terminal end 28 a metal connector 36 is provided which has annular piston [ring] *rings* 38 which [mates] *mate* with the piston rings 16 on the tip 10. The metal connector 36 further has defined in it a constricted area having a sharp cut off portion 40.

A tube 42 extends from the dispensing means 24, through the tubular extension 22 to the aperture 14 in the tip 10.

The dispensing means 24 consists of a mixing syringe 44 in which the plunger 46 is adapted to provide mixing of a fluid elastermeric material, a catalyst and other additive as may be required. The syringe 44 is mounted on top of the control handle 26 with the plunger 46 in contact with a rack 48 and a pivotal mounted pawl 50. The pawl 50 is connected to a trigger 52. Squeezing the trigger 52 causes the plunger 46 to be advanced within the syringe [46] *44* and material within the syringe 44 to be dispensed through the tube 42 to the tip 10.

In the method of this invention the tip 10 is inserted over the end of the flexible portion 28 of the tubular extension. The tip 10 being premolded of a silicone rubber is somewhat elastic and deforms somewhat until the piston ring 16 of the tip of 10 engages and locks with the mating piston rings 38.

The tubular extension [20] *22* with tip 10 installed is inserted into the vagina 54, through the cervical os 56 into the uterine cavity 58. Then, preferably using [flouroscopic] *fluoroscopic* techniques, the tip 10 is aligned with the uterine end of one of the oviducts 12. It should be noted that because of the shape of the uterine cavity 58 the tip can be guided blindly in the proper position. The relative position of the flexible end 28 is controlled by adjustment of the drums 34.

Once the tip 10 is in position the fluid mixture of the elastomer, catalyst and other additives are injected through the tube 42 to the tip 10 by operation of the trigger 52 as noted above. The uncured fluid elastomeric mixture 60 flows through the aperture 14 in the tip 10 and then into the oviduct 12. A sufficient amount of the mixture is injected to fill approximately one third or more of the length of the oviduct 12. Some of the material will flow back around the tip 10 so that the

Re. 29,345

5

surface of the tip 10 will conform to the shape of the uterine end of the oviduct 12 as shown in the tip 10 as modified 62 which is shown in FIG. 5.

The injected elastomeric material 60 is allowed to cure and solidify. The cured material will adhere to the tip 10 to make an essential single unit.

Once the elastomeric material has cured, the tube [40] 42 and the terminal end [36] 28 are withdrawn within the tubular extension 22. The edge 40 cuts the cured material which remains in the tube 42 from the cured material in the aperture 14 of the tip 10. Continued withdrawal of the terminal end [36] 28 results in the tip 10 being stripped from the terminal end as shown in phantom in FIG. 5.

The procedure noted above is repeated for the opposite oviduct to complete the sterilization procedure.

The solidified oviduct blocks each has a configuration which conforms to the interior of the oviduct in which it is cast, thus effectively preventing conception.

*The shaped tip member has an aperture defined therein and a configuration such as to fit in substantial sealing contact adjacent to the uterine end of the oviduct of the female. It has a size larger than the lumen of said oviduct and is positioned within the uterine cavity of said female adjacent to the uterine end of said oviduct with the aperture of said tip member being in axial alignment with the lumen of said oviduct, whereby the tip member remains within the uterine cavity where it can be gripped by mechanical means to remove the oviduct block nonsurgically.*

The oviduct block can remain in place until it is desired to remove it. The use of a material having approximately the same modulus of elasticity as the oviducts assists in maintaining the oviduct blocks 64 in position. The natural convolution of the oviduct likewise results in stabilization of the oviduct blocks 64. The tip 10 serves a most important function of preventing the oviduct block 64 from migrating into the intraperitoneal cavity, a problem that was a serious and relatively common problem with other similar prior art [technique] *techniques.*

As noted above the oviduct block is inserted nonsurgically. The method is relatively simple to learn by those skilled in the medical art. The time required is likewise quite short with a skilled person being able to block both oviducts in about 15 to 30 minutes.

