**SIDLEY AUSTIN LLP**
M. PATRICIA THAYER (SBN 90818)
pthayer@sidley.com
555 California Street
San Francisco, CA  94104
Telephone:     (415) 772-1200
Facsimile:     (415) 772-7400

BRYAN K. ANDERSON (SBN 170666)
bkanderson@sidley.com
AARON R. BLEHARSKI (SBN 240703)
ableharski@sidley.com
1001 Page Mill Road, Building 1
Palo Alto, CA  94304
Telephone:     (650) 565-7000
Facsimile:     (650) 565-7100

NITIN REDDY (SBN 229451)
nreddy@sidley.com
TASHICA T. WILLIAMS (SBN 256449)
ttwilliams@sidley.com
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Telephone:     (213) 896-6000
Facsimile:     (213) 896-6600

Attorneys for Plaintiff
CONCEPTUS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONCEPTUS, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>HOLOGIC, INC.,<br><br>    Defendant. | Case No. 09-cv-02280-WHA<br><br>**CONCEPTUS' OPPOSITION TO HOLOGIC, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(a)(2)**<br><br>Trial date:    October 3, 2011<br>Time:          7:30 AM<br>Courtroom:  8, 19th floor<br>Judge:         Hon. William H. Alsup |

# INTRODUCTION

Plaintiff Conceptus, Inc. ("Conceptus") hereby opposes Hologic Inc.'s motion for judgment as a matter of law under Rule 50(a)(2).

There is ample evidence from which a reasonable jury could conclude that (1) physicians performing the Adiana procedure directly infringe claims 37 and 38 of the '361 patent; (2) Hologic contributed to infringement of the '361 patent by physicians; (3) Hologic induced infringement of the '361 patent by physicians; (4) Hologic willfully infringed the '361 patent; and (5) Conceptus is entitled to damages, in an amount to be determined by the jury. The Court thus should deny Hologic's motion.

# ARGUMENT

The inquiry under Rule 50 is similar to the one at summary judgment: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The Supreme Court has explained that:

> Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.

*Id*. at 255. "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).

Applying that standard here, Hologic's motion for judgment as a matter of law should be denied.

## I. There Is Substantial Evidence Of Direct Infringement By Physicians

### A. The accused method includes "imposing an anchoring force against a tubal wall of the fallopian tube"

There is ample evidence for the jury to conclude that the Adiana matrix imposes an anchoring force against the tubal wall of the fallopian tube. Hologic's own statements in the Adiana

Pre-Market Approval Application ("PMA"), submitted to the FDA, make clear that the matrix radially expands after insertion into the fallopian tube as permitted by patient anatomy:

> To properly position it for delivery, the Matrix is compressed within the electrode sheath. After release from the electrode sheath, the matrix expands to its approximate original shape and volume as permitted by the patient anatomy.

Trial Ex. 55 at HOL-CON 0000126.

To expand to meet patient anatomy, the matrix necessarily must assert a force. Indeed, if no force were exerted by the matrix to the tubal wall, it would not stay in place. Yet, it indisputably does. *See* Trial Ex. 55 at HOL-CON 000413-15.

Hologic argues that it is the swelling and edema in the tubal wall, caused by ablation, that holds the matrix in place, rather than the radial pressure due to expansion to meet patient anatomy. Hologic's argument is irrelevant and wrong. Newton's Third Law of Motion says that for every action there is an equal and opposite reaction.

In any event, the claims do not preclude such resilient engagement and Hologic's own documents indicate that the matrix's edges and expansion contribute to holding it in place. *See* Trial Ex. 22 at HOL-CON 0005984 ("the matrix's edges contribute to the retention of the matrix within the fallopian tube, especially in the initial days after placement."). Indeed, the matrix's design specifications explicitly state that it should be "[c]apable of maintaining position for a short period (1 to 3 weeks)." Trial Ex. 49 at HOL-CON 0092463. Thus, it cannot be said that *only* the swelling and edema temporarily holds the Adiana matrix in place.

