**SIDLEY AUSTIN LLP**
M. PATRICIA THAYER (SBN 90818)
pthayer@sidley.com
555 California Street
San Francisco, CA  94104
Telephone:     (415) 772-1200
Facsimile:      (415) 772-7400

BRYAN K. ANDERSON (SBN 170666)
bkanderson@sidley.com
AARON R. BLEHARSKI (SBN 240703)
ableharski@sidley.com
1001 Page Mill Road, Building 1
Palo Alto, CA  94304
Telephone:     (650) 565-7000
Facsimile:      (650) 565-7100

NITIN REDDY (SBN 229451)
nreddy@sidley.com
TASHICA T. WILLIAMS (SBN 256449)
ttwilliams@sidley.com
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
Telephone:     (213) 896-6000
Facsimile:      (213) 896-6600

Attorneys for Plaintiff
CONCEPTUS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CONCEPTUS, INC.,<br><br>            Plaintiff,<br><br>    v.<br><br>HOLOGIC, INC.,<br><br>            Defendant. | Case No. 09-cv-02280-WHA<br><br>**CONCEPTUS' NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(a)(2)**<br><br>Trial date:    October 3, 2011<br>Time:           7:30 AM<br>Courtroom:  8, 19th floor<br>Judge:          Hon. William H. Alsup |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD, PLEASE TAKE NOTICE that on October 14, 2011 at 7:30 a.m., or as soon thereafter as the matter may be heard, in Courtroom 8, Plaintiff Conceptus, Inc. ("Conceptus") will and hereby does move the Court for judgment as a matter of law under Fed. R. Civ. P. 50(a)(2) of direct infringement, contributory infringement, anticipation, obviousness, written description and damages.  Conceptus respectfully submits this memorandum in support of its motion.

## ARGUMENT

### I. The Only Reasonable Conclusion Is That Hologic Is Liable For Contributory Infringement

#### A. Direct Infringement Has Been Established Because There Is No Question That Physicians Practice Each And Every Step Of Claims 37 and 38.

There is no reasonable dispute that physicians performing the Adiana method practice each and every step of claims 37 and 38 of U.S. Patent No. 6,634,361 ("'361 patent").  Only three limitations remain at issue in this case, and as explained below, all three are practiced by physicians performing the Adiana method, as instructed by Adiana's Instructions For Use ("IFU").

##### 1. "imposing an anchoring force against a tubal wall of the fallopian tube"

Based on the evidence presented in this case, the only reasonable conclusion that the jury could draw is that the Adiana matrix does impose an anchoring force against the tubal wall of the fallopian tube.  Hologic's own statements in the Adiana Pre-Market Approval Application ("PMA"), submitted to the FDA, make clear that the matrix radially expands after insertion into the fallopian tube as permitted by patient anatomy:

> To properly position it for delivery, the Matrix is compressed within the electrode sheath.  After release from the electrode sheath, the matrix expands to its approximate original shape and volume as permitted by the patient anatomy.

Trial Ex. 55 at HOL-CON 0000126.

To expand to meet patient anatomy, the matrix necessarily must assert a force.  Indeed, if no force were exerted by the matrix to the tubal wall, it would not stay in place.  Yet, it indisputably does.  *See* Trial Ex. 55 at HOL-CON 0000413-15.  Hologic's own expert, Thomas Ryan, testified that an insert that expands when placed in the fallopian tube so that it "has very good contact with

1

the inner fallopian tube" wall is imposing an anchoring force against the tubal wall. Trial Tr. at 1241:10-15 (Oct. 12, 2011); *id.* at 1234:6-14. Taken together, this evidence is dispositive.

Hologic argues that it is the swelling and edema in the tubal wall, caused by ablation, that holds the matrix in place, rather than the radial pressure due to expansion to meet patient anatomy. Hologic's argument is irrelevant and wrong. As Newton's Third Law of Motion states, for every action there is an equal and opposite reaction. Pressure from the tubal wall is met by radial pressure from the matrix.

