1   **ARNOLD & PORTER LLP**
    MATTHEW M. WOLF (*pro hac vice*)
2   matthew.wolf@aporter.com
    JOHN E. NILSSON (*pro hac vice*)
3   john.nilsson@aporter.com
    SARA P. ZOGG (*pro hac vice*)
4   sara.zogg@aporter.com
    555 Twelfth Street, NW
5   Washington, DC 20004
    Telephone:     202-942-5000
6   Facsimile:     202-952-5999

7   JENNIFER A. SKLENAR (SBN 200434)
    jennifer.sklenar@aporter.com
8   NICHOLAS H. LEE (SBN 259588)
    nicholas.lee@aporter.com
9   777 South Figueroa Street, 44th Floor
    Los Angeles, CA  90071
10  Telephone:     213-243-4000
    Facsimile:     213-243-4199

11
    MICHAEL A. BERTA (SBN 194650)
12  michael.berta@aporter.com
    One Embarcadero Center, 22nd Floor
13  San Francisco, CA  94111-3711
    Telephone:     415-356-3000
14  Facsimile:     415-356-3099

15  Attorneys for Defendant
    HOLOGIC, INC.

16
                    UNITED STATES DISTRICT COURT
17
                  NORTHERN DISTRICT OF CALIFORNIA
18
                      SAN FRANCISCO DIVISION
19
    CONCEPTUS, INC.,                          Case No.  09-cv-02280 WHA
20
                        Plaintiff,            **HOLOGIC, INC.'S OPPOSITION TO**
21                                            **CONCEPTUS' MOTION FOR**
            v.                                **PERMANENT INJUNCTION AND**
22                                            **MOTION TO ALTER OR AMEND THE**
    HOLOGIC, INC.,                            **JUDGMENT, OR, ALTENRNATIVELY,**
23                                            **HOLOGIC'S REQUEST TO STAY AN**
                        Defendant.            **INJUNCTION PENDING APPEAL**
24
                                              Hearing Date: December 22, 2011
25                                            Time:       8:00 a.m.
                                              Courtroom:  8; 19th Floor
26                                            Judge:      Hon. William Alsup

27

28

    Hologic Opp. To Permanent Injunction Mot.
    Case No. 09-cv-02280-WHA

# TABLE OF CONTENTS

I.      Introduction ..................................................................................................... 1

II.     The Court Should Deny Conceptus' Motion For A Permanent Injunction ................................. 2

        A.      Conceptus Has Not Proven It Will Be Irreparably Harmed Absent An Injunction ......... 4

                1.      There Is No Question As To Whether A Monetary Award Can Be Enforced
                        And Satisfied ................................................................................ 4

                2.      Conceptus Cannot Point To Price Erosion Or Loss of Ancillary Sales As
                        Irreparable Harm ........................................................................... 6

                3.      Conceptus' Declining Sales Growth And Lessened Market Share Does Not
                        Justify An Injunction ...................................................................... 7

                4.      Direct Competition Between Hologic And Conceptus Does Not Justify A
                        Permanent Injunction ...................................................................... 8

        B.      Money Damages Are An Adequate Remedy At Law ........................................... 9

        C.      The Balance Of The Hardships Weighs Against Enjoining Sales Of Adiana ............... 10

        D.      The Public Interest Strongly Weighs Against An Injunction Taking Adiana Off The
                Market ............................................................................................... 12

                1.      Adiana Offers Important Advantages Over Essure To Women And
                        Physicians ................................................................................... 12

                2.      Conceptus' Assertions As To The Availability Of Alternate Form Of Birth
                        Control Contradict Its Arguments At Trial ............................................ 14

III.    Alternatively, The Court Should Stay The Injunction ..................................................... 15

        A.      There Is A Likelihood That Hologic Will Succeed On Appeal ................................ 16

                1.      Claim Construction ........................................................................ 16

                        a.      "lumen-traversing region of the resilient structure" .............................. 17

                        b.      "permanently affixing . . . *with* a lumen-traversing region ..................... 17

                        c.      Whether claim 36 requires a contraceptive method during
                                performance of each of its limitations ............................................. 18

                2.      Other Potential Issues On Appeal Also Weigh In Favor Of A Stay ................. 19

                        a.      Enablement ................................................................................ 19

                        b.      Indirect Infringement .................................................................... 20

c.      Hologic's Daubert Challenge To Conceptus' Technical Expert ............ 20

B.      Hologic Will Be Harmed Absent A Stay ..................................................... 21

IV.    Conceptus Is Not Entitled To the Supplemental Damages and Interest it Requests .................. 22

A.      Conceptus Cannot Recover Pre-Verdict Supplemental Damages ................................. 22

B.      Conceptus Cannot Recover More Than $418.79 Per Adiana Sale ................................ 22

C.      Conceptus' Request For Pre-Judgment Interest Is Excessive ....................................... 23

D.      Conceptus' Request For Post-Judgment Interest Exceeds The Statutory Rate ............. 25

V.     Conclusion ................................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Advanced Cardiovascular Systems, Inc. v. Medtronic,*
    579 F.Supp.2d 554 (D. Del. 2008) ........................................................................... 8

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.,*
    No. C95-03577-DLJ, 2008 WL 4647384 (N.D. Cal. Oct. 20, 2008) ................................ 9, 12

*Am. Cyanamid Co. v. U.S. Surgical Corp.,*
    833 F. Supp. 92 (D. Conn. 1992) ............................................................................ 14

*Atlanta Attachment Co. v. Leggett & Platt,*
    No. 1:05-CV-1071-ODE, 2007 WL 5011980 (N.D. Ga. Feb. 23, 2007) ............................ 6

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.,*
    No. CV-03-0597, 2009 U.S. Dist. LEXIS 31328 (D. Ariz. Mar. 31, 2009) .................... 3, 8, 12

*Bendix Comm. Vehicle, Sys., LLC v. Haldex Brake Prods. Corp.,*
    No. 1:09 CV 176, 2011 WL 780782 (N.D. Ohio Mar. 1, 2011) ................................... 23

*Bionx Implants, Inc. v. Innovasive Devices, Inc.,*
    45 F. Supp. 2d 75 (D. Mass. 1999) ........................................................................ 13

*Bosch LLC v. Pylon Mfg. Co.,*
    659 F.3d 1142 (Fed. Cir. 2011) ......................................................................... 3, 5, 6

*Brooktrout, Inc. v. Eicon Networks Corp.,*
    No. 2:03-CV-59, 2007 WL 1730112 (E. D. Tex. Jun. 14, 2007) ................................. 9

*Cal. Pharmacists Ass'n v. Maxwell–Jolly,*
    563 F.3d 847 (9th Cir. 2009) ................................................................................ 4

*Cal. v. U.S. Dept. of Agriculture,*
    575 F.3d 999 (9th Cir. 2011) ................................................................................ 4

*Canon, Inc. v. GCC Int'l Ltd.,*
    No. 2006-1615, 2008 WL 213883 (Fed. Cir. Jan. 25, 2008) .................................... 5, 6

*Cargill, Inc. v. Sears Petroleum & Transport Corp.,*
    2004 WL 3507329 (N.D.N.Y. 2004) ..................................................................... 16

*Cordis Corp. v. Boston Scientific Corp.,*
    No. 03-027-SLR, 2003 WL 22843072 (D. Del. Nov. 21, 2003) ................................. 12

*Datascope Corp. v. Kontron, Inc.,*
    786 F.2d 398 (Fed. Cir. 1986) ......................................................................... 14, 24

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ......................................................................................... 20

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,*
    835 F.2d 277 (Fed. Cir. 1987) ............................................................................. 15

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ........................................................................................ 1, 2, 3, 10

*ePlus, Inc. v. Lawson Software, Inc.*,
    No. 3:09cv620, 2011 WL 2119410 (E.D. Va. May 23, 2011) ...................................... 6

*Extreme Networks, Inc. v. Enterasys Networks, Inc.*,
    No. 2007-cv-229, 2009 WL 679602 (W.D. Wis. Mar. 16, 2009)............................... 21

*Go Med. Indus., Ltd. v. Inmed Corp.*,
    472 F.3d 1264 (Fed. Cir. 2006)................................................................................ 23

*Gyromat Corp. v. Champion Spark Plug Co.*,
    735 F.2d 549 (Fed. Cir. 1984) ................................................................................. 24

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008)......................................................................... 17, 19

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ................................................................................................ 15

*i4i L.P. v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ................................................................................... 8

*In re Hayes Microcomputer Prods., Inc. Patent Litig.*,
    766 F.Supp. 818 (N.D. Cal. 1991) .......................................................................... 15

*Intamin, Ltd. V. Magnetar Techs. Corp.*,
    623 F. Supp. 2d 1055 (C.D. Cal. 2009) .................................................................. 19

*Intex Plastic Sales Co. v. Hall*,
    No. C-85-2987, 1991 WL 270167 (N.D. Cal. Jul. 10, 1991) ................................... 24

*Laitram Corp. v. NEC Corp.*,
    115 F.3d 947 (Fed. Cir. 1997) ................................................................................. 24

*Lisle Corp. v. A.J. Mfg. Co.*,
    No. 02 C 7024, 2004 U.S. Dist. LEXIS 6024 (N.D.Ill. Apr. 6, 2004) ...................... 16

*Mars Inc. v. Coin Acceptors, Inc.*,
    513 F.Supp.2d 128 (D.N.J. 2007) ........................................................................... 24

*Martek Biosciences Corp. v. Nutrinova Inc.*,
    520 F. Supp. 2d 537 (D. Del. 2007) .......................................................................... 3

*Michilin Prosperity Co. v. Fellowes Mfg. Co.*,
    450 F. Supp. 2d 35 (D.D.C. 2006) .......................................................................... 19