As noted above the oviduct block can be removed nonsurgically if desired. An instrument of the type shown in FIG. 1 is used for this purpose. The tip 10 is replaced with a hooked member which is adapted to engage the loop 18. Once the loop 18 is engaged the oviduct block 64 is withdrawn. It is also possible to use a pronged member to grip the tip and then pull out the oviduct block.

Both the insertion and removal of the oviduct block 64 are relatively painless. However a local anesthetic can be used if desired.

The effectiveness of the contraception method of this invention was found to be excellent. On rabbit tests it was found that the method is 100% effective if the oviduct blocks are properly placed. In further rabbit tests it was found that after the oviduct blocks were removed that fertility was restored. There was no indication of expulsion of the oviduct blocks either in the uterine cavity or in the intraperitoneal cavity. Histologic examination and scanning election microscopic examination have not indicated that there is any adverse reaction to the tissue of the oviducts.

6

The apparatus of this invention has been described in *the* preferred embodiment. It should be appreciated that [the] various modifications can be made to the apparatus without departing from the scope of this invention. For example, the control handle 26 has been provided to enable a simple one handed operation of the apparatus. [If] *It* is possible, however, to simply use control wires which are operated by the fingers of the hand rather than the drums. Further, the dispensing apparatus consisting of the trigger 52, rack 48 and pawl 50, could likewise be removed and the syringe operated manually. Furthermore, the configuration of the tip 10 can be modified to a different shape such as a conical configuration [of] *or* other suitable shapes and still be satisfactory for use in this invention. These and other modifications which would be obvious to those skilled in the art are included within the scope of the subjoined claims.

I claim:

1. The method of forming non-surgically removable oviduct block in a female comprising the step of

 a. providing a shaped tip member having an aperture defined therein; said tip member having a configuration such as to fit in substantial sealing contact adjacent to the uterine end of the oviduct of said female, and having a size larger than the lumen of said oviduct; said tip member being formed from a given cured elastomeric material

 b. positioning said tip member within the uterine cavity of said female adjacent to the uterine end of said oviduct with the aperture of said tip member being in axial alignment with the lumen of said oviduct

 c. injecting through the aperture of said tip member into the lumen of said oviduct a mixture of a fluid self curing elastomeric material which will solidify in said oviduct and adhere to said tip member, said elastomeric material being injected into said oviduct in an amount sufficient to block the passage of ovum through said oviduct to the uterine cavity

 d. and thereafter allowing said uncured elastomeric material to cure to a solidified mass while in contact with said tip member, whereby an oviduct block is formed wherein the tip member remains within the uterine cavity where it can be gripped by mechanical means to remove the oviduct block non-surgically.

2. The method according to claim 1 wherein said tip member further includes a loop member whereby said loop member can be gripped to non-surgically remove said oviduct block.

3. The method according to claim 1 wherein said self-curing elastomeric material is a self-curing silicone elastomer.

4. The method according to claim 1 wherein said self-curing elastomeric material when solidified has a modulus of elasticity substantially the same as said oviduct.

5. The apparatus for forming the oviduct block according to claim 1, said apparatus comprising: a tubular means of a length sufficient to extend from vagina area of said female to the uterine ends of said oviducts and having a diameter sufficiently small to pass through the cervix of said female; said tubular means having first and second terminal ends; said first terminal end having an apertured tip member detachably connected thereto and also means for releaseably holding and ejecting said tip member, said tubular member including means for positioning said first terminal end with said tip member

HOL-CON 0010548

Re. 29,345

7

thereon adjacent the uterine end of said oviduct, and said tubular member further including means for transmission of said self curing elastomeric material from a point adjacent to the second terminal end to and through said aperture in said tip member secured to the first terminal end.