### B. The accused method includes "resiliently engaging an inner surface of the tubal wall with the resilient structure"

There is sufficient evidence from which the jury could conclude that the Adiana system includes "resiliently engaging an inner surface of the tubal wall with the resilient structure."

Hologic argues that this "inner surface" must be either an "inner epithelial" layer that is uninjured. Mot. at 1. But that limitation is not contained in the claims. Independent claim 36, upon which claims 37 and 38 depend, only states that the resilient structure should engage "an inner surface of the tubal wall." Trial Exhibit No. 38. The claim does not limit such wall to be either "epithelial" or an "uninjured." To the contrary, the patent provides several ways in which the

2

resilient structure engages a damaged wall to promote tissue ingrowth. *See* Trial Ex. 38 at col. 4:9-12 ("Specific tissue reactions which may provide these intended results include tissue ingrowth into the contraceptive device and/or the tubal lumen, scar tissue formation, sclerosing of the tubal tissues, and the like"); *id*. at 13:49-53 (In some embodiments, the engagement between outer coil 204 and the tubal wall injures the epithelial tissues, and the healing process results in the formation of scar tissues which interfere with the functioning of the fallopian tube"); *id*. at 4:25-29 ("Alternatively, a sharp edged helical ribbon or other mechanical interaction element may incite the formation of scar tissue, or a surface coating of the coil may sclerose the tubal tissues, exciting formation of tough fibrous connective tissues which interfere with conceptive transport)".[1]

Hologic's opinion of counsel, upon which it heavily relies, admits that "[a]s it is released from the delivery catheter (in which it has been retained in a compressed configuration), the matrix elastically decompresses and expands radially to its uncompressed configuration until its outer circumference *engages* the *inner wall surface of the fallopian tube*." Trial Ex. 750 at HOL-CON 0107793 (emphasis added). These words are virtually identical to the ones used in claims 37 and 38. Further, the testimony of Mr. Harrington and Dr. Anderson support a determination that the matrix engages an injured epithelial layer. So too does U.S. Patent No. 5,945,715, owned by Hologic. *See* Trial Ex. 41 at col. 4:49-51 ("Tissue ingrowth (possibly referred to as scar formation) around the electrode insures a permanent seal of the fallopian tube").

All of this provides that there is more than sufficient evidence to support a jury determination that the Adiana system includes "resiliently engaging an inner surface of the tubal wall with the resilient structure."

---

[1] *See also* Trial Ex. 38 at col. 3:54-57 ("In some embodiments, electrosurgical attachment of an intraluminal device to a surrounding lumenal wall may provide effective anchoring even without loops and other anchoring structures"); *id*. at 9:15-21 ("Ribbon 28 includes sharp outer edges 29, which firmly anchor lumen-traversing region 24 in the fallopian tube wall when torque is applied to intrafallopian device"); *id*. at 11:11-16 ("Fallopian tube tissue in contact with the intrafallopian device is desiccated, and thus attached to the present intrafallopian device. This action also causes permanent tubal damage, leading to the formation of scar tissue which encapsulates the intrafallupian device and causes permanent occlusion of the tubal lumen"); *id*. at 12:58-62 ("In some embodiments, core wire 214 will be capable of transmitting heat, electrical current, and/or some other energy which induces scarring, electrocautery, or the like, so as to attach the contraceptive device within the fallopian tube").

### C. The accused method includes "permanently affixing the resilient structure within the fallopian tube . . . so that at least a portion of the fallopian tube is open"

Conceptus has provided ample evidence that physicians performing the Adiana procedure do so in part by "permanently affixing the resilient structure within the fallopian tube . . . so that at least a portion of the fallopian tube is open." Hologic argues that although the matrix is placed in the tube, it does not permanently affix until there is occlusion. According to Hologic, the matrix may be "easily dislodged" until total occlusion occurs. Mot. at 2.

Hologic's argument is belied by its own documents. At the very least, the numerous statements from Hologic's own documents (including the Adiana IFU) provide sufficient evidence from which a jury could decide that the Adiana method involves permanent affixation while at least a portion of the fallopian tube is open.