In any event, the claims do not preclude resilient engagement and Hologic's own documents indicate that the matrix's edges and expansion contribute to holding it in place. *See* Trial Ex. 22 at HOL-CON 0005984 ("the matrix's edges contribute to the retention of the matrix within the fallopian tube, especially in the initial days after placement."). Indeed, the matrix's design specifications explicitly state that it should be "[c]apable of maintaining position for a short period (1 to 3 weeks)." Trial Ex. 49 at HOL-CON 0092463. Thus, it cannot be said that *only* the swelling and edema temporarily holds the Adiana matrix in place. Conceptus is entitled to judgment as a matter of law on this point.

### 2. "resiliently engaging an inner surface of the tubal wall with the resilient structure"

Physicians performing the Adiana system are "resiliently engaging an inner surface of the tubal wall with the resilient structure." No reasonable jury could conclude otherwise.

The only argument Hologic has ever advanced on this point is that the "inner surface" must be an "inner epithelial" layer that is uninjured. *E.g.,* Trial Tr. at 200:1-11 (Oct. 4, 2011). But that limitation is not contained in the claims. Independent claim 36, upon which claims 37 and 38 depend, only states that the resilient structure should engage "an inner surface of the tubal wall." Trial Ex. No. 38. The claim does not require such wall to be either "epithelial" or "uninjured." To the contrary, the patent provides several ways in which the resilient structure engages a damaged wall to promote tissue ingrowth. *See id.* at col. 4:9-12 ("Specific tissue reactions which may provide these intended results include tissue ingrowth into the contraceptive device and/or the tubal lumen, scar tissue formation, sclerosing of the tubal tissues, and the like"); *id.* at 13:49-53 (In some

embodiments, the engagement between outer coil 204 and the tubal wall injures the epithelial tissues, and the healing process results in the formation of scar tissues which interfere with the functioning of the fallopian tube"); *id*. at 4:25-29 ("Alternatively, a sharp edged helical ribbon or other mechanical interaction element may incite the formation of scar tissue, or a surface coating of the coil may sclerose the tubal tissues, exciting formation of tough fibrous connective tissues which interfere with conceptive transport)".[1]

Hologic's opinion of counsel, upon which it heavily relies, admits that "[a]s it is released from the delivery catheter (in which it has been retained in a compressed configuration), the matrix elastically decompresses and expands radially to its uncompressed configuration until its outer circumference *engages* the *inner wall surface of the fallopian tube*." Trial Ex. 750 at HOL-CON 0107793 (emphasis added). These words are virtually identical to the ones used in claims 37 and 38. Further, the testimony of Mr. Harrington and Dr. Anderson support a determination that the matrix engages an injured epithelial layer. So too does U.S. Patent No. 5,945,715, owned by Hologic. *See* Trial Ex. 41 at col. 4:49-51 ("Tissue ingrowth (possibly referred to as scar formation) around the electrode insures a permanent seal of the fallopian tube").

Thus, there is no reasonable dispute that the Adiana system includes "resiliently engaging an inner surface of the tubal wall with the resilient structure." Conceptus is entitled to judgment as a matter of law on this point.

---

[1] *See also* Trial Ex. 38 at col. 3:54-57 ("In some embodiments, electrosurgical attachment of an intraluminal device to a surrounding lumenal wall may provide effective anchoring even without loops and other anchoring structures"); *id*. at 9:15-21 ("Ribbon 28 includes sharp outer edges 29, which firmly anchor lumen-traversing region 24 in the fallopian tube wall when torque is applied to intrafallopian device"); *id*. at 11:11-16 ("Fallopian tube tissue in contact with the intrafallopian device is desiccated, and thus attached to the present intrafallopian device. This action also causes permanent tubal damage, leading to the formation of scar tissue which encapsulates the intrafallupian device and causes permanent occlusion of the tubal lumen"); *id*. at 12:58-62 ("In some embodiments, core wire 214 will be capable of transmitting heat, electrical current, and/or some other energy which induces scarring, electrocautery, or the like, so as to attach the contraceptive device within the fallopian tube").