*Nelson v. NASA*,
    530 F.3d 865 (9th Cir. 2008) ..................................................................................... 4

*Novozymes A/S v. Genencor Intern., Inc.*,
    474 F. Supp. 2d 592 (D. Del. 2007) .......................................................................... 3

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    No. 2-04-CV-32-TJW, 2007 WL 869576 (E.D. Tex. Mar. 21, 2007) ......................... 5

*Oscar Mayer Foods Corp. v. Conagra, Inc.*,
  869 F. Supp. 656 (W.D. Wis. 1994).................................................................22, 23

*Paice LLC v. Toyota Motor Corp.*,
  No. 2:04-CV-211-DF, 2006 U.S. Dist. LEXIS 61600 (E.D. Tex. Aug. 16,
  2006)..................................................................................................4, 9, 10

*Pfizer Inc. v. Ranbaxy Labs. Ltd.*,
  457 F.3d 1284 (Fed. Cir. 2006)...............................................................19

*Praxair, Inc. v. ATMI, Inc.*,
  479 F. Supp. 2d 440 (D. Del. 2007)...........................................................8

*Presidio Components Inc. v. Am. Tech. Ceramics Corp.*,
  No. 08-CV0335, 2010 WL 3070370 (S.D. Cal. Aug. 5, 2010)...............................22

*Presidio Components Inc. v. Am. Tech. Ceramics Corp.*,
  723 F.Supp.2d 1284 (S.D. Cal. 2010) ........................................................9

*Reebok Int'l, Ltd. v. J. Baker, Inc.*,
  32 F.3d 1552 (Fed. Cir. 1994) ..................................................................3

*Respironics, Inc. v. Invacare Corp.*,
  No. 04-0336, 2008 U.S. Dist. LEXIS 1174 (W.D. Pa. Jan. 7, 2008).........................12

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
  897 F.2d 511 (Fed.Cir.1990) ..................................................................15

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
  862 F.2d 1563 (Fed. Cir. 1988)................................................................23

*Transamerica Life Ins. v. Lincoln Nat. Life Ins.*,
  625 F. Supp. 2d 702 (D. Iowa 2009)............................................................3

*TruePosition Inc. v. Andrew Corp.*,
  568 F. Supp. 2d 500 (D. Del. 2008) ............................................................9

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ............................................................................2

**STATUTES**

28 U.S.C. § 1961(a) ...............................................................................25

**RULES**

Fed. R. Civ. P. 62..................................................................................15

**REGULATIONS**

MPEP 608.01(n) ...................................................................................19

1    Defendant Hologic, Inc. ("Hologic") submits this memorandum in opposition to Conceptus'

2    Motion For Permanent Injunction And Motion To Alter Or Amend The Judgment To Award

3    Supplemental Lost Profits And Pre- And Post-Judgment Interest.

4    **I.    INTRODUCTION**

5         As this Court recognized during the *Markman* process, the '361 patent has little "plain

6    wording." (Dkt. No. 217 at 103-05.) Its claims are rife with "tricky language" and "multiple

7    meanings," all of which "made it very hard for ordinary mortals" to interpret them. (*Id.*) Inevitably,

8    the parties – as well as the Court – struggled with the meaning of language such as "lumen-traversing

9    region of the resilient structure" and "permanently affixing . . . *with* a lumen-traversing region." On

10   appeal, the Federal Circuit will also be forced to struggle with that claim language. If it agrees with

11   Hologic as to the language's meaning, then the jury's verdict of infringement must be reversed, and

12   any request for an injunction will be moot (at least until any second trial). Nonetheless, Conceptus

13   urges the Court to issue a broad and immediate injunction against all U.S. sales of Hologic's Adiana

14   system. Its motivation in so doing is clear. Conceptus fully realizes that the viability of the jury's

15   verdict turns on the resolution of the sort of close legal issues noted by the Court. Conceptus thus

16   hopes to obtain a monopoly in the hysteroscopic sterilization market for as long as possible before

17   those issues are resolved.

18        The Court should resist Conceptus' entreaty, at least until the legal issues in dispute are heard

19   by the Federal Circuit. An injunction is an extraordinary remedy in a patent case just as it is in any

20   other civil action. *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). To justify it, the

21   plaintiff must demonstrate that it would suffer irreparable harm without imposition of equitable

22   sanctions in addition to monetary ones. Conceptus has not met, and cannot meet, this burden. Its harm

23   is purely pecuniary and may be redressed by an ongoing royalty for the three-year span left in the

24   patent's term (or, at a minimum, during pendency of the forthcoming appeal). Indeed, the royalty rate

25   urged by Conceptus at trial would provide it a windfall, making sales of Hologic's Adiana far more

26   profitable to it than sales of its own Essure. Even if Conceptus could show irreparable harm (which it

27   cannot), the balance of hardships between the parties, ███████████████████████ and the

28   public's interest in being able to use an alternative, non-metallic hysteroscopic sterilization technology

Hologic Opp. To Permanent Injunction Mot.        -1-
Case No. 09-cv-02280-WHA

1   clearly weigh against the injunction Conceptus seeks.  Hologic thus asks that the Court deny

2   Conceptus' request for a permanent injunction banning all U.S. sales of Adiana, and instead impose a

3   reasonable royalty on Adiana sales.

4        Conceptus' demands for supplemental damages and post-judgment interest are similarly

5   overreaching.  Conceptus never supplemented its past damages calculations during the pre-trial period

6   and should be precluded from doing so now.  Even if Conceptus' request were justified, its calculations

7   are not.  Indeed, the supplemental damages sought by Conceptus are ***double*** the amount that Conceptus

8   is entitled to recover.  Its post-judgment interest request is similarly flawed, applying the wrong

9   interest rate and a faulty methodology.  For these reasons, which are explained in more detail below,

10  Conceptus' request for a permanent injunction should be denied or – at a minimum – stayed, and its

11  requests for supplemental damages and pre- and post-judgment should be denied.

12  **II.    THE COURT SHOULD DENY CONCEPTUS' MOTION FOR A PERMANENT
        INJUNCTION**

13        Permanent injunctive relief is an equitable remedy reserved for extraordinary circumstances.

14  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[C]ourts of equity should pay

15  particular regard to the public consequences in employing the extraordinary remedy of injunction.").

16  To justify the injunction it seeks, Conceptus bears the burden of showing:  (1) that it has suffered

17  irreparable injury; (2) that the money damages awarded or other remedies at law are inadequate to

18  compensate for that irreparable injury; (3) the balance of the hardships between it and Hologic warrant

19  an equitable remedy; and (4) that the public interest would not be disserved by a permanent injunction.

20  *See eBay*, 547 U.S. at 391.

21        Conceptus appears to be taking the implicit position that – because the jury found claims 37

22  and 38 infringed – its "right to exclude" under the patent laws gives rise to irreparable harm and an

23  immediate injunction.  Although this might have been the case years ago, the Supreme Court made

24  clear in *eBay* that the injunction analysis in patent infringement actions is the same as the equitable

25  analysis that takes place in all other civil contexts:

26        [T]he decision whether to grant or deny injunctive relief rests within the equitable
        discretion of the district courts, and … such discretion must be exercised consistent with
27        traditional principles of equity, in patent disputes no less than in other cases governed by
        such standards.

28

1   *eBay*, 547 U.S. at 394.  The Supreme Court thus "jettisoned the presumption of irreparable harm as it

2   applies to determining the appropriateness of injunctive relief."  *Bosch LLC v. Pylon Mfg. Co.*, 659

3   F.3d 1142, 1149 (Fed. Cir. 2011).

4       At least some of the authority cited by Conceptus in support of its request for a broad

5   permanent injunction was decided prior to *eBay*.  *See Reebok Int'l, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552,

6   1556 (Fed. Cir. 1994) (asserting that, in the context of a preliminary injunction analysis, "[a] strong

7   showing of likelihood of success on the merits coupled with continuing infringement raises a

8   presumption of irreparable harm to the patentee").  Other district court cases cited by Conceptus, while

9   decided after *eBay*, appear to ignore its instruction that an injunction does not necessarily, or even

10  presumptively, follow from a finding of infringement.  For instance, in *Novozymes A/S v. Genencor*

11  *Intern., Inc.*, 474 F. Supp. 2d 592 (D. Del. 2007), the district court read *eBay* to have "simply rejected

12  the proposition that the patentee's right to exclude *should always lead to injunctive relief* for patent

13  infringement."  *Id.* at 612-13 (emphasis added).  In point of fact, the *eBay* court rejected the

14  proposition that "the patentee's right to exclude" *even presumptively leads* to injunctive relief.  Thus,

15  the *Novozymes* court's finding that the violation of the patentee's right to exclude itself presupposes

16  "irreparable harm" is at odds with *eBay*.  *See id.* ("[T]he statutory right to exclude represents a benefit

17  that, under these circumstances, cannot be equated by an award of cash.").[1]  Such reasoning (which

18  underlies Conceptus' motion) is equally inconsistent with the sort of careful and scrupulous inquiry

19  that courts sitting in equity must undertake before issuing injunctions.  *See Bard Peripheral Vascular,*

20  *Inc. v. W.L. Gore & Assocs., Inc.*, No. CV-03-0597, 2009 U.S. Dist. LEXIS 31328, at *17 (D. Ariz.

21  Mar. 31, 2009) ("[T]he ease and frequency with which trial courts have historically granted injunctions

22  in patent cases was often at odds with traditional principles of equity, which has long held that

23  injunctive relief is an 'extraordinary' remedy.").