**6.** The apparatus of claim **5** in which the first terminal end portion is flexible.

**7.** The apparatus according to claim **5** in which the position of the first terminal end is controlled by means operable from the second terminal end.

**8.** The apparatus according to claim **5** wherein the means for holding and ejecting said tip member comprises a slideable member positioned within said tubular member whereby when a tip member is secured at the first terminal end to said slideable member and said slideable member is drawn through said tubular member toward the second terminal end said tip is removed from said slideable member.

**9.** The apparatus according to claim **5** wherein the dispensing means is a syringe having a barrel and a plunger and wherein the plunger is advanceable within the barrel by a rack and pawl drive operated from the second terminal end.

*10. Apparatus for forming an oviduct block comprising: a tubular means having a length sufficient to extend from the vagina area of a female to the uterine end of the oviduct and having a diameter sufficiently small to pass longitudinally through the cervix of said female; said tubular means having first and second terminal ends; said first terminal end having means to engage and connect a tip member thereto, said tubular means including means therein for adjustably displacing said first terminal end laterally relative to said second terminal end to position said first terminal end adjacent the uterine end of said oviduct to cause the tip member to at least temporarily block said uterine end; said tubular means further including fluid passage means for transmission of a plastic material from a point adjacent to the second terminal end into said oviduct beyond said tip member at first terminal end of said tubular means, and means to dispense a sufficient amount of said material to fill a predetermined length of the oviduct and to flow into engagement with the tip member at the uterine end of said oviduct, to form a block having an enlarged end portion exposed in the uterine end of the oviduct.*

*11. The apparatus of claim 10 in which the tubular means adjacent the first terminal end has a flexible portion separable from the block formed by said plastic material, said flexible portion affording displacement of said first terminal end relative to said second terminal end.*

*12. The apparatus according to claim 10 in which the adjustable means is operable from the second terminal end.*

*13. The apparatus according to claim 10 in which the means for dispensing said plastic material is a syringe having a barrel and a plunger, the plunger being advanceable within the barrel by a rack and pawl drive operated from the second terminal end to dispense said sufficient amount.*

*14. Apparatus for forming an oviduct block comprising: a tubular means having a length sufficient to extend from the vagina area of a female to the uterine end of the oviduct and having a diameter sufficiently small to pass through the cervix of said female; said tubular means having first and second terminal ends; said first terminal end including means for holding and releasing a tip member, said tubular means including means for positioning said first terminal end with said tip member thereon adjacent the uterine*

8

*end of said oviduct to at least temporarily block said uterine end; said tubular means further including fluid passage means for transmission of a plastic material from a point adjacent to the second terminal end into said oviduct beyond said tip member at first terminal end of said tubular means, and means to dispense a sufficient amount of said material to fill a predetermined length of the oviduct and to flow into engagement with the tip member at the uterine end of said oviduct, to form a block having an enlarged end portion exposed in the uterine end of the oviduct, said holding and releasing means comprising a slideable member positioned within said tubular means, whereby when the tip member is held at the first terminal end by said slideable member and said slideable member is drawn through said tubular means toward the second terminal end, said tip member is released from said slideable member.*

*15. A non-surgically removable oviduct block for a female, comprising: a solid body of solidified plastic material having a transverse dimension conforming to the interior of the oviduct and having at one end a solid molded tip portion with a configuration adapted to fit in contact with the uterine end of the oviduct of said female forming a single unit; said molded tip portion having a transverse dimension larger than the interior of the oviduct to prevent said block from migrating into the intraperitoneal cavity, whereby said tip portion remains accessible from the uterine cavity, said molded tip portion having means thereon which can be gripped by mechanical means to remove the oviduct block non-surgically; said body of plastic material having a length providing a volume sufficient to block the passage of ovum through said oviduct to the uterine cavity of said female.*

*16. The oviduct block of claim 15 in which the plastic material forming the oviduct block has approximately the same modulus of elasticity as the oviduct.*