*First*, as stated in Adiana's IFU and as reflected in the clinical data Hologic submitted to the FDA, the Adiana matrix was successfully placed in 611 of 645 patients. Trial Ex. 9 at HOL-CON0104858. In its clinical trials, Hologic conducted ultrasounds on these 611 patients. 98.9% still had their matrices in place after one week. Trial Ex. 25 at CON00067830.

*Second*, once the matrix "has been placed in the fallopian tube," "[r]emoval of the matrix will most likely require surgery." Trial Ex. 9 at HOL-CON 0104856. If the matrix was simply sitting in the tube, without being permanently affixed, surgery would not be required to dig it out. Instead, to use Hologic's counsel's analogy, a stiff wind could cause it to fall out. The surgery described in the IFU is more akin to the roots growing into the drainpipe analogy put forth by Dr. Mark Glasser. As he explained, once a certain amount of roots grow into a drain (once a certain amount of tissue grows into the matrix), the roots need to be cut out by a plumber (the matrix needs to be removed by a surgeon).

*Third*, tissue ingrowth takes time. The data Hologic presented to the FDA confirms this. See Trial Ex. 55 at HOL-CON 0005344. Its own IFU states that: "The matrix functions as a benign and permanent scaffold during wound healing. Within the region surrounding the solid core of the matrix, a porous architecture *encourages a tissue in-growth response eventually leading* to total occlusion of the tube." Trial Ex. 9 at HOL-CON 0104854 (emphasis added).

*Fourth*, while the matrices are in place, but before tissue ingrowth causes total occlusion as confirmed by an HSG test, women are advised to use another form of birth control, because the fallopian tubes are still open and thus would allow sperm to pass. Trial Ex. 9 at HOL-CON 0104859. The pregnancy and HSG data discussed at length by Dr. Glasser confirms this.

*Fifth*, three months after placement, the matrices are still there and tissue is growing into and around them. After three months, occlusion is achieved for some, but not all, patients. Although occlusion is not achieved for all patients by 3 months, the matrices are still in place. There is no evidence that the matrices simply fell out.

*Sixth*, the same clinical trial data shows that more than 6% of patients who have the matrix successfully placed do not achieve occlusion as confirmed by an HSG test. Trial Ex. 9 at HOL-CON 0104858. Again, the matrices were still in place for these women. To remove those matrices it would require surgery, and yet occlusion did not occur.

## II.    There Is Substantial Evidence Of Contributory Infringement

Conceptus has adduced ample evidence that would permit a reasonable jury to conclude that Hologic contributed to the infringement of the '361 patent by physicians.

Among other things, Hologic knew that Conceptus accused it of infringing the '361 patent, including claims 37 and 38. *See*, *e.g.*, Trial Exs. 43 (notice letter) and 756 (notice letter). These notice letters overcome judgment as a matter of law on this issue. *See Fujitsu Ltd. v. Netgear Inc.*, 620 F. 3d 1321, 1330 (Fed. Cir. 2010) ("In this case, Philips provided a letter that identified the '952 patent and stated that all 802.11 compliant products infringe. Construing all facts in a light most favorable to Philips, we cannot hold that Netgear did not have the requisite knowledge as a matter of law."); *see also Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) ("proof of a defendant's knowledge, not intent, that his activity cause infringement was necessary to establish contributory infringement"); *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1336, 1340 (Fed. Cir. 2008) ("Unlike contributory infringement, induced infringement under § 271(b) requires proof that the inducer [has] affirmative intent to cause direct infringement") (internal quotation marks omitted). Hologic's own proffered opinion of counsel also demonstrates the requisite knowledge. Trial Ex. 750.

Hologic also knew physicians perform the Adiana procedure in accordance with the Instructions for Use:

> Q. Hologic knew that the physicians were in fact performing the Adiana procedure in accordance with their training?
>
> A. Well, you're not aware of quite what they're doing, but the intent is, yes, that they perform in the procedures consistent with the training.

Trial Tr. at 1039:10-14 (Oct. 11, 2011). Indeed, the Adiana system is especially adapted to practice the Adiana method; it has no other purpose.