### 3. "permanently affixing the resilient structure within the fallopian tube . . . so that at least a portion of the fallopian tube is open"

There is no reasonable dispute that physicians performing the Adiana procedure do so in part by "permanently affixing the resilient structure within the fallopian tube . . . so that at least a portion of the fallopian tube is open." The evidence on this point is voluminous.

*First*, as stated in Adiana's IFU and as reflected in the clinical data Hologic submitted to the FDA, the Adiana matrix was successfully placed in 611 of 645 patients. Trial Ex. 9 at HOL-CON 0104858. In its clinical trials, Hologic conducted ultrasounds on these 611 patients. After one week, 98.9% still had their matrices in place. Trial Ex. 25 at CON00067830.

*Second*, once the matrix "has been placed in the fallopian tube," "[r]emoval of the matrix will most likely require surgery." Trial Ex. 9 at HOL-CON 0104856. If the matrix was simply sitting in the tube, without being permanently affixed, surgery would not be required to dig it out. Instead, to use Hologic's counsel's analogy, a stiff wind could cause it to fall out. The surgery described in the IFU is more akin to the roots growing into the drainpipe analogy put forth by Dr. Mark Glasser. As he explained, once a certain amount of roots grow into a drain (once a certain amount of tissue grows into the matrix), the roots need to be cut out by a plumber (the matrix needs to be removed by a surgeon).

*Third*, tissue ingrowth takes time. The data Hologic presented to the FDA confirms this. *See* Trial Ex. 55 at HOL-CON 0005344. Its own IFU states that: "The matrix functions as a benign and permanent scaffold during wound healing. Within the region surrounding the solid core of the matrix, a porous architecture *encourages a tissue in-growth response eventually leading* to total occlusion of the tube." Trial Ex. 9 at HOL-CON 0104854 (emphasis added).

*Fourth*, while the matrices are in place, but before tissue ingrowth causes total occlusion as confirmed by an HSG test, women are advised to use another form of birth control, because the fallopian tubes are still open and thus would allow sperm to pass. Trial Ex. 9 at HOL-CON 0104859. The pregnancy and HSG data discussed at length by Dr. Glasser confirms this.

*Fifth*, three months after placement, the matrices are still there and tissue is growing into and around them. After three months, occlusion is achieved for some, but not all, patients. Although

occlusion is not achieved for all patients by 3 months, the matrices are still in place. There is no evidence that the matrices simply fell out.

*Sixth*, the same clinical trial data shows that more than 6% of patients who have the matrix successfully placed do not achieve occlusion as confirmed by an HSG test. Trial Ex. 9 at HOL-CON 0104858. Again, the matrices were still in place for these women. To remove those matrices it would require surgery, and yet occlusion did not occur.

Given this voluminous evidence, the only reasonable conclusion is that physicians performing the Adiana procedure do so in part by "permanently affixing the resilient structure within the fallopian tube . . . so that at least a portion of the fallopian tube is open." Conceptus thus is entitled to judgment as a matter of law on this point.

**B.     Hologic Is Liable For Contributory Infringement Because It Had Knowledge Of Infringement And Because The Adiana System Has No Non-Infringing Purpose.**

As explained above, physicians performing the Adiana method directly infringe claims 37 and 38 of the '361 patent. Section 271(c) imposes liability on Hologic, as the seller of the Adiana system, if certain conditions are met:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, *knowing the same to be especially made or especially adapted for use in an infringement* of such patent, and not a staple article or commodity of commerce *suitable for substantial noninfringing use*, shall be liable as a contributory infringer.