24  _____

25  [1] Other district court cases cited by Conceptus appear to make the same error.  *See Transamerica Life Ins. v. Lincoln Nat. Life Ins.*, 625 F. Supp. 2d 702, 719 (D. Iowa 2009) ("Lincoln has not been, and cannot be, adequately compensated for such future infringement, because it cannot be adequately

26  compensated for the loss of the right to exclude a competitor from using the claimed method."), *rev'd*, 609 F.3d 1364 (Fed. Cir. 2010); *Martek Biosciences Corp. v. Nutrinova Inc.*, 520 F. Supp. 2d 537, 558

27  (D. Del. 2007) ("The court first concludes that Martek has suffered irreparable harm because of Lonz's infringement of Martek's right to exclude others from practicing the '594 and '281 patents."), *vacated*

28  *in part*, 579 F.3d 1363 (Fed. Cir. 2009).

**A.      Conceptus Has Not Proven It Will Be Irreparably Harmed Absent An Injunction**

Cases outside the patent infringement context provide insight into the nature of "irreparable harm" – as opposed to harm that may be redressed by legal remedies.  For instance, because it can be permanent and irremediable, environmental injury may give rise to "irreparable harm."  As the Ninth Circuit Court of Appeals has explained, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often *permanent or at least of long duration, i.e., irreparable.*"  *Cal. v. U.S. Dept. of Agriculture*, 575 F.3d 999, 1020 (9th Cir. 2011) (emphasis added).  Similarly, constitutional violations may also constitute "irreparable harm."  *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm.").  Here, in contrast, the harm to Conceptus is purely economic.  As a consequence, it simply cannot be said to be "irreparable."  *Cal. Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) ("economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award."); *see also Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF, 2006 U.S. Dist. LEXIS 61600, at *16 (E.D. Tex. Aug. 16, 2006) ("Irreparable harm lies only where injury cannot be undone by monetary damages."), *rev'd on other grounds*, 504 F.3d 1293 (Fed. Cir. 2007).

In pressing for a broad injunction, Conceptus effectively argues that an injunction should inevitably ensue when the patentee and the defendant compete directly, especially in a narrow market.  This argument runs afoul of the explicit reasoning of many of the cases on which Conceptus relies and ignores important facts in others – facts that are not present here.  A fair reading of the case law leads to the conclusion that, while the equities may weigh in favor of a finding of irreparable harm in certain other contexts, they do not do so here.

**1.      There Is No Question As To Whether A Monetary Award Can Be Enforced And Satisfied**

Cases on which Conceptus relies suggest that there may be "irreparable harm" in instances where a monetary award cannot be enforced or satisfied.  For instance, in *Canon*, the Federal Circuit pointed out that "Defendants' business operations are geographically 'far-flung,' making the

1    enforcement of a money judgment 'exceedingly difficult.'"  *Canon, Inc. v. GCC Int'l Ltd.*, No. 2006-

2    1615, 2008 WL 213883, at *4 (Fed. Cir. Jan. 25, 2008).  Similarly, in *O2 Micro*, the court noted that

3    "all three defendants are foreign corporations and that there is little assurance that it could collect

4    monetary damages."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, No. 2-04-CV-32-TJW, 2007

5    WL 869576, at *2 (E.D. Tex. Mar. 21, 2007).  There is no similar concern here.

6         Nor is there any issue as to whether Hologic can satisfy the judgment.  Indeed, Conceptus does

7    not even suggest that it has concerns as to whether a monetary award could be satisfied.  In contrast, in

8    *Bosch*, this concern was central to the conclusion of irreparable harm.  *Bosch*, 659 F.3d at 1151 (citing

9    Pylon's lack of financial wherewithal to satisfy a judgment); *see also id.* at 1154 ("As additional

10   evidence of irreparable harm, Bosch introduced evidence showing that the financial condition of both

11   Pylon and its corporate parent raised questions about Pylon's ability to satisfy a judgment.").  The

12   defendant's lack of resources also figured prominently in the *Bosch* court's conclusion that money

13   damages would not be adequate to compensate the patentee:

14        More importantly, the questionable financial condition of both Pylon and its parent
          company reinforces the inadequacy of a remedy at law.  A district court should assess

15        whether a damage remedy is a meaningful one in light of the financial condition of the
          infringer before the alternative of money damages can be deemed adequate. While

16        competitive harms theoretically can be offset by monetary payments in certain
          circumstances, the likely availability of those monetary payments helps define the

17        circumstances in which this is so.

18   *Id.* at 1155-56.  In fact, there was evidence that the defendant could not even pay its *past damages*:

19   "the only evidence of record is that Pylon likely will be faced with a substantial damages award for its

20   past infringement and may be unable to pay even that."  *Id.* at 1156.  This was also a prime concern in

21   *Canon*:  "[T]o the extent that money damages against Defendants were awarded, there appears to be a

22   reasonable basis for the district court's finding that there would be little probability that Canon could

23   affect the collection of a money judgment."  *Canon*, 2008 WL 213883, at *4.

24        These dilemmas, which undermined the adequacy of damages in the cases cited by Conceptus,

25   simply do not exist here.  As Conceptus repeatedly argued at trial, Hologic is large and well-funded:

26   •    "And the defendant here is Hologic.  A global company with many products,
          including the product Adiana."  (Tr. at 146:20-22.)

27   •    "Adiana was bought by CyTyc, which was a pretty good-sized company in GYN
          medicine.  And then before the year was over, CyTyc was acquired by Hologic, a

28        huge company in women's health."  (Tr. at 420:15-20.)

1

• "Everybody was concerned with this idea that even though our technology might
have been better – in our minds, it was definitely better – and all of a sudden we're
going to lose market share to a big company." (Tr. at 689:13-16.)

2

3   While Hologic's resources surely played into Conceptus' "David versus Goliath" arguments to the

4   jury, the case law relied upon by Conceptus demonstrates those resources also eliminate a primary

5   concern militating in favor of an injunction.

6               **2.   Conceptus Cannot Point To Price Erosion Or Loss of
                       Ancillary Sales As Irreparable Harm**

7

8          In the cases cited by Conceptus there was also clear evidence that an ongoing royalty for sales

9   of the infringing product could not fully redress the economic harm suffered by the patentee.  In

10  *Canon*, for example, the Federal Circuit emphasized that the defendant was undercutting the patentee

11  in the market, leading to price erosion losses on sales of its own product.  *Canon*, 2008 WL 213883 at

12  *4 ("As the trial court found, competition from Defendants will likely result in substantial price

13  erosion of Canon's patented product as well as loss of Canon's market share."); *see also Bosch*, 659

14  F.3d at 1153 ("Bosch argues that the harm caused by this competition is irreparable because it has

15  suffered irreversible price erosion, loss of market share, loss of customers, and loss of access to

16  potential customers."); *Atlanta Attachment Co. v. Leggett & Platt*, No. 1:05-CV-1071-ODE, 2007 WL

17  5011980, at *6 (N.D. Ga. Feb. 23, 2007) ("AAC has presented evidence of price erosion").

18         Similarly, in *ePlus* (on which Conceptus also relies, Dkt. No. 498 at 3), the district court

19  emphasized that sales of the patentee's patented products led to ancillary sales of more revenue-

20  producing products and that the loss of those ancillary sales constituted irreparable harm.  *See ePlus,

21  Inc. v. Lawson Software, Inc.*, No. 3:09cv620, 2011 WL 2119410, at *11 (E.D. Va. May 23, 2011)

22  ("The record shows that ePlus derives the majority of its revenue from its VAR business, and Procure

23  and Content provide ePlus with opportunities to cross-sell and up-sell its VAR products to customers

24  of Procure and Content.").  Here, Adiana's price point does not undercut that of Essure. (Tr. 775:8-12

25  (Essure average selling price $1296); Zogg Decl., Ex. 3 at 1 (Adiana average selling price $1276), filed

26  herewith.)  Moreover, Conceptus sells only Essure.  Thus, there are no ancillary sales losses to militate

27  in favor of a finding of irreparable harm.

28

### 3.   Conceptus' Declining Sales Growth And Lessened Market Share Does Not Justify An Injunction

Conceptus' real injury is its claimed loss of sales and hence of market share.  As a factual matter, testimony of Conceptus' own witnesses demonstrates that its complaints against Hologic continue to be highly overstated.  Mr. Cote acknowledged that it was the recession, not Hologic, that began to slow the company's sales growth:  "Q. What was causing the actual sales growth of Essure after to slow?  A. 2008?  I think most of us can accept was the beginning of probably the worst economic recession that's hit."  (Tr. 713:12-15.)[2]  Conceptus' marketing documents attest to the steady decline in sales beginning in late 2007 *before* the launch of Adiana in July of 2009.  (TX 183 at 337.) Conceptus' documents also point to a host of causes separate from Adiana (above and beyond the recession).  For instance, physicians were not promoting Essure.  (TX 821 ("Physicians, for the most part, have not taken on a proactive role in promoting Essure to their patients.").)  Patients were reluctant to make the irrevocable decision to implant Essure.  (*Id*. ("Patient demand per doctor is low, most likely due to the emotional magnitude of the decision (nonreversible) and the other consumer options that allow the permanent birth control decision to be put off.").)  And patients were concerned about having Essure's metal coils left in their fallopian tubes.  (TX 635; TX 641; Tr. 699:23-701:24, 702:12-703:6, 1214:10-18, 1215:6-16; Zogg Decl., Ex. 2 at 76:7-15, 78:19-25, 79:19-21, 90:24-91:1.)