*17. The oviduct block of claim 15 in which the length of said plastic material body is at least one third of the length of the oviduct.*

*18. The oviduct block of claim 15 in which the plastic material is a cured elastomeric material.*

*19. The oviduct block of claim 18 in which the elastomeric material is a self-curing silicone elastomer.*

*20. The oviduct block of claim 15 in which the tip portion includes a loop member comprising said means to be gripped to non-surgically remove said oviduct block from the oviduct.*

*21. The method of forming non-surgically removable oviduct block in a female, comprising the steps of:*

*a. introducing an injecting means through the cervical os into the uterine cavity of said female;*

*b. providing a pre-formed tip member having an aperture therein adjacent to the uterine end of the oviduct of said female to limit the flow of material dispensed by the injecting means;*

*c. injecting from said injecting means through said aperture into the interior of said oviduct beyond said tip member a plastic material which will flow into engagement with said tip member, said plastic material being injected into said oviduct in an amount sufficient to block the passage of ovum through said oviduct to the uterine cavity; and*

*d. allowing said plastic material to solidify in said oviduct in contact with said tip member to provide a single-unit oviduct block at least partially formed by said solidified plastic material, said tip member providing a portion larger than the interior of the end of said oviduct exposed in the uterine cavity, whereby the*

**9**

**Re. 29,345**

**10**

exposed portion of the block can be gripped by mechanical means to remove the oviduct block non-surgically.

22. The method of forming non-surgically removable oviduct block in a female, comprising the steps of:

a. introducing an injecting means through the cervical os into the uterine cavity of said female;

b. providing a seal between said injecting means and the wall of the uterus in the marginal area circumscribing the uterine end of the oviduct of said female to limit the flow into the cavity of material dispensed by the injecting means;

c. injecting from said injecting means into the interior of said oviduct beyond said seal a plastic material which will flow into engagement with said seal, said plastic material being injected into said oviduct in an amount sufficient to block the passage of ovum through said oviduct to the uterine cavity; and

d. allowing said plastic material to solidify in said oviduct and provide an oviduct block at least partially formed by said solidified plastic material and having a tip portion larger than the interior of the end of said oviduct exposed in the uterine cavity, whereby the exposed portion of the block can be gripped by mechanical means to remove the oviduct block non-surgically.

23. The method according to claim 22 wherein said seal is provided by a pre-formed molded tip member having an aperture therein and the plastic material injected into the interior of the oviduct is injected through the aperture of said tip member.

24. The method according to claim 22 further including the step of providing a loop member on the exposed portion

in said uterine cavity to permit removal of said oviduct block by engaging the loop and extracting said block.

25. The method of claim 22 in which the plastic material injected into the oviduct has approximately the same modulus of elasticity as the oviduct.

26. The method of claim 22 in which the plastic material is a self-curing elastomeric material.

27. The method of claim 26 in which the elastomeric material fills at least one third of the length of the oviduct.

28. The method of forming non-surgically removable oviduct block in a female, comprising the steps of:

a. introducing an injecting means through the cervical os into the uterine cavity of said female;

b. positioning the injecting means adjacent the uterine end of the oviduct and providing a seal with the uterine wall in the marginal area circumscribing the interior of the oviduct limiting the flow into the uterine cavity of material dispensed by the injecting means;

c. injecting from said injecting means into the interior of said oviduct beyond said seal a plastic material which will flow into engagement with said seal, said plastic material being injected into said oviduct in an amount sufficient to block the passage of ovum through said oviduct to the uterine cavity; and

d. allowing said plastic material to solidify in said oviduct and provide an oviduct block at least partially formed by said solidified plastic material, whereby the block can be gripped by mechanical means to remove the oviduct block non-surgically.

29. The method of claim 28 including the step of providing a molded tip portion as an integral part of said block, said tip having means directed toward and located in the uterine cavity and of a shape to be gripped for removal of the block.

* * * * *

HOL-CON 0010550