Ignoring all of this evidence, Hologic focuses its argument on its supposed belief that the matrix "was not permanently affixed until complete ingrowth (and thus occlusion) had occurred due to the threat of dislodgement." Mot. at 3. As explained in § I.C., *supra*, numerous Hologic documents directly contradict this supposed knowledge and suggest that, before complete occlusion, the matrices were permanently in place and indeed would need surgical intervention to have them removed. At the very least, the evidence discussed above forecloses judgment as a matter of law in Hologic's favor.

## III. There Is Substantial Evidence Of Inducement Of Infringement

There is ample evidence from which a reasonable jury could conclude that Hologic induced physicians to infringe claims 37 and 38 of the '361 patent. As an initial matter, the facts that Hologic long had knowledge of the '361 patent and that the Adiana method and Adiana matrix have no use other than to infringe is presumptive evidence of Hologic's intent to induce infringement by selling the Adiana system. *Ricoh*, 550 F.3d at 1338 ("When a manufacturer includes in its product a component that can only infringe, the inference that infringement is intended is unavoidable").

But the evidence does not stop there. Here, there is "[e]vidence of 'active steps . . . taken to encourage direct infringement,' such as … instructing how to engage in an infringing use, [which] show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *DSU,* 471 F.3d at 1305 (quoting *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)).

As Ms. Petrovic and others testified, Hologic instructs doctors on how to perform the Adiana procedure which, as explained above, infringes claims 37 and 38 of the '361 patent. Indeed, Hologic's IFU makes clear that the Adiana system should only be performed by physicians who have been trained by Hologic on how to do the infringing procedure:

> This device should only be used by physicians who have . . . completed Hologic's Adiana® Permanent Contraception physician training program, and have read and understood these instructions for use. Completion of the Adiana physician training program includes proctoring in Adiana RF treatment and implantable matrix (matrix) placement for at least three cases.

Trial Ex. 9 at HOL-CON 0104854 (emphasis removed).

Hologic again argues that it "believes that the Adiana matrix is not permanent affixed within the fallopian tube until there has been complete ingrowth and thus occlusion." As explained above, there is overwhelming evidence refuting this supposed belief from Hologic's own documents. At the very least the jury could reasonably conclude in Conceptus's favor on this.

Hologic also argues that it is entitled to judgment as a matter of law on inducement because it lacked the requisite intent for purposes of inducement because there is uncontradicted evidence that it obtained and relied on opinions of counsel. This is wrong.

Opinions of counsel are not dispositive. As the Federal Circuit has explained, "If counsel's opinion is found to be incompetent, however, a fact finder may discount its usefulness in determining a party's good faith." *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006). Moreover, the whole point of the jury system is to have the jury decide whether Hologic's conduct and its counsel's opinions were credible. "It is within the province of the jury to determine the credibility of a witness and the weight to be given his testimony; the jury is not required to accept testimony as true, even if it is uncontradicted." *Amsted Industries v. Buckeye Steel Castings Co.*, 24 F.3d 178, 183 (Fed. Cir. 1994) (discussing claimed "good faith belief that the [] patent was invalid").

There is ample evidence from which the jury could conclude that the opinions of counsel were either incompetent or effectively meaningless. For example, the letters were *both* provided at high pressure junctures when there was a strong incentive for counsel to say exactly what their

clients needed to hear: that the Adiana system did not infringe. The first opinion letter was obtained at the time that Adiana was being acquired by Cytyc for more than $200 million (*see* Trial Tr. at 1011:18-24, 1017:18-21), and the second letter was obtained just as the Adiana system was being launched in the United States (*see* Trial Tr. at 1034:7-12).

The jury also could decide that the opinion letters were of dubious quality because they did not fully appreciate the patent examiner's consideration of certain references (Trial Tr. at 1014:17-1015:3) and because outside counsel was not made aware of the critical HSG data, which helped explain why permanent affixation occurs while at least a portion of the fallopian tube is open (Trial Tr. at 1102:16-1103:5).

Indeed, in the face of these obvious shortcomings and the convenient timing of both of the letters, the jury may well decide that the opinions of counsel are more indicative of Hologic's intent to paper over a problem than they are of its good faith belief that it did not infringe the '361 patent.