35 U.S.C. § 271(c) (emphasis added); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 488 (1964) ("*Aro II*") (contributory infringement requires a "showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing"). Moreover, the Federal Circuit has held that "proof of a defendant's knowledge, not intent, that his activity cause infringement [is] necessary to establish contributory infringement." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990); *see also Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1336, 1340 (Fed. Cir. 2008) ("Unlike contributory infringement, induced infringement under § 271(b) requires proof

5

CONCEPTUS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 09-CV-02280-WHA

that the inducer [has] affirmative intent to cause direct infringement") (internal quotation marks omitted).

Here, the only reasonable conclusion is that Hologic is liable for contributory infringement. *First*, there is absolutely no evidence that the Adiana system can be used for any purpose other than performing the Adiana method. The lack of a "substantial noninfringing use" is presumptive evidence in favor of contributory infringement. *See Ricoh*, 550 F.3d at 1338.

*Second*, Hologic knew physicians perform the Adiana procedure in accordance with the Instructions for Use:

> Q. Hologic knew that the physicians were in fact performing the Adiana procedure in accordance with their training?
>
> A. Well, you're not aware of quite what they're doing, but the intent is, yes, that they perform in the procedures consistent with the training.

Trial Tr. at 1039:10-14 (Oct. 11, 2011). Indeed, the Adiana system is especially adapted to practice the Adiana method; it has no other purpose.

*Third*, there is no question that Hologic was aware that practicing the Adiana method would infringe the '361 patent. Conceptus notified Hologic of the '361 patent and warned it against infringing it. *See*, *e.g.*, Trial Exs. 43 (notice letter) and 756 (notice letter). These notice letters establish knowledge. *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010) ("In this case, Philips provided a letter that identified the '952 patent and stated that all 802.11 compliant products infringe. Construing all facts in a light most favorable to Philips, we cannot hold that Netgear did not have the requisite knowledge as a matter of law.") Any doubt about Hologic's knowledge is conclusively eliminated by its opinions of counsel. Those would not be necessary if Hologic did not know or at least suspect that the Adiana system infringed the '361 patent.

Given this overwhelming evidence, the only reasonable conclusion is that Hologic had "(1) knowledge of the activity that is alleged to be infringing ... and (2) knowledge of the patent." *Sandisk Corp. v. Lexar Media, Inc.*, 91 F. Supp. 2d 1327, 1335 (N.D. Cal. 2000). That is all that is required. *See id*.

### C. Conceptus Is Entitled To Lost Profits Because It Has Satisfied All Of The *Panduit* Factors.

Conceptus has satisfied all four of the factors set forth in the landmark decision of *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1160-62, (6th Cir. 1978), and thus is entitled to lost profits. No reasonable jury could conclude otherwise.

The first factor is demand for the patented product. *Id*. The uncontroverted evidence in this case is that Conceptus had achieved double-digit growth in its sales of Essure from 2002 until 2009 when Adiana first launched. *See* Trial Tr. at 760:7-24 (Oct. 7, 2011). Moreover, as Ms. Elsten testified and as Hologic's own documents show, the transcervical hysteroscopic sterilization market is a two-supplier market. *See*, *e.g.*, Trial Ex. 134; Trial Tr. at 772:11-20 (Oct. 7, 2011); *see also* Trial Ex. 117. In a two-supplier market, the "demand" factor is met. Indeed, "[i]n the two-supplier market, it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F. 2d 1573, 1578 (Fed. Cir. 1989).

The second factor was decided by this Court at summary judgment. As the Court already determined, "there were no acceptable and available, non-infringing alternatives to the claimed inventions during the relevant damages period." Dkt. No. 356 at 17:14-16, 19:28-20:2.

The parties stipulated that the third *Panduit* factor was not in dispute. "For purposes of this case, Hologic will not contest that Conceptus had the manufacturing and marketing capacity to make and sell a sufficient number of Essure to replace Adiana sales in the United States from July 2009 through June 2011." Trial Tr. at 684:2-10 (Oct. 6, 2011).