Moreover, Conceptus' in-court narrative of irreparable financial harm caused by Adiana simply does not jibe with its out-of-court pronouncements.  Mr. Sieczkarek admitted that his company continued to exceed expectations even after Adiana's launch:  "Q. So you exceeded your expectations after Adiana's launch, correct?  A. Yes.  We did."  (Tr. at 1204:19-21.)  Thus, in a 2009 statement to investors, the company announced its "pleas[-ure] to have exceeded our earnings guidance for the first quarter of 2010."  (TX 670.)  There is no mention whatsoever of financial harm caused by, or sales lost to Adiana.  Indeed, even recently, the Company announced that it had again exceeded its estimates, without ever mentioning Hologic or Adiana.  (Zogg Decl., Ex. 1.)  The plain truth is that Conceptus has never indicated that competition from Hologic had forced the sort of "change of business strategy"

---

[2] Ms. Tunstall acknowledged that, prior to the recession, Conceptus boasted a market share of close to $700 million.  (Tr. 444:22-25.)

1    that courts have considered "irreparable harm." *See i4i L.P. v. Microsoft Corp.*, 598 F.3d 831, 862

2    (Fed. Cir. 2010) ("The district court found that Microsoft captured 80% of the custom XML market

3    with its infringing Word products, forcing i4i to change its business strategy."). It defies history, logic

4    and Conceptus' responsibilities to its shareholders for Conceptus to claim now that it was in fact

5    suffering "irreparable harm" throughout this period.[3]

### 4.    Direct Competition Between Hologic And Conceptus Does Not Justify A Permanent Injunction

6

7            At base, Conceptus' argument appears to be that a patentee in "direct competition" with the

8    defendant inevitably suffers irreparable harm absent a permanent injunction.[4] This simply is not the

9    law. Courts have frequently refused to enter a permanent injunction, even where the patentee and

10   defendant are in direct competition. *Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440 (D. Del. 2007)

11   provides a case in point. There, the court noted that the patentee's product was "in direct and head-to-

12   head competition" with the defendant's product and that the products were the only ones on the

13   market. *Id.* at 442. Nonetheless, the court concluded that "[the patentee] has not demonstrated that it

14   is entitled, at this time, to the broad scope of injunctive relief it has requested." *Id.* at 444. In so doing,

15   the court noted that "[the patentee's] desire to become a monopoly supplier in its product's market is

16   hardly unique, and is not conclusive evidence of any factor." *Id.* Other post-*eBay* cases confirm that

17   direct competition between the patentee and the defendant does not in and of itself justify an

18   injunction. *See Bard*, 2009 U.S. Dist. LEXIS 31328 at *17-20 (declining to grant injunction despite

19   fact that accused products were ones "for which [the patentee] sells an alternative, nearly identical

20   counterpart"); *Advanced Cardiovascular Systems, Inc. v. Medtronic*, 579 F. Supp. 2d 554, 558-59 (D.

21   Del. 2008) (denying injunction despite the fact that "ACS and Medtronic compete directly in both

22

23   _____

24   [3] Conceptus' damages expert, Cate Elsten, admitted that, based on her own estimates, almost 40 percent of the sales locations to which Hologic sold Adiana did not even buy Essure (and, thus,

25   because they were untrained on the device, could not buy it). (Tr. 802:6-9.)

26   [4] As a threshold matter, Conceptus now acknowledges that it competes with other forms of permanent contraception such as tubal ligation. (Dkt. No. 498 at 17.) Conceptus cannot, on the one hand, insist that it competes with other technologies besides Adiana (providing alternatives beyond Essure to

27   Adiana consumers) in arguing that enjoining Adiana sales would have no impact on the public health and, on the other, insist that it competes only with Hologic for purposes of the "irreparable harm" and

28   patent damages inquiries.

1  markets"); *Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*, No. C95-03577, 2008 WL

2  4647384 (N.D. Cal. Oct. 20, 2008) (denying injunction despite direct competition between parties).[5]

3  **B.   Money Damages Are An Adequate Remedy At Law**

4      The real question that Conceptus fails to address is why royalty payments for sales of Adiana

5  are not an adequate remedy to compensate for its financial harm.  In contrast to cases cited by

6  Conceptus (Dkt. No. 498 at 3-4), there is no dilemma in calculating such royalty payments here.  *Cf.*

7  *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 532 (D. Del. 2008) ("the value of defendant's

8  continued infringement (phases 3, 4, and 5) is unknown"); *Brooktrout, Inc. v. Eicon Networks Corp.*,

9  No. 2:03-CV-59, 2007 WL 1730112, at *2 (E. D. Tex. Jun. 14, 2007) ("The inability to calculate the

10  plaintiff's future loss with reasonable precision makes legal remedies inadequate in this case.").

11  Indeed, Conceptus has already put forward evidence of what it considers to be a reasonable royalty rate

12  (20% of revenues from sales of Adiana).  It is hardly inequitable to impose this exorbitant royalty rate

13  rather than ban sales of Adiana entirely.  Only three and one-half years remain in the patent's term.

14  Yet, applying Conceptus' 20% royalty to likely sales of Adiana would (based on Conceptus'

15  calculations) net Conceptus over $76 million in royalty payments over that short span.  (Tr. 810:22-

16  812:11.)  This is above and beyond the $18 million damages award at trial.

17      Conceptus' financial results for 2009 demonstrate how such royalty payments actually

18  represent a windfall to the company.  For the year ending December 31, 2009 (Conceptus' best year

19  ever), Conceptus had net income of just under $8 million on sales of $131.4 million – under 6% of

20  revenue generated from sales.  (TX 593 at CE000298; *see also* Zogg Decl., Ex. 1.)  With an ongoing

21  royalty payment of 20% of Adiana revenues, Conceptus would earn three times more from every

22  Adiana sale than from a sale of Essure.  Indeed, if the $131 million in sales revenue in 2009 were for

23  sales of Adiana rather than Essure, Conceptus would have earned over $26 million.  Applying an

24  ongoing royalty is clearly more than fair.  *Paice*, 2006 U.S. Dist. LEXIS 61600 at *16 (damages in

25  accordance with reasonable royalty set by jury will remedy losses from sales of infringing products).

26

27  [5] Conceptus also cites its unwillingness to date to license the '361 patent, a fact that does not justify an
injunction.  *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, 723 F. Supp. 2d 1284, 1337 (S.D.

28  Cal. 2010) ("Presidio's unwillingness to license … does not change the Court's determination.").

**C.    The Balance Of The Hardships Weighs Against Enjoining Sales Of Adiana**

Even if the issue of irreparable harm were a close one, the balance of hardships inquiry is not. A comparison of the relative hardships should an injunction be entered weighs heavily in favor of Hologic.[6]  As explained in the supporting declaration of Shacey Petrovic, ███████████████ ████████████████████████████████████████ (Petrovic Decl. ¶¶ 11-12, filed herewith.)  In addition, Hologic's considerable investment in Adiana (valued in 2007 at approximately $215 million) would be utterly nullified and its reputation with customers damaged.  (*Id.* ¶¶ 13-16.) These are precisely the sorts of hardships that courts elsewhere have found dispositive in deciding against the sort of broad injunction requested by Conceptus.  *See Paice*, 2006 U.S. Dist. LEXIS 61600 at *16 ("Court finds that the hardships balance against enjoining Defendants . . . [E]njoining [] sales will likely interrupt not only Defendants' business but that of related businesses, such as dealers and suppliers.  The burgeoning hybrid market could also be stifled as the research and expense of bringing its product line to market would be frustrated.  And the Court finds that enjoining Defendants will damage their reputation.").

Conceptus dismisses these hardships, insisting that they are all of Hologic's own making.  (Dkt. No. 498 at 10-11.)  In so doing, Conceptus attempts to portray Hologic as a knowing and willful infringer of claims 37 and 38.  Nonetheless, there was absolutely no evidence at trial of knowing infringement on the part of either the Adiana developers or, later, Hologic.  It is undisputed that the engineers at Adiana, Inc., began independent development of the Adiana product well before the '361 patent application issued in October of 2003.  (Tr. 864:9-867:6, 884:15-19, 889:19-890:5.)  There is no allegation or evidence that Adiana copied Conceptus' product or its designs.  Nor is there any factual support for Conceptus' claim that Hologic knowingly acquired and began selling the Adiana product line in violation of Conceptus' patent right.  (*See* Dkt. No. 494 at Part II.)  Conceptus' only purported evidence in support of this claim consists of the "notice letters regarding Conceptus' intellectual property" and an "indemnification agreement with Adiana shareholders."  (Dkt. No. 498 at 10.) However, the notice letters introduced at trial identified three patents containing more than 130 claims

---

[6] A district court has considerable discretion in assessing the relative hardships in determining whether to issue an injunction.  *eBay*, 547 U.S. at 393-94.

among them.  (Tr. 937:17-938:19; TX 43; TX 756; TX 765; TX 38; TX 206.)  Two of the three patents identified in the notice letters were never asserted against Hologic, and the letters never accused the Adiana technology of infringing claims 37 and 38 of the '361 patent.  (*See* TX 43; TX 756; TX 765.)  Moreover, Adiana, Cytyc and Hologic all received advice of counsel and proceeded with the good faith belief that the Adiana system did not infringe any valid claim of the '361 patent.  (Tr. 938:20-941:4; TX 744; Tr. 1032:11-1033:14; TX 750; TX 748; TX 749; Tr. 1089:19-1090:25, 1094:6-13.)

The truth of the matter is that neither claims 37 or 38 specifically nor the '361 patent generally were ever featured before this litigation got underway.  Indeed, when Conceptus moved for a preliminary injunction, it still failed to single out claims 37 and 38 or even the '361 patent.  Instead, it chose to move on three others patents, ultimately selecting a claim as to which the Court found multiple deficiencies precluding a likelihood of success on the merits.  (Dkt. No. 131 at 3-8.)  Only after the dismissal of the three patents asserted in its preliminary injunction motion did Conceptus focus the Court's (and Hologic's) attention on claims 37 and 38 of the '361 patent.  (Dkt. No. 141.)