## IV.     There Is Substantial Evidence Of Willful Infringement

There is substantial evidence that Hologic willfully infringed the '361 patent. Moreover, as the Federal Circuit has explained, "[w]illfulness of behavior is a classical jury question of intent." *Richardson v. Suzuki Motor Co., Ltd.*, 868 F. 2d 1226, 1250 (Fed. Cir. 1989). The Court thus should deny Hologic's motion for judgment as a matter of law on this issue.

Hologic argues that the Court recognized in the preliminary injunction proceedings that Hologic "raises a substantial question with regard to whether" a different specification in a different patent enabled a different claim. Mot. at 4. As has been explained in prior briefing to this Court, the enablement analysis turns on whether the full scope of the claims are enabled by the specification. *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1306-07 (Fed. Cir. 2001). Other claims and other specifications in other patents have no bearing on that question.

Hologic also points to is its own supposed belief that the Adiana system does not infringe claims 37 and 38, which was based on the opinions of counsel it obtained. As explained above, there is clear evidence that the opinions were obtained at a time when there was a tremendous amount of pressure to provide a green light to the Adiana system, either because the entire company

was being acquired for a huge sum of money, or because the system was just about to be launched in the United States.  *See* § III, *supra*.

Moreover, Hologic's post-filing conduct in attempting to "crush" Conceptus, target and convert Essure users, and eventually "own" the hysteroscopic permanent contraception market is ample evidence of willfulness.  *See*, *e.g.*, Trial Exs. 117, 134.  In addition, as numerous witnesses explained, Hologic desperately wanted to enter the transcervical hysteroscopic sterilization market because it wanted to protect and drive sales of its lucrative NovaSure business.  Finally, the jury is entitled to consider and weigh the credibility of numerous witnesses under Hologic's control who changed their deposition testimony or otherwise made statements inconsistent with their prior activities.

Relying on dicta from *In re Seagate Tech., LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007), Hologic also argues that it is entitled to judgment as a matter of law on willful infringement because Conceptus did not seek a preliminary injunction on the '361 patent.  *Seagate* was a case about discovery and whether a party could use opinions of counsel as a shield to a charge of willfulness while at the same time preventing discovery based on privilege grounds.  In the course of deciding the discovery issue, the Federal Circuit stated that "[a] patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct."  *Id*. at 1374.

Conceptus does not believe that this dicta is dispositive of willfulness under the specific circumstances of this case and especially the safe harbor provision provided by the Hatch-Waxman amendment, 35 U.S.C. § 271(e)(1), which precluded Conceptus from following up with its notice letters in 2007 with a complaint for infringement.  *Cf. Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.*, No. 05-CV-1887 (DMC), 2009 WL 483865, at *3 (D.N.J. Feb. 25, 2009) (declining to dismiss willfulness claim in a Hatch-Waxman case after denial of preliminary injunction because "*Seagate* did not create a per se rule of dismissal, and . . . it may be possible for Novartis to show after discovery that Teva acted in reckless disregard of the 'objectively high likelihood' that it was infringing on a valid patent").  While there was prefiling conduct consistent with willfulness, Conceptus simply could not pursue claims against Hologic until FDA approval was imminent.

9

CONCEPTUS' OPPOSITION TO HOLOGIC'S MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 09-CV-02280-WHA

Indeed, if it were dispositive of this issue, Hologic could and should have moved for summary judgment at the close of fact discovery. Nevertheless, Conceptus recognizes that *Seagate* suggests that the failure to seek a preliminary injunction is a significant issue that the jury can and should weigh in deciding whether Conceptus has sufficiently proven willful infringement.

## V.     There Is Substantial Evidence Of Lost Profits

Hologic is not entitled to judgment as a matter of law on damages. To the contrary, Conceptus has satisfied all four of the factors set forth in the landmark decision of *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1160-62, (6th Cir. 1978), and thus is entitled to lost profits.