The fourth *Panduit* factor also is satisfied because nobody disputes that there is enough financial data to compute lost profits. *See*, *e.g.*, Trial Exs. 277, 161, 194, 190.

Hologic argues that notwithstanding these factors, there are some sales of Adiana that would not have gone to Essure. As Ms. Elsten explained, however, in the "but for" world, it is "by far most likely" that a woman who had been convinced of the benefits of transcervical hysteroscopic

sterilization would have chosen Essure if there was no Adiana.  Trial Tr. at 768:20-769:15 (Oct. 7, 2011).[2]

Because all four Panduit factors have been satisfied, the only reasonable conclusion that could be reached is that Conceptus is entitled to lost profits.

## II. There Is No Clear And Convincing Evidence That The '361 Patent Is Invalid

A patent is presumed valid.  35 U.S.C. § 282.  To prove invalidity of any patent claim, Hologic has the heavy burden of producing evidence that each of the asserted claims are invalid by *clear and convincing evidence*.  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 848 (Fed. Cir. 2010).  Hologic has failed to provide any evidence, much less clear and convincing evidence, of the invalidity of claims 37 and 38.

### A. There Is No Clear And Convincing Evidence That Any Reference Anticipates Claim 37 Or 38 Of The '361 Patent

"To anticipate a claim, *a single* prior art reference must expressly or inherently disclose each claim limitation."  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008) (citation omitted) (emphasis added).  Further, "[t]he way in which the elements are arranged or combined in the claim must itself be disclosed, either expressly or inherently, in an anticipatory reference."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1332 (Fed. Cir. 2010).

Unless "a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations *arranged or combined in the same way as recited in the claim*, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under *35 U.S.C. § 102*."  *Id.* (citing *Net MoneyIN, Inc. v. VeriSign, Inc.,* 545 F.3d 1359, 1371 (Fed. Cir. 2008)) (emphasis in original).  In addition, "[t]he concept of 'inherent disclosure'

---

[2] It is no answer to argue that Conceptus did not prove damages with mathematical precision.  That is not required:

> The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.

*Bluebonnet Savings Bank v. US*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).

does not alter the requirement that all elements must be disclosed in an anticipatory reference in the same way as they are arranged or combined in the claim." *Id.* However, "[i]herency…may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* (citations omitted).

Hologic has fallen far short of meeting its burden of setting forth clear and convincing evidence that any reference contains every claim limitation as arranged in the asserted claims.

### 1. Schmitz-Rode 1994

The first alleged anticipatory reference is T. Schmitz-Rode, *Experimental Nonsurgical Female Sterilization: Transcervical Implantation of Microspindles in Fallopian Tubes*, Journal of Vascular and Interventional Radiology 5:905-910 (1994) ("Schmitz-Rode 1994"), Trial Exhibit 501, which discloses self-expandable steel mesh devices that were transcervically implanted in rabbit fallopian tubes. *Id.* at 501. This reference does not anticipate claim 36, since it does not disclose a structure "imposing an anchoring force against a tubal wall" that is "resiliently engaging an inner surface." Since the reference does not disclose these claim limitations in claim 36, the reference cannot anticipate claims 37 and 38 either.

In addition, instead of resiliently engaging the tubal wall, the disclosed device distorts the rabbit's fallopian tube. *See* Trial Tr. at 1295:22-1296:5 (Oct. 12, 2011).[3] Moreover, Hologic's expert admitted that there is a difference between tissue structure of rabbits and humans, Trial Tr. at 1299:6-7 (Oct. 12, 2011), and Mr. Sheehan testified—without rebuttal—that the reference does not enable any method in humans. Rough Trial Tr. at 151:17-152:5. Thus, undue experimentation would be required to devise a device that would work in humans. Because the invention is directed to human contraception, the publication fails to enable the asserted claims. *Cf. In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) ("As long as the reference discloses all of the claim limitations ***and*** enables the subject matter that falls within the scope of the claims at issue, the reference anticipates[.]") (emphasis added); *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1381

---

[3] Mr. Sheehan testified about the failure of this device to resiliently engage an inner surface. *See* Rough Trial Tr. at 148:10-16; *see also id.* at 173:13-175:6.