In short, even if there were infringement it was not the sort of knowing infringement that would justify the sanction sought by Conceptus.  Indeed, this Court has already concluded that there was no willful infringement of claims 37 and 38.  The Court's ruling refutes Conceptus' characterization of Hologic as a knowing infringer:

> The record is that the defendant was innocent of any infringement prior to the complaint, and that's because of the safe harbor, and for public policy reasons Congress has decided that the type of conduct they engaged in is to be encouraged for the public interest.  And so the only possible conduct that could lead to willfulness is post-filing conduct.  Meaning after the complaint was filed.  And there this statement from *Seagate Technology* counsels extremely strongly against willfulness damages in this case, enhanced damages.  And in general, the record would not support it anyway.

(Tr. 1412:25-1413:11.)

The real crux of Conceptus' "balance of hardships" argument is that the hardships to a company of Hologic's size are inherently less significant than those endured by a smaller company.  As already explained, however, Conceptus' hardships may be redressed by remedies short of the permanent injunction it seeks.  Moreover, the different sizes of the parties alone cannot justify a permanent injunction.  *See Respironics, Inc. v. Invacare Corp.*, No. 04-0336, 2008 U.S. Dist. LEXIS

1   1174, at *16 (W.D. Pa. Jan. 7, 2008) ("The allegedly divergent size of the parties does not justify

2   permanent injunctive relief in this case.").   The hardships to Hologic and its employees if an injunction

3   is entered are real and militate strongly against an injunction against all sales of Adiana.

### D.   The Public Interest Strongly Weighs Against An Injunction Taking Adiana Off The Market

5       The threat of real hardships to the public also weighs against entry of an injunction.  As

6   Conceptus recognizes, banning Adiana from the market would leave patients with Essure as the only

7   option for non-surgical, permanent birth control.  (Dkt. No. 498 at 17.)  As a result, doctors and

8   patients would be deprived of the unique features and benefits offered by Adiana.  This elimination of

9   medical choices for doctors and patients, described in detail below, is precisely the sort of public

10  interest factor that courts have cited in denying requests for permanent injunctions.  *See Bard*

11  *Peripheral*, 2009 U.S. Dist. LEXIS 31328 at * 30 (finding that public benefits available from

12  infringing product could not be duplicated with other products on the market); *Advanced*

13  *Cardiovascular*, 2008 WL 4647384 at * 11 (finding a "negative market effect" regarding the public

14  interest if infringing product is taken off the market "as the market will be reduced to only one

15  available [] medical device"); *Cordis Corp. v. Boston Scientific Corp.*, No. 03-027-SLR, 2003 WL

16  22843072, at *2 (D. Del. Nov. 21, 2003) (denying injunction and stating that there is an "obvious

17  concern of depriving the public of the best and safest medical devices by limiting competition").

### 1.   Adiana Offers Important Advantages Over Essure To Women And Physicians

20      As explained by the supporting declarations of Drs. Anderson, Dominicis and Mellinger,

21  Adiana offers an important choice to women who will not, or cannot, use Essure.  (Anderson Decl. ¶¶

22  9; *see also id*. at 9-17; Dominicis Decl. ¶ 11; Mellinger Decl. ¶¶ 9-11, 14.)  The Essure coils are made

23  of a nickel-titanium alloy, and each coil is more than 10 times longer than Adiana.  (Anderson Decl. ¶¶

24  10, 12.)  As a consequence, the metal coil trails into the patient's uterus.  (*Id.* ¶ 10.)  In contrast,

25  Adiana is made of silicone (a non-metal), is only 3.5 mm in length and, once deposited into the

26  fallopian tubes, leaves no trailing components into the uterine cavity.  (*Id.* ¶¶ 11, 14.)

27      There are many women interested in hysteroscopic sterilization who will not, and in some

28  instances *cannot*, select Essure.  (Anderson Decl. ¶ 19; Dominicis Decl. ¶¶ 6, 9; Mellinger Decl. ¶¶ 9-

11.)  Drs. Anderson, Dominicis and Mellinger (who practice in different regions of the country) have all met women who want hysteroscopic sterilization but who do not want Essure's longer metallic coils placed in their fallopian tubes.  (Anderson Decl. ¶ 19; Dominicis Decl. ¶ 6; Mellinger Decl. ¶¶ 11, 14.)  Their experience in this regard was confirmed by testimony from Conceptus' own witnesses at trial.  (Tr. 699:23-701:24, 702:12-703:16; Tr. 1214:10-18, 1215:6-16; *see also* TX 641, TX 635; Zogg Decl., Ex. 2 at 76:7-15, 78:19-25, 79:19-21, 90:24-91:1.)  Case law establishes that providing medical options to patients is an important factor militating against an injunction of the sale of a medical device.  *Bionx Implants, Inc. v. Innovasive Devices, Inc.*, 45 F. Supp. 2d 75, 79 (D. Mass. 1999) ("Patients who need the kind of help that [two competing devices] provide, clearly have an interest in having access to whichever device would serve them better.  Since [the court] is in no position to say [which] will serve all of the patients better [], I can only suppose that the public interest overall will be better served by leaving the medical community to sort out which device is better under which circumstances.").

Equally important is the evidence that there are clinical reasons for physicians to use Adiana over Essure.  Dr. Amy Brenner testified that, while she prefers Essure, there are specific problems that she has encountered with Essure (*e.g.*, previously unsuccessful Essure procedures, including an expulsion and a perforation) that have led her to use Adiana with certain patients.[7]  (Zogg Decl., Ex. 2 at 40:4-14, 40:16-41:3, 41:15-19, 69:21-70:10, 76:7-77:5.)  Similarly, Drs. Anderson, Dominicis and Mellinger have witnessed perforations caused by Essure procedures.  (Anderson Decl. ¶ 13; Dominicis Decl. ¶ 8; Mellinger Decl. ¶¶ 8-9.)  Dr. Anderson provided a photograph of one such perforation:



---

[7] Conceptus dismisses concerns about perforations and expulsion, claiming that "[t]he only testimony at trial about the rate of perforations and expulsions with either Essure or Adiana came from Ms. Elsten," who testified as to a 0.18 percent perforation rate with Essure.  (Dkt. No. 498 at 16.)  This representation ignores the testimony of Dr. Brenner, which was played to the jury via video at trial.

1   (Anderson Decl. ¶ 13 & Ex. 4.)  There is no similar attendant risk with Adiana, leading certain

2   physicians and patients to prefer Adiana.  (*Id.* ¶ 14; Dominicis Decl. ¶¶ 5, 8; Mellinger Decl. ¶¶ 9, 14.)

3       Dr. Anderson also explained that a number of women have suffered persistent pain after

4   placement of Essure coils.  (Anderson Decl. ¶¶ 13, 16; *see also* Dominicis Decl. ¶ 7.)  Based upon a

5   survey of cases performed at Vanderbilt University, 11.8% of the Essure procedures resulted in post-

6   operative pain.  1.68% of these cases required surgical intervention.  (Anderson Decl. ¶ 15 & Ex. 5

7   TA000041-52 (presentation describing risk factors for pain after hysteroscopic sterilization).)  Dr.

8   Anderson has personally witnessed approximately 4 cases at Vanderbilt University where the Essure

9   coils were removed post-placement due to pain.  (*Id.* ¶ 16; *see also id.* ¶ 13.)  For these reasons, just as

10  patients should be allowed to continue use Adiana, doctors should be allowed to continue to offer it as

11  an option.  *Advanced Cardiovascular Sys., Inc.*, 579 F. Supp. 2d at 561 (recognizing strong public

12  interest in maintaining diversity in market and certain physicians' preference for the defendant's stent);

13  *Datascope Corp. v. Kontron, Inc.*, 786 F.2d 398, 401 (Fed. Cir. 1986) (affirming denial of injunction

14  and recognizing "the public will be harmed by an injunction in that some physicians prefer defendant's

15  [medical device]."); *Am. Cyanamid Co. v. U.S. Surgical Corp.*, 833 F. Supp. 92 (D. Conn. 1992) (harm

16  to public when some physicians preferred accused product).

### 2.   Conceptus' Assertions As To The Availability Of Alternate Form Of Birth Control Contradict Its Arguments At Trial

19      Throughout trial, Conceptus stressed the benefits of hysteroscopic sterilization over tubal

20  ligation and temporary methods of birth control.  (*See* Tr. 148:10-25, 472:20-475:13, 764:4-23,

21  768:20-769:6.)  Specifically, Conceptus' witnesses testified as to the risks of tubal ligation (*e.g.,*

22  potential injury and even death and long recovery periods) and the disadvantages of temporary birth

23  control methods (*e.g.,* high user non-compliance).  Now, in its desire to obtain an injunction,

24  Conceptus argues that women who cannot or will not use Essure should be forced to use these other

25  forms of birth control rather than be permitted the choice of Adiana.  Clearly, the public health would

26  be served by providing women with the safest and most effective methods of birth control.  Adiana is a

27  safer procedure than tubal ligation because it avoids the potential risks and long recovery period

28  associated with a surgical procedure.  (Anderson Decl. ¶ 20; Dominici Decl. ¶ 12.)  In addition,

1   because it does not rely upon user compliance for efficacy, it is more effective in practice than

2   temporary methods of birth control such as oral contraceptives and condoms.  (Anderson Decl. ¶ 21;

3   Dominicis Decl. ¶ 10; TX 9 at IFU-8.)  Even Dr. Brenner (who testified as a fact witness despite her

4   ties to Conceptus) demonstrated her preference for Adiana when she is unable to perform Essure.