The first factor is demand for the patented product. *Id*. The uncontroverted evidence in this case is that Conceptus had achieved double-digit growth in its sales of Essure from 2002 until 2009 when Adiana first launched. *See* Trial Tr. at 760:7-24 (Oct. 7, 2011). Moreover, as Ms. Elsten testified and as Hologic's own documents show, the transcervical hysteroscopic sterilization market is a two-supplier market. *See*, *e.g.*, Trial Ex. 134; Trial Tr. at 772:11-20 (Oct. 7, 2011); see also Trial Ex. 117. In a two-supplier market, the "demand" factor is met. Indeed, "[i]n the two-supplier market, it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F. 2d 1573, 1578 (Fed. Cir. 1989).

The second factor was decided by this Court at summary judgment. As the Court already determined, "there were no acceptable and available, non-infringing alternatives to the claimed inventions during the relevant damages period." Dkt. No. 356 at 17:14-16, 19:28-20:2.

The parties stipulated that the third *Panduit* factor was not in dispute. "For purposes of this case, Hologic will not contest that Conceptus had the manufacturing and marketing capacity to make and sell a sufficient number of Essure to replace Adiana sales in the United States from July 2009 through June 2011." Trial Tr. at 684:2-10 (Oct. 6, 2011).

The fourth *Panduit* factor also is satisfied because nobody disputes that there is enough financial data to compute lost profits. *See*, *e.g.*, Trial Exs. 277, 161, 194, 190.

Hologic argues that notwithstanding these factors, there are some sales of Adiana that would not have gone to Essure. As Ms. Elsten explained, however, in the but for world, it is "by far most likely" that a woman who had been convinced of the benefits of transcervical hysteroscopic sterilization would have chosen Essure if there was no Adiana. Trial Tr. at 768:20-769:15 (Oct. 7, 2011).

Moreover, Conceptus does not have to prove damages with mathematical precision. To the contrary, the test is whether it is reasonably probable that Conceptus would have made the sales Hologic did for Adiana if Adiana was not on the market:

> The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.

*Bluebonnet Savings Bank v. US*, 266 F. 3d 1348, 1355 (Fed. Cir. 2001).

Here, the jury has ample evidence from which it can conclude that Conceptus is entitled to lost profits. Furthermore, it is immaterial that Ms. Elsten did not offer an alternative lost profits calculation. The decision of how much in damages to award a plaintiff is a classic question for the jury to decide.

## **CONCLUSION**

For all of these reasons, the Court should deny Hologic's motion for judgment as a matter of law. Conceptus has adduced more than enough evidence from which a reasonable jury could find that Hologic was liable. Indeed, as will be explained in Conceptus's forthcoming motion for judgment as a matter of law, Conceptus believes that this evidence is so overwhelming that no reasonable jury could conclude that Hologic was not liable under these theories.

Dated: October 12, 2011                     SIDLEY AUSTIN LLP

                                           */s/ M. Patricia Thayer*
                                           M. PATRICIA THAYER (SBN 90818)
                                           pthayer@sidley.com
                                           555 California Street, Suite 2000
                                           San Francisco, CA 94104
                                           Telephone:(415) 772-1200
                                           Facsimile: (415) 772-7400

| | |
|---|---|
| 1 | BRYAN K. ANDERSON (SBN 170666) |
| | bkanderson@sidley.com |
| 2 | AARON R. BLEHARSKI (SBN 240703) |
| | ableharski@sidley.com |
| 3 | 1001 Page Mill Road, Building 1 |
| | Palo Alto, CA 94304 |
| 4 | Telephone:(650) 565-7000 |
| | Facsimile: (650) 565-7100 |
| 5 | |
| | NITIN REDDY (SBN 229451) |
| 6 | nreddy@sidley.com |
| | TASHICA T. WILLIAMS (SBN 256449) |
| 7 | ttwilliams@sidley.com |
| | 555 West Fifth Street, Suite 4000 |
| 8 | Los Angeles, CA 90013 |
| | Telephone:(213) 896-6000 |
| 9 | Facsimile: (213) 896-6600 |
| 10 | ***Counsel for Plaintiff Conceptus, Inc.*** |

(Lines 11 through 28 blank)

---

12

CONCEPTUS' OPPOSITION TO HOLOGIC'S MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 09-CV-02280-WHA