(Fed. Cir. 2003) ("An anticipatory reference need only enable subject matter that falls within the scope of the claims at issue[.]").

Furthermore, Schmitz-Rode 1994 contains no teaching that tissue ingrowth occludes the fallopian tube.  To the contrary, Hologic's expert did not provide any evidence that this reference discloses this claim limitation.  In fact, he merely speculated that, if one waited long enough or filled it with some other material, this "may" cause occlusion through tissue ingrowth.  Trial Tr. at 1249:4-21 (Oct. 12, 2011).  This absolute lack of evidence of either express or implied disclosure of the element  falls short of the clear and convincing standard.

### 2. Schmitz-Rode 1993 and U.S. Patent No. 5,522,822

Hologic next points to two other references, which are even farther off the mark.  The first is T. Schmitz-Rode, *Self-expandable Spindle for Transcather Vascular Occlusion: In Vivo Experiments*, Radiology 188:95-100 (1993) ("Schmitz-Rode 1993"), Trial Exhibit 500, which describes a variety of self-expandable steel mesh vaso-occlusive devices ("spindles").  *Id.* at HOL-CON 0116214.  Schmitz-Rode 1993 does not disclose any of the claim limitations and only makes a passing reference to the use of microspindles in the fallopian tube, which does not disclose any of the claim elements other than the preamble.  *See* Trial Tr. at 1293:11-21 (Oct. 12, 2011).  Further, Hologic's own expert put forth no opinion that the reference anticipated the claimed method.  *See* Trial Tr. at 1293:22-1294:8 (Oct. 12, 2011).

Hologic also cited U.S. Patent No. 5,522,822 ("Phelps 822"), Trial Ex. 394, which is a coil for use in the field of vasoocclusion.  *Id.* at HOL-CON 0011125.  Mr. Ryan testified, although the Phelp 822 fails to mention anything about transcervical sterilization, this deficiency can be cured by reference to U.S. Patent No. 4,994,069 (Ritchart), Trial Exhibit 399, which itself gave a fleeting mention of use of a wire in the uterus and/or fallopian tubes.  This is legally wrong; simply citing another patent is not enough to incorporate the material by reference.  To do so requires the "host document" (Phelps 822) to "identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents." *Advanced Display Sys., Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted) (emphasis added).  No such details are provided in Phelps 822.  Moreover, the patent does not provide *any*

10

*information* concerning what is needed to succeed in transcervical sterilization and thus is not enabling. *See Impax*, 468 F.3d at 1381; Trial Tr. at 1291:19-22 (Oct. 12, 2011).

In sum, neither of these references can anticipate claim 36 since they do not even disclose use of any device in the fallopian tube and thus cannot meet the first element which requires "transcervically introducing." Furthermore, the references cannot anticipate dependent claims 37 and 38, since neither reference discloses promotion of tissue ingrowth to permanently affix a device or occlude a fallopian tube.

### 3. Brundin 1983

The next alleged anticipatory reference is J. Brundin, *Hydrogel Tubal Blocking Device: P-Block*," *in* Female Transcervical Sterilization 240-244 ("Brundin 1983"), Trial Exhibit 480, which describes a Mark 7 P-block. This device is a tubal blocking device, with a copolymerized hydrogel body fixed on a nylon 6 skeleton. *Id.* at HOL-CON 0012090. Upon insertion, the device is "hydratized" by body fluids. *Id.*

The publication does not anticipate claim 36, because it fails, *inter alia*, to disclose the "permanently affixing" limitation. The reference provides no indication that the device is permanently affixed by any portion of the resilient structure. In fact, the device was designed to be removable. *Cf.* Trial Exhibit 480 at HOL-CON0012092 ("One woman, who achieved satisfactory tubal occlusion, subsequently requested removal of the devices due to bleeding."). As such, it cannot anticipate the asserted claims.