5   (Zogg Decl., Ex. 2 at 41:16-19.)  Thus, Adiana should continue to be available for women who cannot

6   use, or choose not to use, Essure.

7   **III.   ALTERNATIVELY, THE COURT SHOULD STAY THE INJUNCTION**

8          In the event that the Court is inclined to enter a permanent injunction, Hologic respectfully

9   requests that the Court stay the injunction pending appeal of this matter.  Federal Rule of Civil

10  Procedure 62(c) authorizes a court to stay an injunction pending a Federal Circuit appeal.  *See* Fed. R.

11  Civ. P. 62(c).  In making this determination, courts look to following four factors:  (1) whether the stay

12  applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant

13  will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure the

14  other parties interested in the proceeding; and (4) where the public interest lies.  *See In re Hayes*

15  *Microcomputer Prods., Inc. Patent Litig.*, 766 F.Supp. 818, 822-23 (N.D. Cal. 1991) (citation omitted).

16  For the reasons set forth in the discussion of the "irreparable harm" issue in the context of the

17  injunction inquiry, Conceptus will not be substantially injured if any injunction is stayed for the period

18  of the appeal.  (*See supra* Part II.A.)  And for the reasons set forth in the discussion of the "public

19  interest" inquiry, that factor militates in favor of a stay just as it militates in favor of denying injunctive

20  relief entirely.  (*See supra* Part II.D.)  The remaining two factors – likelihood of success on appeal and

21  harm to the movant absent a stay – also weigh strongly in favor of a stay of any injunction.[8]

22

23  [8] Courts need not accord these factors equal weight.  *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512-13 (Fed.Cir.1990).  Instead, the Federal Circuit has instructed courts to use a "sliding scale approach" such that when "harm to the applicant is great enough, a court will not require

24  a 'strong showing' that the applicant is likely to succeed on the merits."  *Id.* at 512 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835

25  F.2d 277, 278 (Fed. Cir. 1987) (granting stay and explaining that whether to grant a stay pending appeal, a court "assesses the movant's chances of success on the merits and weighs the equities as they

26  affect the parties and the public."); *cf. Hilton*, 481 U.S. at 778 (to prevail on a stay a *movant must establish a strong likelihood of success on the merits or, failing that, must demonstrate that it has a*

27  *substantial case on the merits and that the harm factors militate in its favor*) (emphasis added).  Here, there is both a strong showing that, in the event that the Court denies Hologic's post trial motions,

28  Hologic is likely to prevail on appeal, as well as harm to Hologic should the Court enter an injunction.

**A.     There Is A Likelihood That Hologic Will Succeed On Appeal**

There are, respectfully, a number of issues of law that Hologic will take up on appeal, any one of which would require reversal or vacatur of the jury's verdict.

**1.     Claim Construction**

Most significantly, there are a number of claim construction issues that the Federal Circuit will review *de novo*.  Because of the *de novo* nature of the Federal Circuit's review of claim construction issues, and because of their technical complexity, courts have concluded that the presence of claim construction disputes on appeal factors in favor of a stay of any injunction.  For example, in *Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 2004 WL 3507329, at *12 (N.D.N.Y. 2004), the court noted its own difficulty in attempting to construe the critical claim terms and noted also the Federal Circuit's reversal rate particularly for issues of claim construction:

> Gauging Cargill's likelihood of success on appeal, the first of the factors to be considered, is somewhat difficult in this case.  On the one hand the jury's verdict, which followed five days of deliberation, appears well reasoned, and its determinations on the various issues relating to the patent infringement claims are both internally consistent and adequately supported by the evidence in the record.  By the same token, I am mindful of the sheer number and complexity of the legal and factual issues which have been presented with regard to those claims, *as well as the difficulty experienced by me when attempting to construe the claims of the '793 patent and discern the intended meaning of certain of the patent's critical claim terms.  I am also cognizant of the Federal Circuit's unusually high rate of reversal, particularly when engaged in de novo review of claim construction.  Thus, while remaining confident of my rulings and the jury's verdict, I assess this factor as weighing in Cargill's favor.*

*Id.* at *12 (citation omitted) (emphasis added); *see also Lisle Corp. v. A.J. Mfg. Co.,* No. 02 C 7024, 2004 U.S. Dist. LEXIS 6024, at *13 (N.D.Ill. Apr. 6, 2004) ("If the Federal Circuit reaches a different conclusion on how the claims of the patent in suit should be constructed, the resulting determination of infringement would be in doubt.  Given the professed difficulties that this Court had in arriving at its claim construction, the Defendants have a fair likelihood of success on the merits of an appeal of the claim construction ruling.").

Here, as the Court itself has noted, the asserted claims are far from a model of clarity.  Largely because of this, there are several claim construction rulings that Hologic will likely seek to have reviewed by the Federal Circuit.  If the court of appeals agrees with Hologic's position as to any one of them, the jury's verdict of infringement will be reversed and the case remanded (or, to the extent there is no remaining fact dispute, judgment will be entered in Hologic's favor).

### a.   "lumen-traversing region of the resilient structure"

During claim construction, both sides agreed that the "lumen-traversing region" of claimed "resilient structure" must cross the fallopian tube.  However, they disagreed as to whether it must cross at least a substantial portion of the length (as Hologic contended) or the width (as Conceptus contended).  The Court noted the "tricky" wording of "lumen-traversing region," the fact that the patent diagrams and legend supported Hologic's contention that the lumen-traversing region crossed at least part of the length of the fallopian (*i.e.,* left to right on Fig. 1), and the possible multiple meanings of "lumen traversing region."  Specifically, in response to Conceptus' argument, the Court stated:

> It doesn't have to [cross] the full diameter, because lumen-traversing region is shown in your own diagrams as going left to right as opposed to diameter. . . .   Why didn't your [sic] people use plain wording?  Why did they have to use this tricky language "lumen traversing," and have it have multiple meanings? . . . . Well, it does have multiple meanings.  Go back to where they define 24 [designated as "lumen-traversing region"] right there.  They define that as the lumen-traversing region, which is left to right. . . . I feel like your inventor made it very hard for ordinary mortals.

(Dkt. No. 217 at 103-105.)  Ultimately, the Court rejected the constructions of both parties and construed the term to mean the "region of the resilient structure that interacts with the wall of the fallopian tube lumen to permanently affix the resilient structure within the fallopian tube lumen." (Dkt. No. 189 at 17.)  Hologic continues to believe, however, that "lumen-traversing region" means a region of the resilient structure that must cross at least a substantial portion of the length of the fallopian tube.  This construction is consistent with the figures of the patent and the specification's description of the "lumen-traversing region" of those figures.  (*See* TX 38 at Figs. 1, 6, col. 9:9-20, 10:14-25.)  If the Federal Circuit agrees, the jury's verdict will necessarily be reversed.[9]

### b.   "permanently affixing . . . *with* a lumen-traversing region

Another claim construction dispute that will figure in Hologic's appeal pertains to the phrase "permanently affixing . . . *with* a lumen-traversing region" and, in particular, what "with" means in this

---

[9] While the Court determined that Hologic's position was inconsistent with certain statements elsewhere in the specification, there is no requirement that a term such as "lumen-traversing region" that is used only in certain claims and certain embodiments be strained to be interpreted consistently with all embodiments including ones that make no mention of the term.  *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383 (Fed. Cir. 2008) ( "It is often the case that different claims are directed to and cover different disclosed embodiments").

phrase. Late in the case, Conceptus offered a new gloss on "permanently affixing . . . *with* a lumen-traversing region," claiming that "*with*" means *where* permanent affixation occurs, not *how* it is accomplished. In response, Hologic pointed to intrinsic evidence indicating that "the lumen-traversing region" is the actual means by with permanent affixation occurs, not merely the site of affixation. (*See, e.g.*, Dkt. Nos. 389, 422.) After trial had begun, the Court adopted Conceptus' construction.

Nonetheless, Hologic continues to strongly disagree with any construction of "permanently affixing . . . *with* a lumen-traversing region" that would allow the "lumen traversing region" to function merely as the site (not the means) of affixation. Such a construction is inconsistent with the language of claim 36, from which claims 37 and 38 depend. In full, the claim limitation recites "permanently affixing the resilient structure within the fallopian tube *with* a lumen-traversing region of the resilient structure." When "with" is replaced with "to" the claim language becomes nonsensical, requiring permanently affixing the resilient structure to a region of itself – *i.e.,* "permanently affixing the resilient structure within the fallopian tube *[to]* a lumen-traversing region of the resilient structure." The language of independent claim 36 (as well as the other intrinsic evidence) strongly suggests that "the lumen-traversing region" is the means by with permanent affixation occurs, not the location of affixation. Again, if the Federal Circuit agrees, the jury's verdict will be reversed.