In addition, the reference clearly does not anticipate claim 37 or 38, because there is absolutely no evidence that the P-block either promotes tissue ingrowth or that tissue ingrowth occludes the fallopian tube—even inherently. *Cf.* Trial Exhibit 480 (finding, after nearly two years, that "[a] *few* giant cells were seen in the surrounding tissues and capillaries") (emphasis added). There is no evidence that the hydrogel actually "promotes" tissue ingrowth—just that such ingrowth was observed. Rough Trial Tr. 146:14-25.

### 4. Brundin 1987

The final reference proffered is J. Brundin, *Observations on the mode of action of an intratubal device, the P-block*, Am. J. of Obst. & Gyn. 997-1000 (1987) ("Brundin 1987), Trial Ex.

11

481, which provides a means of blocking the oviducts using a device known as the P-block and consists of a nylon 6 core upon which a hydrogel body has been anchored by copolymerization. *Id.* at HOL-CON 0012108. This reference does not anticipate claim 36 because it fails to meet, *inter alia*, "imposing an anchoring force against a tubal wall" and "by resiliently engaging an inner surface" claim limitations. Because claims 37 and 38 are dependent on claim 36, the reference does not anticipate either of those claims.

Even if the reference anticipated claim 36 (which is does not), Brundin 1987 does not anticipate claim 37 since it fails to disclose the *promotion* of tissue ingrowth. Hologic's expert provided no evidence that this reference disclosed this claim limitation. *See* Trial Tr. at 1238:11-23 (Oct. 12, 2011). In fact, the reference states that "it has been shown that the presence of the P-block in the woman increases the inflammatory reaction *not of the tubal epithelium* but in the immediate region of the intratubal device. This would mean that an inflammatory reaction in the tubal epithelium due to the presence *of the intramural P-block alone* could not represent the antifertility effect of the intratubal device." *Id.* at HOL-CON 0012110 (emphasis added).

Also, this publication cannot anticipate claim 38, since the reference explicitly states that "[e]vidently, the hydrogelic P-block, Mark 9 *does not* occlude the intramural portion of the oviduct sufficiently to exert an obstruction to the water-soluble dye used for hysterosalpingography, even on careful transcervical injection." *Id.* at HOL-CON 0012110.

* * *

Since Hologic has failed to provide any reference that contains all of the claim limitations of the asserted claims, either expressly or inherently, it has failed to carry its burden. Conceptus should be granted judgment as matter of law concerning Hologic's anticipation defense.

### B. There Is No Clear And Convincing Evidence That The Prior Art Renders The '361 Patent Invalid As Obvious.

A claimed invention is unpatentable due to obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Hologic's invalidity expert, Mr. Ryan, did not provide any testimony that one or more items of prior art

rendered claims 37 and 38 obvious.  Indeed, his trial testimony never used the word "obvious," much less explained why any combination would have been obvious to one of ordinary skill in the art in September 1997.  Hologic thus has come forward with absolutely no evidence on this affirmative defense, let alone the clear and convincing evidence.  For this reason alone, Conceptus is entitled to judgment as a matter of law on obviousness.

In addition, Hologic cannot overcome Conceptus' ample evidence of secondary considerations of non-obviousness, "such as commercial success, long-felt but unresolved need, failure of others…and unexpected result." *Ruiz v. AB Chance Co.*, 234 F. 3d 654, 660 (Fed. Cir. 2000).  As the Federal Circuit has explained: "Our precedents clearly hold that secondary considerations, when present, must be considered in determining obviousness." *Id*. at 667.  Moreover, evidence of secondary considerations, "may be sufficient to overcome a prima facie case of obviousness." *Id*. (quoting *In re Beattie*, 974 F.2d 1309, 1313 (Fed. Cir. 1992)).