> **c.      Whether claim 36 requires a contraceptive method during performance of each of its limitations**

During summary judgment, the parties disputed whether claim 36 requires a contraceptive method while "at least a portion of the fallopian tube is open." Specifically, claim 36 recites:

> ***An intrafallopian contraceptive method*** comprising: transcervically introducing a pre-formed resilient structure into a target region of a fallopian tube; imposing an anchoring force against a tubal wall of the fallopian tube by resiliently engaging an inner surface of the tubal wall with the resilient structure; and permanently affixing the resilient structure within the fallopian tube with a lumen-traversing region of the resilient structure ***so that at least a portion of the fallopian tube is open.***

(TX 38.) Hologic argued that the claim language required that the method be contraceptive while "at least a portion of the fallopian tube is open." In support of this position, Hologic pointed not only to the clear language in the claim but also to embodiments of the invention disclosed in the specification (such as those using a copper implant) that provided contraception without an occluded (or blocked)

1    lumen.  (Dkt. No. 271 at 10-12.)[10]  Despite the fact that both parties agreed that the preamble was a

2    limitation of the claim, the Court rejected Hologic's argument.  (Dkt. No. 356 at 11.)  Instead, the

3    Court determined, in part based on dependent claims 37 and 38, that "claim 36 does not require

4    provision of any contraception *while* the fallopian tube is open so long, of course, as contraception is

5    the eventual result of the procedure."  (*Id.*)

6           Respectfully, Hologic believes this construction to be erroneous.  To suggest that dependant

7    claims 37 and 38 do not require a "contraceptive method" upon completion of those steps of claim 36

8    ignores the language of the independent claim, and improperly vitiates the requirements of the claim

9    from which they depend.  *See* MPEP 608.01(n) (dependant claim cannot eliminate or alter limitation of

10   independent claim); *Intamin, Ltd. V. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1064, 1067 (C.D.

11   Cal. 2009) (dependant claim invalid because it erases limitation of independent claim); *Pfizer Inc. v.*

12   *Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006) (same); *Michilin Prosperity Co. v.*

13   *Fellowes Mfg. Co.*, 450 F. Supp. 2d 35, 39-41 (D.D.C. 2006).  Once again, if the Federal Circuit

14   agrees, the jury's verdict will be reversed.

15                    **2.    Other Potential Issues On Appeal Also Weigh In Favor Of A Stay**

16          In addition to issues of claim construction, there are other complex legal and factual issues that

17   Hologic will likely take up on appeal.  There is a strong likelihood that a ruling on any one of these

18   issues in Hologic's favor by the Federal Circuit would result in the jury's verdict being overturned.

19                              **a.    Enablement**

20          As set forth in Hologic's motion for judgment as a matter of law ("Rule 50 Motion") (Dkt. No.

21   494), Conceptus successfully argued at trial that the phrase "permanently affixing … *with* a lumen-

22   traversing region" encompasses permanent affixation involving the use of energy.  Having pressed for

23   such admittedly broad scope of the purportedly novel aspect of the claims, Conceptus was under a

24

25   ―――――――――――――――――
     [10] Although the '361 patent specification may recite embodiments that provide contraception only
     upon occlusion, claim 36 need not be construed to encompass all embodiments in the specification.
26   *See Intamin, Ltd. v. Magnetar Tech., Corp.*, 483 F.3d 1328 (Fed. Cir. 2007) ("[T]his court has
     acknowledged that a claim need not cover all embodiments.").  Indeed, in contrast to the vast majority
27   of other claims in the '361 patent, claim 36 was drafted specifically to recite a contraceptive method,
     where one of the limitations required an open lumen.  *See Helmsderfer*, 527 F.3d at 1383 (different
28   claims are often directed to and cover different disclosed embodiments).

1    statutory obligation to demonstrate its enablement.  Yet, as Conceptus itself admits, the '361 patent

2    provides no more than a "suggestion[] about ways that one could use … energy … to slightly injure the

3    tube and provoke this tissue ingrowth response."  (Tr. 154:7-10.)  In order to overcome this deficiency,

4    Conceptus mischaracterized the enablement standard in its arguments to the jury.  Under the proper

5    standard, based solely on to the testimony of Conceptus' own witnesses (most notably, its expert Dr.

6    Webster), no reasonable finder of fact could conclude that the '361 patent's specification would have

7    enabled one of ordinary skill in the art to permanently affix a device through use of energy without

8    undue experimentation.  (*See* Dkt. No. 495.)

9                              **b.    Indirect Infringement**

10           As also set forth in Hologic's Rule 50 Motion, the Supreme Court's *Global-Tech* decision

11   makes clear that there can be no liability for indirect infringement unless the patentee proves that the

12   accused infringer ***knows that the accused method is both patented and infringing***.  (Dkt. No. 494.)

13   There was simply no evidence in the trial record to suggest, even circumstantially, that Hologic

14   believed physicians' use of the Adiana system would infringe claims 37 and 38.  Thus, questions of

15   indirect infringement should have been resolved in Hologic's favor.  The jury, however, was likely led

16   astray by Conceptus' closing argument in which it urged the jury to apply outdated law with a lesser

17   scienter component, thereby eviscerating the knowledge requirement set forth in *Global-Tech*.

18                 **c.    Hologic's Daubert Challenge To Conceptus' Technical Expert**

19           As set forth in Hologic's motion for a new trial (Dkt. No. 495), Hologic moved *in limine* to

20   exclude Dr. Glasser from testifying that use of the accused Adiana system meets independent claim

21   36's requirement of "permanently affixing . . . so that at least a portion of the fallopian tube is open"

22   because his opinion equating the commencement of tissue ingrowth with permanent affixation was not

23   supported by any of the admissibility factors of *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579,

24   499 (1993).  In successfully opposing Hologic's motion, Conceptus advanced two primary arguments:

25   (1) the opinion was purportedly based upon Hologic's own documents; and (2) it was based upon "peer

26   reviewed articles."  (Dkt. No. 385 at 3-5; *see also* Tr. 501:20-502:4 (confirming same basis).)  At trial,

27   however, Conceptus failed to back up either of these claims or support Dr. Glasser's opinion.  Dr.

28   Glasser also conceded during cross-examination that he did not know the standard for determining

1 when permanent affixation occurs, appearing to conflate the "permanently affixing" requirement of

2 claim 36 with the lesser requirement of mere affixation found in other claims. (Tr. 617:18-23, 621:15-

3 18, 632:25-634:11, 636:9-20; *see also* TX 38 at claim 9.)

4 **B.    Hologic Will Be Harmed Absent A Stay**

5         As explained above in Part II.C., Hologic will be harmed in the event that an injunction is

6 entered prior to its appeal. Specifically, Hologic faces damages to its commercial relationships ▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Petrovic Decl. ¶¶ 11-12, 15.) In addition, significant

8 expenditures would be required to ramp back up the business in the event that an injunction is entered

9 and then ultimately vacated after a successful appeal. (*Id.* ¶ 16.)

10        This potential harm should be given even *more weight in the context of a request for a stay*.

11 The court's decision in *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, No. 2007-cv-229, 2009

12 WL 679602, at *4 (W.D. Wis. Mar. 16, 2009) is highly instructive. ▮▮▮▮▮▮▮▮ the defendant in that

13 case pointed to evidence that employees' jobs would be lost if an injunction went into effect, as well as

14 evidence of likely damage to its commercial relationships:

15        In support of its motion, defendant cites the affidavit of its director of product management, who
16        avers that many employees are devoted to the Matrix X router, including engineers, technicians,
          marketers and sales associates; *these jobs will disappear if the injunction issues; and the*
17        *absence of the Matrix X will make it harder to market its other products and maintain*
          *customer relationships*.

18 *Id.* (emphasis added). In addressing whether a stay was appropriate, the court noted that, "[a]lthough

19 there is some overlap in the questions whether a plaintiff is entitled to a permanent injunction and

20 whether the defendant should receive a stay of the injunction on appeal, the two questions obviously

21 arise at different stages of the case and require different analyses." *Id.* In particular, the court

22 emphasized that the harm to the defendant was even more important in the context of the stay inquiry.

23 *Id.* Pointing to the harms identified by the defendant, the court thus granted its motion to stay:

24        *The harms defendant describes are of the type that could leave a significant impact on its*
          *business even if it prevails on appeal. Although I disagree with defendant's challenges to the*
25        *jury's verdict, the court of appeals may see things differently. Accordingly, I will grant*
          *defendant's motion for a stay of the injunction pending appeal.*
26

27 *Id.* (emphasis added). For similar reasons, even if it concludes a permanent injunction is warranted,

28 this Court should grant a stay of any such injunction pending Hologic's appeal.

## IV.    CONCEPTUS IS NOT ENTITLED TO THE SUPPLEMENTAL DAMAGES AND INTEREST IT REQUESTS

### A.    Conceptus Cannot Recover Pre-Verdict Supplemental Damages

Conceptus' attempt to recover supplemental damages for Adiana sales made between July 1, 2011 and October 17, 2011 (Dkt. No. 498 at 18-19) is improper for two reasons.  First, because "[t]he jury is presumed to have compensated [the plaintiff] for all of its lost profits leading up to the trial," awarding supplemental damages for that time period would improperly invade the jury's province under 35 U.S.C. § 284.  *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV0335, 2010 WL 3070370, at *2 n. 1 (S.D. Cal. Aug. 5, 2010) (refusing to award supplemental damages for two-month time period leading up to trial because plaintiff could have, but did not, argue to the jury that its damages should be proportionally increased for the months not accounted for in the sales data); *Oscar Mayer Foods Corp. v. Conagra, Inc.*, 869 F. Supp. 656, 668 (W.D. Wis. 1994) (refusing to supplement pre-verdict damages for which plaintiff offered no evidence of lost profits, stating that it would be "an improper invasion of the jury's province to determine actual damages").

Second, Conceptus' failure to obtain the damages it now seeks is due in large part to its own omission.  Conceptus supplemented its damages report once in mid-August, 2011 to account for sales figures through June 2011.  It did not seek to supplement again prior to trial, nor did it attempt to project future damages for any sales occurring between July 1, 2011 and October 17, 2011.  *See* Guidelines For Trial And Final Pretrial Conference In Civil Jury Cases Before The Honorable William Alsup, at ¶ 18 (the cut-off date for past damages is as of the expert report, which may be supplemented by stipulation of the parties).  Conceptus should not be permitted to cure these deficiencies now.