*First*, it is undisputed that Essure was and is commercially successful.  Although Hologic questions the nexus between the commercial success and claims 37 and 38, that nexus was provided by Ms. Tunstall, who testified that those claims were at the core of the Essure method.  Trial Tr. at 441:8-15 (Oct. 5, 2011).

*Second*, there is substantial evidence of a long-felt but unresolved need.  As Hologic's own expert, Mr. Ryan, published outside of this litigation:  "Ligation of the fallopian tubes without surgery has been called the holy grail of gynecology and women's health."  Trial Ex. 169; Trial Tr. 1288:21-24 (Oct. 12, 2011).  Numerous companies had tried and failed to achieve this holy grail.

*Third*, there is substantial evidence of failure of others.  As Ms. Tunstall testified:

> Q.  As a result of these meetings and conversations, what did you conclude about the success of prior efforts in this area?
>
> A.  There really hadn't been any successes. Nothing had been commercialized. And there had been numerous attempts, all different ways, of using known technologies, putting them together to try to block the fallopian tubes. But, you know, nature was stronger. Nature found a way around them. And there were a lot of failures for the products that got to clinical trials, a lot of failures in the clinical trials, and some of the products never even got to clinical trials because they had such bad results in their testing.

Trial Tr. at 400:19-401:4 (Oct. 5, 2011).

13

In light of this evidence, no reasonable jury could conclude that prior art rendered claims 37 and 38 of the '361 patent invalid due to obviousness.

### C.   There Is No Clear And Convincing Evidence That The '361 Patent Is Invalid Due To Lack Of Written Description.

Hologic has failed to come forward with clear and convincing evidence that claims 37 and 38 are invalid for lack of written description. As the Federal Circuit recently has explained en banc, the written description:

> must clearly allow persons of ordinary skill in the art to recognize that the inventor invented what is claimed. In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.

*Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).

Hologic argues that claims 37 and 38 fail to meet this requirement because they do not describe non-metal. Hologic is wrong. The '361 patent makes clear that the device used in the method must be "preformed" and "resilient" so that it can impose an anchoring force against a tubal wall. *See* Dkt. 268-30 (Ex. 30) at claim 36. The patent specifically teaches that anchoring may be achieved, for example, using a malecott structure or radially expandable braid (col. 3, lines 4-5, Figures 18A-C), both of which are preformed and resilient, and both of which typically are not made of metal. *See also* Rough Trial Tr. at 157:3-16.

Thus, there is no doubt that the inventors had possession of a method using materials other than metal, because they expressly call it out. As the Court previously ruled: "Given that non-metallic devices were prevalent in the prior art at the time the patent application was filed, a person having ordinary skill in the art would have understood that the resilient structure could be made of any material so long as the structure was sufficiently resilient." Dkt. No. 189 at 9.

### **CONCLUSION**

For all of these reasons, the Court should enter judgment as a matter of law in Conceptus' favor.

Dated: October 13, 2011                                    SIDLEY AUSTIN LLP

14

CONCEPTUS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 09-CV-02280-WHA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

   /s/ M. Patricia Thayer
M. PATRICIA THAYER (SBN 90818)
pthayer@sidley.com
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400
BRYAN K. ANDERSON (SBN 170666)
bkanderson@sidley.com
AARON R. BLEHARSKI (SBN 240703)
ableharski@sidley.com
1001 Page Mill Road, Building 1
Palo Alto, CA 94304
Telephone: (650) 565-7000
Facsimile: (650) 565-7100

NITIN REDDY (SBN 229451)
nreddy@sidley.com
TASHICA T. WILLIAMS (SBN 256449)
ttwilliams@sidley.com
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

***Counsel for Plaintiff Conceptus, Inc.***

15

CONCEPTUS' MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 09-CV-02280-WHA