### B.    Conceptus Cannot Recover More Than $418.79 Per Adiana Sale

Even if supplemental damages were permissible in these circumstances, the damages sought by Conceptus are not supportable.  Indeed, the supplemental damages sought by Conceptus for the time period between October 18, 2011 and resolution of its injunction motion is ***double*** the amount that Conceptus is arguably entitled to recover.  Conceptus seeks $837.58 for *every* Adiana sale (*i.e.*, each unit of product, which is one catheter containing one matrix) (Dkt. No. 498 at 18-19), which equates to an effective royalty rate of 130%.  (Zogg Decl., Ex. 3 at 1.)  The jury's verdict, however, equates to an

1   effective royalty rate of only 66%.  (*Id.*)[11]  Thus, Conceptus' request for supplemental lost profits must

2   be halved, from $837.58 to $418.79 per Adiana sale, in order to conform to the jury's award.  *See*

3   *Bendix Comm. Vehicle, Sys., LLC v. Haldex Brake Prods. Corp.*, No. 1:09 CV 176, 2011 WL 780782,

4   *1 (N.D. Ohio Mar. 1, 2011) (supplemental compensatory damages should be calculated consistent

5   with jury's damages award, which equates to a 10.29% royalty); *Presidio*, 2010 WL 3070370 at *2

6   (awarding supplemental damages based upon the ratio of damages awarded by jury to defendant's

7   sales during the damages period); *Oscar Mayer*, 869 F. Supp. at 668 (awarding supplemental damages

8   at the ratio of damages to sales determined from the jury's verdict).  In addition, Conceptus is entitled

9   to supplemental damages on no more than 805 Adiana units for October 2011.[12]

10      **C.      Conceptus' Request For Pre-Judgment Interest Is Excessive**

11          The district court has discretion to determine the appropriate amount of pre-judgment interest,

12   *Datascope v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed. Cir. 1989) (district court has substantial discretion

13   to determine prejudgment interest rate in patent cases), which in this case should be set at the Treasury

14   Bill ("T-Bill") rate.  Contrary to Conceptus' suggestion, the determination of pre-judgment interest is

15   not unique to patent cases, and there is no rule of thumb for awarding interest at the prime rate of

16   interest.  *Go Med. Indus., Ltd. v. Inmed Corp.*, 472 F.3d 1264, 1272 (Fed. Cir. 2006) (calculation of

17   rate is not unique to patent law); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1563,

18   1580 (Fed. Cir. 1988) ("nor do we intend to establish any rule that prejudgment interest at the prime

19   rate should be awarded as a matter of course in every case"); *cf.* Dkt. No. 498 at 20-21 (implying that

20   the prime rate is the standard in patent cases).  In requesting the prime rate, Conceptus ignores that

21   many courts – including the Northern District of California – have applied the T-Bill rate, and that the

22   Federal Circuit has upheld awards at this lower rate.  *See, e.g., Mars Inc. v. Coin Acceptors, Inc.*, 513

23   _____

24   [11] This result is likely due to Ms. Elsten's failure to account for the fact that Adiana's sales figures are reported on a per unit basis, while Conceptus' Essure sales are reported on a per procedure basis (2

25   Essure implants per box).

     [12] ███████████████████████████ However, as discussed in Part IV.A, Conceptus is not entitled

26   to recover supplemental lost profits for sales made pre-verdict (October 1-17, 2011).  Thus, it may recover supplemental damages for lost sales for only 14 days in October.  Hologic calculated its 14-

27   day sales figure (Zogg Decl., Ex. 3 at 1) by multiplying its total October sales by 14/31.  *See Presidio*, 2010 WL 3070370 at *2 n. 2 (to determine sales through April 13, court subtracted half of the April

28   sales from total amount for April).

1   F.Supp.2d 128, 136 (D.N.J. 2007) (utilizing T-Bill rate, and citing other cases where T-Bill rate has

2   been applied); *Datascope*, 879 F.2d at 829 (affirming district court's interest award, stating that it was

3   unconvinced that the T-Bill rate failed to adequately compensate the patentee); *Intex Plastic Sales Co.*

4   *v. Hall*, No. C-85-2987, 1991 WL 270167, at *5-6 (N.D. Cal. Jul. 10, 1991) (citing *Datascope*)

5   (applying T-Bill rate).

6       Conceptus' only justification for the higher prime rate is its contention that it had more than

7   $18.8 million in outstanding debt.  (Dkt. No. 498 at 22.)  However, Conceptus incurred this debt in

8   February 2007 (Dkt. No. 498-14 ¶ 2), well before Hologic introduced the Adiana system in the United

9   States in July 2009.[13]  Conceptus' borrowing cannot be imputed in any way to damage allegedly

10  resulting from Adiana sales, and thus, does not favor the higher prime interest rate.  *See, e.g., Mars*,

11  513 F. Supp. 2d at 133 (in choosing interest rate, court must determine whether patent holder would

12  have used the money avoid borrowing); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir.

13  1997) (affirming T-Bill rate for pre-judgment interest where patentee failed to show "a causal

14  connection between any borrowing and the loss of the use of the money awarded as a result of

15  [defendant's] infringement"); *see also Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 557

16  (Fed. Cir. 1984) (affirming lower court's award of simple interest and declining to create a rule that

17  pre-judgment interest should always be compounded).

18      Conceptus also requests that any prejudgment interest awarded be compounded annually.  (Dkt.

19  No. 498 at 20.)  Hologic agrees that, if interest is compounded at all, compounding no more frequently

20  than on an annual basis is appropriate.  *Gyromat*, 735 F.2d at 557 (declining to hold that pre-judgment

21  interest must always be compounded).

22      For these reasons, pre-judgment interest should be limited to the T-Bill rate of 0.11% (*see* Part

23  IV.C, *infra*), compounded annually – if at all.

24  _____

25  [13] As described in Part II.A.3, Conceptus has repeatedly issued public statements discussing the
    reasons for its declining sales, and never once has Conceptus attributed its decline to Hologic or
    Adiana.  Conceptus does not even allege – nor could it hope to demonstrate – that it would have

26  avoided the 2007 debt but for the Adiana sales.  Likewise, Conceptus does not and cannot allege that
    the line of credit it negotiated in August 2011 – mere weeks before trial – was required as a result of

27  Adiana sales.  (Dkt. No. 498 at 21.)  Thus, even if Conceptus borrowed at a rate higher than prime, its
    debt has no connection to this litigation, and Conceptus should not receive a windfall in the form of

28  pre-judgment interest at the prime rate.

1          **D.      Conceptus' Request For Post-Judgment Interest Exceeds The Statutory Rate**

2          Finally, Conceptus' request for post-judgment interest is excessive.  Post-judgment interest is

3  recoverable "on any money judgment" and "shall be calculated from the date of the entry of the

4  judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield … *for the*

5  *calendar week preceding[.] the date of the judgment*."  28 U.S.C. § 1961(a).  For the calendar week

6  ending October 14, 2011 (the week before the Court entered judgment in this case), the statutory rate

7  was 0.11%, not the 0.18% interest rate that Conceptus applied in its calculation.  (*Compare* Zogg

8  Decl., Ex. 3 *with* Dkt. No. 498-2 at PJI Ex. 5.1 n.2 (calculating post-judgment interest using the

9  "average of 2011 1-year T-bill rate for January through October found in PJI Exhibit 4.3"); *id*. at PJI

10 Ex. 4.3 )(calculating average 2011 interest as 0.18%).)

11         Not only does Conceptus apply the wrong interest rate – 0.18% versus 0.11% – but it seeks

12 post-judgment interest on the jury's damages award *plus* $717,471 in pre-judgment interest.  (Dkt. No.

13 498-2 at PJI Ex. 5.1 n.2 (calculating daily interest based upon "Damages+Interest").)  Conceptus is not

14 entitled to recover $717,471 in post-judgment interest as described in Part IV.C above, or post-

15 judgment interest on any prejudgment interest awarded by the Court.[14]

16         For these reasons, Conceptus' request for daily interest payments of $94.72 (first year) and

17 $94.90 (second year) must be reduced to $56.65 per day (first year) and $56.71 per day (second year).

18 (*Compare* Dkt. No. 498 at 22 *with* Zogg Decl., Ex. 3 at 2.)

19 **V.      CONCLUSION**

20         For the reasons set forth above, Hologic requests that the Court deny Conceptus' motion for a

21 permanent injunction, or in the alternative stay any injunction pending appeal.  Hologic also requests

22 that the Court deny Conceptus' request for the supplemental damages and interests it seeks.

23

24

25 ────────────────────

[14] Even if Conceptus were entitled to post-judgment interest on the $717,471 of pre-judgment interest
26 it seeks, the daily interest rate would be no more than $58.81 (first year) and $58.87 (second year),
   based upon the 0.11% interest rate.  (Zogg Decl., Ex. 3 at 2.)  In addition, if the Court amends the
27 judgment to allow supplemental damages and/or determines that pre-judgment interest should be
   subject to post-judgment interest, then interest would not begin to accrue until the date of the new
28 judgment.  28 U.S.C. § 1961(a) (interest is calculated from the entry of judgment).

1  Dated:  December 1, 2011                    Respectfully submitted,

2

3                                    By:   /s/ Nicholas H. Lee
                                          Nicholas H. Lee (SBN 259588)

4                                         **ARNOLD & PORTER LLP**

5                                         44th Floor
                                          777 South Figueroa Street
6                                         Los Angeles, CA  90071
                                          Telephone:  (213) 243-4000
7                                         Facsimile:  (213) 243-4199
                                          Email:  nicholas.lee@aporter.com

8                                         *Attorneys for Defendant HOLOGIC, INC.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28